United States Courts
Southern District of Texas
FILED

AUG 1 4 2018

David J. Bradley, Clerk of Court

1 | ALEX G. TSE (CABN 152348)
United States Attorney
2 | BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division
3 | MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
4
150 Almaden Blvd., Suite 900
5 | San Jose, CA 95113
Telephone:    (408) 535-5040
6 | Fax:          (408) 535-5066
Email: michael.pitman@usdoj.gov
7 | Attorneys for United States of America

H18-1279M

8

9   Sealed
Public r' uno ficial staff access
10  t 1 .' n s ' ument are
prohibi ed by court order.

11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

12 | In the Matter of the Search of the Following      )   CASE NO.
Property:                                          )
13                                                     )   APPLICATION TO SEAL WARRANT
Houston, Texas 77056-1417)  AND AFFIDAVIT AND [PROPOSED]
14                                                     )   ORDER
15                                                     )
                                                      )
16

17                        SEALING APPLICATION

18        The United States respectfully requests that this Court enter the proposed Sealing Order set forth

19 | below, requiring that the Clerk of the Court file and maintain under seal the search warrant, the

20 | application for a search warrant, and supporting affidavit and attachments in this matter, as well as this

21 | Application to Seal Search Warrant Documents and Order.

22        As set forth in Internal Revenue Service Special Agent Trista Merz's Search Warrant Affidavit,

23 | filed in support of the application of the search warrant submitted herewith, law enforcement agents are

24 | currently involved in an investigation of the targets identified in Special Agent Merz's affidavit.

25 | Disclosure of the information contained in this affidavit as well as the warrant could jeopardize the

26 | ongoing investigation and could lead to the destruction of evidence.  Nothing in this order shall prevent

27 | the government from providing a copy of said documents to members of law enforcement and the

28 | United States Attorney's office or leaving a copy of the Search Warrant at the premises.

1    Accordingly, the United States respectfully requests that the Application for a Search Warrant,

2   the Search and Seizure Warrant, the Search Warrant Affidavit, and accompanying attachments, and this

3   Application to Seal Warrant Documents and Order, be sealed until further order of the Court.

4                                    Respectfully submitted,

5                                    ALEX G. TSE
                                     United States Attorney
6

7

8                                    _____
                                     MICHAEL G. PITMAN
9                                    Assistant United States Attorney
                                     Tax Division
10

11

12                                   SEALING ORDER

13    Based upon the above Application, and for good cause appearing, the COURT HEREBY

14   ORDERS that the clerk of the Court shall file and maintain under seal, until further order of the Court,

15   the accompanying Application for a Search Warrant and Search Warrant Affidavit (with accompanying

16   attachments), the accompanying Search And Seizure Warrant, and this Application to Seal Search

17   Warrant Documents and Order.  Nothing in this order shall prevent the government from providing a

18   copy of said documents to members of law enforcement and the United States Attorney's office or

19   leaving a copy of the Search Warrant at the premises.

20    IT IS SO ORDERED.

21

22   Dated:  8·14·18                 _____
                                     NANCY K. JOHNSON
23                                   UNITED STATES MAGISTRATE JUDGE
                                            TRUE COPY I CERTIFY
24                                          ATTEST:
                                            DAVID J. BRADLEY, Clerk of Court
25                                          By Kathleen Murphy
                                                            Deputy Clerk
26                                          Sealed
27                                   Public and unofficial staff access
                                     to this document are
28                                   prohibited by court order.

AO 93 (Rev. 11/13) Search and Seizure Warrant

Sealed
Public                 si z access
                 is sent are
             ed by court order.

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Houston, Texas 77056-1417 | )<br>)<br>)   Case No.   **H18 - 1279M**<br>)<br>)<br>) |

**TRUE COPY I CERTIFY**
**ATTEST:**
**DAVID J. BRADLEY, Clerk of Court**
By Kathleen Murphy
Deputy Clerk

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Southern_____ District of _____Texas_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, Description of Premises to be Searched, incorporated into the Affidavit in Support of Application for
Search Warrant.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, Description of Items to be Seized, incorporated into the Affidavit in Support of Search Warrant.

**YOU ARE COMMANDED** to execute this warrant on or before _____August 24, 2018_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____Nancy K. Johnson_____ .
                                                                                                          *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   **8-14-18 @ 9:40am**                        _____
                                                                                          *Judge's signature*

City and state:      Houston, Texas                        Nancy K. Johnson, U.S. Magistrate Judge
                                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: H18-1279M | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
## Location to be Searched

    1.    A single residence located at                , Houston, Texas 77056-1417, in the Southern District of Texas, occupied by Carlos Kepke, and used by Kepke as law office.  More particularly described as a red brick two story town home with the address "149" just to the right of the front door.

**ATTACHMENT B**
**Items to be seized**

1.      Any record, paper, document, correspondence, mail item/parcel, folder, index card, ledger, notebook, booklet, journal, or any electronic/digital/computerized form of such records that relates to the ownership, formation, creation, maintenance, management, opening and management of financial accounts, distribution of income and profits, investment in, accounting for, or federal and state tax return preparation, relating to the time period from 1992 to the present for:

a.      Robert Smith;

b.      Flash Holdings, LLC;

c.      Flash Property Management, LLC;

d.      Excelsior Trust;

e.      Vista Equity Partners;

f.      Vista Management Ltd.

g.      Vista Equity funds;

h.      Vista Equity Fund II LP;

i.      Vista Equity Partners Fund III LP;

j.      Vista Equity Partners Fund IV LP;

k.      Vista Foundation Fund I LP;

l.      Robert Brockman;

m.      Evatt Tamine;

n.      Trevor Lloyd;

o.    Donald Jones, also known as Don Jones;

p.    Spanish Steps;

q.    Point Investments, LLC;

r.    Roy Whitley;

s.    Ron Whitley; and

t.    Enrique Gasca.

2.    Any documentary evidence, records, correspondence, and/or digital evidence indicating that the following entities were created, maintained, and/or managed for the purpose of concealing income and/or assets taxable in the United States from the United States Internal Revenue Service for the tax years 1992 through the present:

a.    Excelsior Trust;

b.    Flash Holdings, LLC;

c.    Vista Management Ltd.

d.    Flash Property Holding, LLC;

e.    Flash Property Management, LLC;

f.    White Mulberry SARL;

g.    Mountain Air Recovery Trust;

h.    Boulder River Ranch Recovery Settlement;

i.    SCI Thisbe;

j.    SCI Pyramus;

k.    Universal Computer Systems;

l.    Universal Computer Systems Holdings;

m.  Dealer Computer Services;

n.  DCS Risk Management, Ltd.;

o.  Reynolds and Reynolds;

p.  Spanish Steps Holdings, Ltd.

q.  Spanish Steps LLC;

r.  Point Investments, Ltd.;

s.  Point Investments LLC;

t.  The Point Purpose Trust;

u.  A Eugene Brockman Charitable Trust;

v.  A. Eugene Brockman Children's Trust;

w.  Massengill Children's Trust;

x.  Massengill Grandchildren's Trust;

y.  Louise C. Massengill Family Trust;

z.  St John's Trust Company;

aa.  Cabot Global Investment, Ltd.;

bb.  The Outdoor Rehabilitation Trust;

cc.  Waterford Charitable Trust;

dd.  Cabarita PTC Limited;

ee.  Addington Trading LLC;

ff.  Cascade Holdings LLC;

gg.  Edge Capital Investments, Ltd.;

hh.  Harrison Capital Investments;

      ii.     Kiama Management LLC;

      jj.     Legend Investments LLC;

      kk.    Pilot Management, Ltd.

      ll.     Regency Management, Ltd.

      mm.  Tangarra Consultants Limited; and

      nn.    Wedge Consulting, Ltd.

3.     Any record, paper, document, correspondence, mail item/parcel, folder, index card, ledger, notebook, booklet, journal, or any electronic/digital/computerized form of such records, that relates to the ownership, formation, creation, maintenance, management, opening and management of financial accounts, distribution of income and profits, investment in, accounting for, or preparation and presentation of federal and state tax returns, relating to the time period from 1992 to the present for:

      a.  Carlos E. Kepke;

      b.  The Robert E. Kepke Trust;

      c.  Westford Financial Corporation;

      d.  Vex Tex; and

      e.  Lion Securities.

4.     Any records, documentary evidence, correspondence, and/or digital evidence indicating that the following entities were created, maintained, and managed for the purpose of concealing income and assets taxable in the United States from the United States Internal Revenue Service for the tax years 1995 through 2017:

      a.  The Robert E. Kepke Trust;

      b.  Westford Financial Corporation;

      c.  Vex Tex; and

      d.  Lion Securities

5.     Carlos E. Kepke's client list of his legal practice operating out of his home at _____ , Houston, Texas 77056-1417, in the Southern District of Texas, in any form, paper or digital, to include past and former clients from 1992 to the present.

6.     Such records pertaining to the individuals and entities listed in paragraphs 1 through 4 above to include:

      a.  Correspondence, business plans, financial projections, financial models, proposals, memoranda, quotes, estimates, bids, deeds, titles, trust indentures, partnership agreements, articles of incorporation, registrations, licenses, appraisals, agreements, contracts, stock certificates, confirmations, receipts, bills of sale, statements, invoices, checks, drafts, vouchers tax forms, work papers, and tax returns;

      b.  Other accounting/business/ financial documents such as balance sheets, profits & loss statements, cash flow statements, audit work papers, deposits and withdrawal tickets, wire transfer records, ATM receipts/memos, account statements, lease agreements; and

      c.  Any other domestic and foreign documents required by federal, state, county, municipal and foreign governmental bodies for the formation, maintained, and management of the described entities and related transactions.

7.     Any electronic or mechanical item or device that could contain the type of records described herein, such as any type of computer or computerized record keeping storage system, such as a personal digital assistant, flash drive, thumb drive, portable hard drive, computer, tablet, smart phone, pager, fax machine, electronic planner, diskette, CD, DVD, Memory stick drive, roll-a-dex, address/phone book, calendar, or diary.

8.     Any passwords, encryption keys, and other access devices that may be necessary to access any computer, computerized record keeping storage system or electronic file.

AO 106 (Rev. 04/10)  Application for a Search Warrant

Sealed
Public and unofficial staff access
to t  s instrument are
pro  'bited by court order.

## UNITED STATES DISTRICT COURT

for the

Southern District of Texas

United States Courts
Southern District of Texas
FILED

AUG  1 4 2018

David J. Bradley, Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

, Houston, Texas 77056-1417

Case No.

H18 - 1279M

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, Description of Premises to be Searched, incorporated into the Affidavit in Support of Application for Search Warrant.

located in the _____ Southern _____ District of _____ Texas _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, Description of Items to be Seized, incorporated into the Affidavit in Support of Search Warrant.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

TRUE COPY I CERTIFY
ATTEST:
DAVID J. BRADLEY, Clerk of Court
By _Kathleen Murphy_
   Deputy Clerk

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to defraud |
| 26 U.S.C. §§ 7201, 7203, 7206 | Tax evasion, failure to file and filing false tax returns |
| 31 U.S.C. §5322 | Failure to file report of offshore accounts |

The application is based on these facts:

See attached Affidavit in Support of Application for Search Warrant with incorporated Attachments A and B.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Trista H. Merz_
*Applicant's signature*

Trista Merz, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  8-14-18

City and state:  Houston, Texas

_Nancy K. Johnson_
*Judge's signature*

Nancy K. Johnson, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Trista Merz, Special Agent with the Department of the Treasury, Internal Revenue Service, Criminal Investigation, Denver Field Office, being duly sworn, depose and say as follows:

## I.   INTRODUCTION

### A.   Agent Background

1.      I am a Special Agent of the Internal Revenue Service - Criminal Investigation (hereinafter "IRS CI") and have been so employed since 2005.  My formal education includes earning my Juris Doctorate degree from the University of Iowa in the year 2000. During my employment, I have conducted and/or assisted in criminal investigations involving tax fraud, money laundering, and other related federal violations. I have been trained in tax and financial investigative techniques at the Federal Law Enforcement Training Center in Glynco, Georgia, which emphasized the enforcement of Title 26 criminal tax offenses and tax related Title 18 and Title 31 offenses. Additionally, I have received training in the preparation for and execution of search warrants.  Through my training and experience, I have become familiar with the types of records businesses typically maintain in the course of their regular activity including ledgers, journals, invoices, receipts, bank documents and correspondence including e-mail.  A large part of my duties as an IRS CI Special Agent involve analyzing these types of records to determine the existence of criminal activity and to find evidence of criminal activity.

2.      In addition to my experience gathered through my employment and education, I have participated in the execution of search warrants for physical and digital records and other evidence, including searches of computers and other digital devices. As a Federal Law Enforcement Officer, I am authorized to execute warrants issued under the authority of the United States.

3.      This affidavit sets forth the information necessary to establish probable cause for the issuance of a search warrant.  It is not intended to include every fact or matter observed by me or known by law enforcement. The statements in this affidavit are based upon my investigation.  The sources of my statements herein include: witness interviews; publicly available records; physical surveillance; consensually monitored conversations between Carlos Kepke and IRS CI undercover agents in 1999 (hereinafter "UCA 1") and 2017 and 2018 (hereinafter "UCA 2" and "UCA 3"); financial records; government records; tax forms and documents filed with the Internal Revenue Service (hereinafter "IRS") and/or the U.S. Department of the Treasury by Robert F. Smith, Robert Brockman, Carlos Kepke and related persons and entities; my personal observations during the course of the investigation; and information conveyed to me by other government regulatory and law enforcement officials.  Where I set forth the statements of others in this affidavit, I set them forth in substance and in part.  When I write that a financial transaction occurred, an e-mail was transmitted, or an event occurred on a specified date, I mean that the transaction occurred, the e-mail was transmitted, or the event occurred on or about the date specified.

**B.**     **Subject Premises and Property to be Seized**

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 26, United States Code Sections 7201 [tax evasion], 7203 [failing to file income tax returns], 7206(1) [making and subscribing false tax returns or other documents], and 7206(2) [aiding and assisting in the preparation and presentation of false tax returns], Title 18, United States Code Section 371 [conspiring to defraud the United States], and Title 31, United States Code Section 5322 [failing to file reports of foreign bank accounts] have been committed by individuals utilizing the tax planning services of Carlos E. Kepke (hereinafter "Kepke"), a lawyer whose practice is located in the Southern District of Texas, and by Kepke himself, with regard to his United States Individual Income Tax Returns, all for the tax years 1995 through 2014.

5.     By this application and pursuant to Federal Rule of Criminal Procedure 41, I seek a warrant to search the office of Carlos E. Kepke, located in his residence at Houston, Texas 77056-1417, in the Southern District of Texas, as more particularly described in Attachment A (hereinafter "**The Kepke Law Office**"). In addition to his office, Kepke maintains a commercial storage rental unit 1034, within the "Public Storage" franchise located at the intersection of Southwest Fwy & Wilcrest, with a street address of 11770 Southwest Fwy., Houston, Texas 77031-3614, in the Southern District of Texas (hereinafter "**The Storage Unit**").

6.      There is probable cause to believe that within **The Kepke Law Office** and

**The Storage Unit**, there is evidence, fruits, and instrumentalities of federal crimes,

including Tax Evasion, Willfully Failing to File Income Tax Returns, Making and

Subscribing False Income Tax Returns or Other Documents, and Aiding and Assisting in

the Preparation and Presentation of False Tax Returns, in violation of Title 26, United

States Code Sections 7201, 7203, 7206(1) and 7206(2), Conspiracy to Defraud the United

States, in violation of Title 18, United States Code Section 371, and Failing to File

Reports of Foreign Bank Accounts, in violation of Title 31, United States Code

Section 5322.

## II.    SUMMARY OF PROBABLE CAUSE

7.      The present investigation is focused on a tax-evasion scheme promoted by

Kepke in which taxable income is moved offshore and circulated through a series of

offshore structures and entities with the intent of concealing it from the IRS, and thereby

evading the assessment and payment of any United States income tax liability associated

therewith.  While their taxable income was kept offshore, the United States taxpayers

surreptitiously maintained dominion and control over said income through intermediaries

and nominees.  Later, and at a time of the taxpayers' choosing, the funds were used by

taxpayers for their personal benefit without any reporting to the IRS.

8.      Pursuant to Title 26, United States Code Section 7701(o), if a United States

taxpayer enters into a transaction, or series of transactions, that does not change their

economic position in a *meaningful way*, and was not entered into for a *substantial non-*

*tax avoidance purpose*, then the transaction(s) can be ignored for federal income tax

purposes.  During the course of this investigation I have accumulated and reviewed

evidence establishing to a probable cause standard that the transactions Kepke arranged

for his clients did not change their economic positions in any meaningful way, and were

not entered into for substantial non-tax avoidance purposes.  In other words, subsequent

to the transactions Kepke arranged, his clients retained complete economic dominion and

control over the income and assets that they purportedly conveyed to foreign trusts and

corporations, thereby remaining taxable on said income under Title 26 of the United

States Code.

       9.     The grand jury is currently investigating several of Kepke's clients who

have used his tax shelter scheme including: Robert F. Smith (hereinafter "Smith"),

founder, Chairman and Chief Executive Officer of Vista Equity Partners (hereinafter

"Vista"); and Robert Brockman (hereinafter "Brockman"), Chairman and Chief

Executive Officer of Reynolds and Reynolds (hereinafter "R&R").

## III.   FACTS ESTABLISHING PROBABLE CAUSE

       10.    This affidavit sets forth facts establishing probable cause for the issuance of

a search warrant for **the Kepke Law Office**, which is located at             , Houston,

Texas 77056-1417, as more particularly described in Attachment A, and **the Storage**

**Unit**, which is located the intersection of Southwest Fwy & Wilcrest, with a street

address of 11770 Southwest Fwy., Houston, Texas 77031-3614.  However, this affidavit

does not include every fact or matter observed by me or known by law enforcement

because it is intended to show only that there is sufficient probable cause for the

requested warrant.

11.     Since in or about 2009 it appears that Kepke's law practice has been located

at his personal residence,                    , Houston, Texas 77056-1417.  On May 24,

2017, UCA 2 met with Kepke at this address in connection with this investigation.  On

February 7, 2018, UCA 3 met with Kepke at this address. In late July 2018, the Texas

Bar website continued to show this address as Kepke's office address.

12.     Based on the undercover agents' meetings and discussions with Kepke,

described in greater detail below, I believe evidence that Kepke assisted clients in

creating, implementing and using foreign trusts and corporations to commit tax evasion,

in violation of Title 26, United States Code Section 7201, and other crimes, will be found

in hard copy format inside **the Kepke Law Office,** as well as in the computer systems

and electronic devices associated with Kepke's law practice.

A.     **Background**

**Initiation of Criminal Investigation**

13.     By letter dated October 19, 2015, the U.S. Department of Justice, Tax

Division, requested that IRS CI review and evaluate material obtained as part of the

Swiss Bank Program,[1] and provide an assessment as to whether the evidence warranted

---

[1]     On August 29, 2013, the Department of Justice Tax Division announced the Swiss Bank
Program which provided a path for Swiss banks to resolve potential criminal liabilities in the
United States. Swiss banks eligible to enter the program were required to advise the department
by December 31, 2013 that they had reason to believe that they had committed tax-related
criminal offenses in connection with undeclared U.S.-related accounts. Banks already under
criminal investigation related to their Swiss-banking activities and all individuals were expressly
excluded from the program.

        Under the program, banks were required to: (1) make a complete disclosure of their
cross-border activities; (2) provide detailed information on an account-by-account basis for
accounts in which U.S. taxpayers have a direct or indirect interest; (3) cooperate in treaty
requests for account information; provide detailed information as to other banks that transferred

IRS CI's involvement in a federal grand jury investigation.[2]  As part of its participation in the Swiss Bank Program, Banque Bonhôte & Cie, SA (hereinafter "Banque Bonhôte"), provided materials disclosing that Smith and his now former wife, Suzanne J. McFayden Smith, held two bank accounts at Banque Bonhôte.  However, as more fully set forth in this affidavit, Smith was the beneficial owner and/or signatory, of at least eight additional bank accounts at Banque Bonhôte.  Evidence accumulated in this investigation indicates that these bank accounts at Banque Bonhôte, and others, were used by Smith to conceal taxable income from the IRS.

14.     On March 31, 2016, IRS CI reported its concurrence with the Tax Division's assessment, and recommended that the Tax Division authorize a grand jury investigation of Smith for potential Title 26 and Title 26-related violations for the years 2010 through 2013. The Tax Division authorized the grand jury investigation on May 17, 2016. Through this investigation, as more fully set forth in this affidavit, it was discovered that Kepke assisted Smith in setting up offshore structures, including

---

funds into secret accounts or that accepted funds when secret accounts were closed; (4) agree to close accounts of accountholders who fail to come into compliance with U.S. reporting obligations; and (5) pay appropriate penalties. Swiss banks meeting all of the above requirements were eligible for a non-prosecution agreement.

[2]      Previously, in October of 2012, the Federal Bureau of Investigation [hereinafter "FBI"] provided IRS CI in Denver, Colorado, information related to Smith. The FBI information consisted of the allegation that Smith caused one of his businesses to pay an individual as an employee of one of Smith's businesses when, in fact, the individual performed purely personal services for Smith.

Separately, in September of 2013, the IRS received a Form 211, Application for Award for Original Information, from a private investigator employed by the divorce attorney for Smith's former wife. The application alleged that Smith had his business pay for, and treat as business-related expenses, the rental of a luxury New York City apartment and living expenses of Smith's then-girlfriend.

Excelsior Trust (hereinafter "Excelsior"),[3] Flash Holdings, LLC (hereinafter "Flash"), and Vista Management Ltd. that Smith used to conceal income and assets from the IRS beginning in 2000 and continuing up to and including December 31, 2014.

#### The Targets

15.    Smith is the founder, Chairman and CEO of Vista Equity Partners, a private equity firm headquartered in San Francisco, California, with more than $31 billion in assets under management. Vista specializes in acquiring mid-sized software companies for the purpose of re-selling them later for a profit. In 2000 Smith established Vista's first fund, Vista Equity Fund II, LP (hereinafter "VEF II"), as a Cayman Islands foreign partnership. VEF II's original name was "Emerging Technologies Investment Fund L.P." Vista subsequently created additional offshore "parallel" funds in which both Smith and Brockman invested. These "parallel funds" mirrored the investment activity of designated domestic Vista funds but were sited in foreign countries.

16.    Brockman is currently the Chairman and CEO of R&R, a company headquartered in Kettering, Ohio, that provides software products to automobile dealerships. In 2006, Universal Computer Systems Holding, Inc. (hereinafter "UCSH"), based in Houston, Texas, acquired R&R. In 2006, Vista provided $50 million in equity financing for UCSH's acquisition of R&R. Brockman is the founder and president of UCSH, whose stock is 95% owned by Spanish Steps Holdings, Ltd., a British Virgin Island based entity (hereinafter "Spanish Steps"). The director of Spanish Steps is an

---

[3]      Kepke sometimes mistakenly refers to Excelsior Trust as Excalibur Trust.

**Affidavit—Page 8 of 84**

individual by the name of Evatt Tamine (hereinafter "Tamine"). As detailed herein, the evidence indicates that Tamine is actually in Brockman's employ and his "go between" with Kepke.

17. Brockman's investments in various offshore Vista funds, including VEF II, Vista Equity Partners Fund III (Parallel), LP (hereinafter "VEPF III), Vista Equity Partners Fund IV (Parallel), LP, and Vista Foundation Fund I (Parallel), LP, were made using a Bermuda entity named Point Investments, Ltd. (hereinafter "Point"). Point was wholly owned by the Nevis entity Point Investments, LLC, which was in turn owned by The Point Purpose Trust, a Bermuda Trust. Tamine is the Director of Point and the trustee of the Point Purpose Trust. Point was registered in Bermuda in 1999, near the time that Smith established VEF II. The Limited Partnership Agreement for VEF II, dated March 30, 2000, indicates that Point initially provided a $300 million capital commitment to the fund. Pursuant to the Second Amendment to Limited Partnership Agreement of Vista Equity Fund II, LLC, effective September 5, 2006, Point increased its capital commitment to $1.0 billion.

18. Kepke is an attorney who maintains his office at his personal residence, , Houston, Texas 77056-1417. His business is known as Carlos E. Kepke, Attorney at Law. Kepke's date of birth is          1939 and his Social Security number is XXX-XX-2964. Kepke has no criminal convictions, and maintains a Texas motor vehicle driver's license, number XXXX2471. The Texas State Bar website indicates that Kepke earned his law degree from the University of Texas in 1964, and was admitted to the State of Texas Bar the same year. The Texas State Bar website lists Kepke's practice

areas as International, Taxation, and Wills-Trusts-Probate.

19.    Kepke's business website, www.kepkelaw.com, states: "The Law Office of Carlos E. Kepke began operations in 1992. It is a boutique law firm engaged in only one practice area - the use of foreign structures for United States ('U.S.') tax savings and/or asset protection." The website further states that KEPKE has been specializing in this area of the law for more than thirty years.

**B.    Previous IRS CI Investigation of Kepke**

20.    Beginning in approximately 1999, IRS-CI conducted an administrative investigation, which included an undercover investigation of Kepke, personally and with respect to his business of establishing foreign tax shelters for clients. That investigation was closed in or about 2002 without a criminal referral being made to the Department of Justice. I have reviewed several drafts of an affidavit prepared in the 1999 investigation by an IRS-CI special agent summarizing the undercover operation prepared in support of a planned search warrant that was never executed. The information set forth below is based upon: my review of that draft affidavit; certain documents contained within the IRS's administrative file for Kepke; discussions with the IRS case agent assigned to this matter; and an interview of UCA 1 who is now retired from the IRS. The recordings of the consensually monitored conversations can no longer be located.

21.    During the 1999 undercover operation, Kepke told UCA 1 that he was a tax lawyer by profession and has been doing offshore work for what he called, "high net worth individuals" since 1975. In addition, Kepke stated that he ran the international division of the law firm of H.L. Hunt in Dallas, Texas. Kepke returned to Houston,

Texas to run his own firm, and now his practice is solely dedicated to helping people to

establish offshore structures.

22.     The 1999 affidavit stated that public records indicated that Kepke was a

keynote speaker at financial seminars hosted by an organization named "Flight to

Equality," and had been a keynote speaker at multiple seminars over a period of several

years. Seminar organizers described Kepke in their literature as one of the most

knowledgeable attorneys in the United States in the field of international taxation and

financial privacy.

23.     The scope of the 1999 IRS CI investigation included Kepke's filed personal

Federal income tax returns for 1995 through 1998, on which Kepke reported his business

income and deductions on Schedules C. Kepke reported no interest, dividends or capital

gains on these income tax returns. Kepke told UCA 1 that he used a foreign trust and

corporation for the past 27 years. Kepke further explained to UCA 1 that he maintained

all of his investments in this foreign structure. No income from, or indication of, these

foreign investments appeared on Kepke's federal income tax returns. According to

UCA 1, Kepke also informed him that the name of his foreign corporation is Vex Tex

and he had used this foreign corporation to invest in a golf course in the Houston, Texas

area. Kepke reported no income from investments made through Vex Tex to the IRS.

24.     As part of the 1999 investigation, IRS-CI interviewed Kepke who admitted

to having two trusts. One trust was a domestic trust that it appeared Kepke included on

his federal income tax returns, and the second was a foreign trust called The Robert E.

Kepke Trust created in either Bermuda or the BVI. According to Kepke, the foreign trust

did not distribute any income. Kepke was the beneficiary of this trust, but he was not a trustee. The Robert E. Kepke Trust owned the foreign corporation, Westford Financial Corporation. According to Kepke, Westford Financial Corporation was a holding company. Westford Financial Corporation was created as either a Bermuda or BVI corporation. Westford Financial Corporation owned the corporations Vex Tex and Lion Securities. The 1999 investigation was unable to obtain any information concerning these foreign corporations from Bermuda or the BVI.

25.     Kepke described himself as an agent and power of attorney for Vex Tex, and reported receiving approximately $3,000 a year for his services. Vex Tex maintained a bank account in Bermuda, but the underlying records could not be obtained from Bermuda.

26.     IRS Examination Division based its 1999 criminal referral of Kepke to IRS CI on money transferred from Vex Tex to Kepke's domestic bank account in 1995 and 1996. Kepke claimed he neither owned nor operated Vex Tex's bank account in Bermuda. Kepke, however, used the proceeds from the Vex Tex bank account to purchase his residence. Kepke's use of the Vex Tex funds was styled as a "loan," with Kepke purportedly required to make loan payments to Vex Tex. It appears, however, that the entire Vex Tex/Kepke transaction was a sham designed to assist Kepke in concealing taxable income in a Vex Tex bank account to evade federal income tax on the same. This manner of concealing income is nearly identical to the methodology Kepke employed for his clients Smith and Brockman.

27.     In or about 1995 Kepke sought relief from debt under Title 11 of the United States Bankruptcy Code.  In his Bankruptcy Petition, Kepke did not report any foreign assets.  Kepke also did not identify any investments held through Vex Tex.  In or about 1995 the Bankruptcy Court granted Kepke relief and discharged approximately $1.5 million of income taxes, interest and penalties Kepke owed to the IRS.

28.     A review of Kepke's 2009 through 2017 federal individual income tax returns reveals that he did not report to the IRS any interest, assets or income in or from any foreign holdings, including trusts, companies or bank accounts.

29.     During the 1999 undercover operation Kepke told UCA 1 the following:

> We are taxed worldwide. If we make money in the United States, we pay taxes. If we make money outside the country, we pay tax because we are American citizens. Our government taxes us on worldwide income. If we were foreigners, we could make money in the United States buying and selling stocks, investing and doing any untold other kinds of stuff, just clipping coupons. As foreigners we would not pay U.S. income tax, moreover if we were foreigners in a country that didn't have an income tax, like let's say the Cayman Islands, we wouldn't pay any income tax, because we wouldn't pay U.S. income tax. We wouldn't pay Cayman Islands either, because there isn't any. So what I do is, I attempt to take wealthy individuals and while I can't make you a foreigner because you are probably not going to give up your citizenship. What I basically try to do is take your wealth and make it a foreigner. Make it owned by a foreigner so that you, so that your wealth, your dollars, enjoy the tax benefits that you would enjoy if you were a foreigner; yet, you keep them. You keep control. They're still yours. They're still yours to use and so on.

30.     According to UCA 1's draft affidavit, Kepke explained to UCA 1 that his program works by using at least one foreign corporation and one foreign trust. A "Creator" first forms the trust. The Creator is either a foreign or American relative of the client. It is more advantageous to have a foreign relative act as the Creator, because then

there are no filing requirements. If an American Creator is utilized, he advised UCA 1 to use an elderly relative. Kepke further explained to UCA 1 that while the American Creator is alive, the trust would have to file a trust form with the Internal Revenue Service. Then, according to Kepke, once the Creator is deceased there are no more filing requirements.

31.     Kepke explained that the person who creates the trust is not going to be involved with the trust after it is formed. The Creator is not even involved in the creation of the trust. The Creator does not meet Kepke, nor does he pay Kepke for any services. Kepke's client, the person who is forming the trust, pays Kepke's fees and is designated as the beneficiary of the trust – not the "Creator."

32.     Kepke further explained that the client, in this situation UCA 1, would be designated as the trust "Protector." Another individual, hired by Kepke and UCA 1, would serve as the "Trustee." The Trustee, on paper, is the legal owner of the assets. However, as the trust Protector, UCA 1 would maintain control over the Trustee, the trust and the trust's assets. The trust Protector makes investment decisions and determines when distributions are to made to the beneficiary(ies).

33.     During the IRS civil examination of Kepke's income tax liabilities for 1995 and 1996 that preceded the criminal referral to IRS CI, Kepke provided client invoices he used to bill 102 clients for legal services during the years 1995 and 1996. The IRS Special Agent handling the 1999 IRS CI investigation identified twenty clients from Kepke's invoices whose filed federal income tax returns for the years 1995, 1996 and 1997 appeared to be compatible with the advice Kepke provided to UCA 1.

Brockman was one of the twenty clients identified.

### C.   Undercover Operation Conducted in 2017 and 2018

34.   In 2017, IRS CI initiated a second undercover operation concerning Kepke as part of a grand jury investigation of the tax shelters Kepke was organizing and selling. The second undercover operation utilized two different undercover agents seeking to protect their assets.  I have reviewed all of the recordings, transcripts and memoranda of the investigation associated with this undercover operation, and the information set forth below is based upon a review of this evidence.

35.   UCA 2 presented himself to Kepke, by e-mail, as an automobile broker based in Pennsylvania with an elderly grandmother who was preparing to leave him a farm in her will.  UCA 2 told Kepke that he wanted to protect this farm from creditors and his future wife.

36.   Kepke told UCA 2 that setting up offshore trusts "is my practice for twenty-five (25), thirty (30) years, that's all I do. I don't do anything else. . . . Never been to court, I'm not one of those kinds of lawyers. I just do this . . . kind of planning."

37.   I have listened to the audio recordings and reviewed the transcripts of UCA 2's telephone calls placed to Kepke.  The following relevant information was obtained from these telephone calls:

       a.   Kepke told UCA 2 that he has high net worth clients whose wives have no idea how much money is offshore;

       b.   Kepke recommended the undercover agent pick a name for his trust like "Excelsior Trust" (the same name as Smith's foreign trust);

      c.      Kepke told UCA 2 "you still are in . . . you, you will not give up control of the trust;" and

      d.      Kepke described the creation of a false $100,000 business deduction for a client. "[H]is U.S. company bought a hundred thousand dollar tax deduction [for a feasibility study].  Which it had to pay for, you know, it paid a hundred thousand but paid it to its offshore company, so he paid himself essentially, if you follow what I mean." Kepke emphasized that his client had to pay a student between $10,000 and $15,000 to conduct an actual feasibility study so that "if they ever audited, uh . . . I mean, if he, if he can't show that here's . . . here is my, you know, two hundred page study or whatever the hell it was he got. [ ] Uh–uh . . . then, you know, it'd – that'd be tax fraud. And he wouldn't do that."

38.    During the 2017 undercover operation, Kepke explained to UCA 2 multiple times how his foreign structure works.  Kepke said that UCA 2 first needed to create a foreign trust and the foreign trust would then create an offshore company and that company would "own" his U.S. assets.  It is done this way in order to keep the assets out of the United States' jurisdiction. Kepke referred to this as "asset protection."

39.    During the 2017 undercover operation, Kepke stated that his "trust to this day is a Bermuda Trust." Kepke informed UCA 2 that:

      I am set up exactly the way you are. I don't . . . I-I hardly own anything, my-my. . . my trust, uh . . . by my dad years ago owns everything and []my

bank account is offshore. But, the only, only reason that . . . I put . . . eh . . .
money in an offshore bank account, that I know of . . . is to, uhm . . . uh . . .
it- . . . if it goes to the asset protection aspect . . . if you got money . . . in-in
an asset protected structure, which you'll have an asset protected structure.

40.     On March 24, 2017, during a telephone conversation with UCA 2, Kepke
stated that he "wouldn't put a trust in Bermuda today for anything because what's-what's
happened with Bermuda is that it's become a sieve to the U.S. Internal Revenue Service
in all -- . . . I mean, they almost just pass freely information about everything." Kepke
went on to state that "far away the best for what I'm doing and including asset protection
is Belize. . . . [The] owner of the assets through a bank account or the brokerage account,
that corporation I typically use is from, is from Nevis."  Beginning in 2000, Smith
utilized a virtually identical structure as Kepke described to UCA 2 to conceal a portion
of his income earned from Vista from the IRS.

41.     On May 24, 2017, UCA 2 met with Kepke at his home.  During that
meeting, Kepke told UCA 2 that he keeps an original copy of each client's trust
documents.  Kepke also told UCA 2 that he has many clients that he has never met in
person, and that some of his clients have hundreds of millions of dollars, and "set up" as
many as ten corporations.  Kepke told UCA 2 that the trust package cost $25,000, which
includes Kepke's fee to set up the foreign trust and corporation.

42.     Kepke described to UCA 2 how he uses third party administrators to assist
in setting up and managing foreign trusts for his clients.  These third parties are located in
other countries like Belize and Nevis.  From the investigation, it appears that Kepke and

his clients use these third parties to create the appearance that the funds placed into these entities, and associated bank accounts, belong to these third parties, when in fact these funds originated with Kepke's clients and are controlled by them.

43.     On or about December 2, 2017 UCA 3 made contact with Kepke expressing interest in purchasing an offshore structure similar to that discussed with UCA 2.  UCA 3 presented himself to Kepke as a friend of UCA 2 who owns a small business that buys and operates bars.  UCA 3 also told Kepke that he had a "nest egg" of money that he wished to protect

44.     In a telephone conversation held on December 4, 2017, Kepke made several statements to UCA 3 about how his foreign tax shelter structure operates.  Kepke assured UCA 3 that although on paper UCA 3 appears that he no longer owns these assets, in Kepke's structure he will maintain full dominion and control over his assets and income. Specifically, Kepke said in part:

  a.     **Kepke:** "you have to understand that legally you no longer own those assets, although they are still yours to deal with.  Uh . . . that's . . . and that's, that in a nutshell is what asset protection planning is." *(tr.p9);* and

  b.     **Kepke:** "But . . . but t-the main thing is – number one, it's protected – number two, you've not let  . . . you – you've lost legal ownership, but you've not lost the ability to control what you wanna do with your money – that is, how you wanna invest it or where you wanna put it or so on." **UCA 3**: "what if  you want it back?" **Kepke**: "Then

you take it out of the trust, end of story." *(tr.p22)*.

45.     Kepke described to UCA 3 how his structure is set up and its tax benefits.
UCA 3 represented to Kepke that his cousin has terminal cancer and might be willing to
act as the "creator" of this trust.  Specifically, Kepke stated in part:

a.     **Kepke:** ". . . if you're a creator [of the trust] you don't have the tax

advantage.  So, what you have to do is you have to sell your assets to

the trust. . . I'll be happy to get into you on that with you if you're

really cons-. . . if you think this is a real possibility.  And it's . . . it's

significantly better, uh . . . because  you -  you – you end up –to

make it your example, two (2) million dollars in the trust – uh – that

is – that earns tax free . . . so let's say you go to stock market and

you buy stocks and you sell 'em.  Normally you pay a capital gains

tax.  You would pay no tax." *(tr.pp28-29)*;

b.     **Kepke:** "What you do is you . . . we create what's known as a

limited partnership . . .you give your money [one million dollars] to

the limited partnership and that is tax free transaction. . . Then, eh - .

. . you sell the limited partnership to the trust, so now the trust owns

the limited partnership, and the limited partnership has a million

dollars in it.  And so, there's a bank account in the name of the - . . .

Robert S. (UNINTELLIGIBLE) . . . Limited Partnership . . . you

sold a million dollars, you get a note back from the trust, for the

million dollars . . you get a note. . ..  So the trust . . . owes you a

million dollars.  If you - . . . if you given it a million dollars and it's given you a million dollar note back and,  you know, that means that - . . . that means that the you're gonna get your million dollars back and its not gonna be in the trust anymore." *(tr.pp34-36);* and

c.   **Kepke:** "He's out of it.  Now, I should . . I should tell you this, the- the- the- creator of the trust, your cousin, uh. . . in addition to having to fund the trust initially, because you can't . . you can't have an unfunded trust in law.  It's not . . it doesn't exist.  You gotta fund it. And the – and the trustees in- in – in that we deal with require a one-time acceptance fee of a trust of about three (3) or four (4,000), and the first year's trustee's fees of about two (2) or three (3) somethin' or so.  I usually say about seventy-five hundred ($7,500) dollars is gonna go into fund the trust for the first year." *(tr.pp41-42).*

46.   Kepke described to UCA 3 the role of the "trustee" of the trust in his structure and how UCA 3 will retain the ability to control his assets and income. Specifically, Kepke stated in part:

a.   **Kepke:** "They'll [Trustee] be happy to come up and see you and they're good people.  I've been doin' business with them for twenty (20) years, more. . . Well, actually, them - . . . you're not trusting them with your money . . . They're not gonna have your money.  Your money is gonna go wherever you want it.  You wanna keep it in the Pennsylvania bank account . . ." *(tr.p47);*

b.    **Kepke:** "So what they require, all trustees require that you create a

corporation . . . that- . . . well, and we create a corporation that is owned

by the trust, and the assets are actually lodged in that corporation, so we

would have the Belize trust that owns an off-shore corporation.  The off-

shore corporation has the million dollars, it's the one that gives the note,

and it's the one's name on the bank account on the - . . . in the

Pennsylvania bank." (*tr.p50);* and

c.    **Kepke:** "You still - . . . you're gonna still control the assets, you're

gonna still - . . .you know, it . . . blah-blah-blah- . . . you're gonna still

have the bank account and everything is, like - . . . the only - . . . the

only way it affects you is if, number one, they're gonna charge you for

the creation of the corporation, they're gonna charge you to . . .to  . . .

every . . . the annual fees to keep it up, which are minimal – four, five

hundred dollars a year, somthin' like that. . . .I'd call it-like Excalibur

Trust, or something like that, you know - . . ." (*tr.pp53-54).*

47.    UCA 3 told Kepke that his cousin may be willing to act as the "creator" of

this trust but that he does not have much money.  In response, Kepke described how

UCA 3 could provide money to his cousin to "create" the trust using a purported

"purchase" of his cousin's furniture, or some other item.  Specifically, Kepke stated in

part:

a.    **Kepke:** "Let's say, and I'll just use an example, let's say that your

cousin has a car or a painting or a piece of furniture or something that

you like. You buy it from him . . and if you don't pay him seventy-five hundred dollars.  You pay him . . .you know, eight-thousand –seven dollars or whatever – not the same amount of money that he's gonna create the trust with, if you follow me. . .  And you buy it and you take it, and you get - . . .I mean you give him a little some- . . .a little- . . . have a written document that shows that you bought it. . .  from him and you take possession, whatever it is. . . Well, and you can't . . . and you can't just give him a gift.  Y-you can't – I'm givin' a g-I'm making you a gift of ten-thousand ($10,000) dollars and then, you know, one week later, seventy-five hundred (7,500) of it is put in a trust.  That-that won't work." (*tr.pp60-61);*

b.      **Kepke:** "Uh, and I charge - . . . and I charge three-thousand ($3,000) dollars to create the foreign corporation that we will need- the corporation that we will need, as I explained earlier . . . And your costs after that are . . . the . . . once you funded it, is the annual trustee fee, which is prob'ly gonna be around three-thousand (3,000), somewhere like that, a  year.  And the upkeep of the corporation which is gonna be somewhere around six (6) or seven-hundred (700) dollars a year.  So your cost is gonna be somewhere in the range of thirty-five hundred (3,500) to forty-five hundred ($4,500) dollars a year for the upkeep of the deal." (*tr.p65*) ; and

   c.  **Kepke:** "But, y-you control my time.  I mean, if you call me and you

       wanna talk about somethin' or you got a idea you want me tell you-

       what-what thinking about buying this ranch or this new business and

       you-you know, and I get involved and giving you advice about how to

       do it with a trust then I'm runnin' the clock on you." (*tr.p66*).

  48.  Based on my training and experience, in the December 4, 2017 phone

conversation between Kepke and UCA 3, Kepke explained to UCA 3 how Kepke's tax

shelter is organized, structured and set-up in such a way to create the appearance that

UCA 3's "relative" was creating a foreign trust for UCA 3, separate and apart from

UCA 3's taxable income and assets.  Kepke explained how much he would charge

UCA 3 for setting up a trust in Belize and a foreign corporation in another country which

would be "owned" by the trust.  The foreign corporation in turn would own, "on paper," a

bank account into which UCA 3 would deposit funds he wished to conceal from the IRS.

Kepke further explained how despite the paperwork, UCA 3 would always retain

dominion and control over his funds.  Finally, Kepke explained to UCA 3 how to create a

fraudulent conveyance to provide a relative the funds necessary to "fund" the Belize trust

by purporting to "purchase" an asset from the relative using a sufficient amount of funds.

The structure described by Kepke to UCA 3 is nearly identical to the entities and

structures Kepke created and organized for Smith and Brockman.

  49.  In a person to person meeting held on February 7, 2018 at The Kepke Law

Office at      , Houston, Texas, Kepke made several statements to UCA 3 about

how his foreign tax shelter structure operates. Also present at this meeting was an

**Affidavit—Page 23 of 84**

individual identified as Emil LNU [Arguelles]. Emil was introduced as an attorney in

Belize who acts as a trustee. Arguelles described to UCA 3 what his role will be in the

Kepke structure. Kepke described the fees needed to form this structure and how to make

it appear as if these fees were being paid by the trust "creator," and not UCA 3.

Specifically, Kepke and Arguelles made, in part, the following statements:

a.   **Emil:** ". . . I worked with Carlos for, over fifteen (15) years . . Arguelles
and Company is my law firm. . . . And Orion is the sister company
simply because that's the licensed trustee provider. In Belize, lawyers
can't advertise" *(tr.p20);*

b.   **Emil:** "Carlos comes in with . . . We – we – we provide the offshore
structure and service. He provides the, uhm . . . domicile US legal
advice and-and-and we work together. We take instructions, largely
from Carlos in respect of the US clientele." *(tr.p21);*

c.   **Kepke**: "That's . . . that would be some – I'm let him tell you his fees
which could be somewhere between seven (7) to ten-thousand (10,000)
– somethin' like that." *(tr.p30);*

d.   **Kepke**: "What I was getting to about the four (4) plus three (3), the
seven-thousand (7,000) . . . That has to come from Tom [UCA 3's
cousin] . . . it can't get . . . I mean, it has to be, uh, evidence by that . . .
by a check or money order or somethin' from Tom. . . . If you give him
the money and he creates a trust then the law says you're the creator and
the deal doesn't work . . . you are not to be the creator.. . . . So you can't

give him the money.  Now, the . . . But what you can do . . . is, uh . . and I'm just gonna give you an example.  He's a . . . you're a smart guy. . . . And Tom has a car, and so you buy it.  And you, you know, you you're givin' him . . . don't give him seven-thousand ($7,000) dollars for it. Give him X dollars for it, like, . . . nine-thousand-one-hundred (9,100) or whatever and then Tom now has seven-thousand ($7,000) dollars . . .Don't – don't do it, where you give him exactly seven-thousand ($7,000) dollars . . . And the next day, seven- . . .he gives seven-thousand ($7,000) dollars away.  I mean, that's . . . more immediately so there's a time lag." (*tr.p33-35*);

e.  **UCA 3**: "Who's the trustee then, Tom or . . ." **Emil:** "Orion is the trustee." **Kepke:** "Tom is just - . . . Tom is what's known as a grantor or the, or the creator of the trust. . . .Once he signs off and creates the trust and funds it with the seven ($7,000) grand . . . He's out of the picture. He's done now." *(tr.pp39-40)*; and

f.  **Kepke**: "So, we don't . . . so, you can't give the money to the trust – the million dollars.  What we do is you take the money . . .We create a limited partnership.  I don't know if you know what that is, but, it's . . .You're the limited partner. . . . You own . . . you own the limited partnership interest where . . . so, once we put the . . . you put a million dollars in, and this is a tax free deal and you . . you know, uh . . .you know, then you sell your limited partnership interest to the trust. . . and

they give you a note for the . . . you sold 'em a mil – a- an entity that's

worth- . . . has a million dollars of cash and that's the only asset – it's

got a million, duh - . . .The trust then owes you for that 'cause you sold

'em, so they give you a note . . ." *(tr.pp43-44).*

50.     Kepke further described how UCA 3 will continue to control the structure,

his assets and income in the structure.  Specifically, Kepke and Arguelles stated in part:

a.      **Kepke**: "The-the-the trust just owns the company so there'll be a

manager of that company." **UCA 3**: "Who's that then?" **Kepke**:

"Whoever you want." (tr.pp47-48);

b.      **UCA 3**: "you seem like nice guys, but, right, I'm handin' over, say,

five-million dollars.  I wanna make sure that it's stayin'. . . **Kepke**:

"You control the money." **UCA 3**: "That's what I wanna do – what

most clients do." **Emil**: "But we-we don't want to be in control of

your money." **UCA 3**: "Alright, so I never really . . . I never lose

control of my money." **Kepke**: "You never lose control  . . . You,

you're just playin' with bank accounts actually.  You don't physic . .

in . . . the company  . . . the underlying company that we created . .

.we'll open a bank account and you will . . . where you now have

your million dollars will go into that bank account in the name of the

ABC company.. .. And you will be the signature on that account."

*(tr.pp49-50)*;

c.      **Kepke**: "Now there – a-a- and I have other clients that-that get the

trustee involved more. . . . Rare.  I mean, like, for example,
managing money, handlin' their bank accounts.  I'm sure you got a
number of clients that have that situation too.  **Emil**: "Yeah, but not
us per se. . ... we-we have client, uhm. . . attorneys in New York and
Florida, and LA. . . that have simultaneous, similar structures . .. and
. . . it's the same federal requirement, and it's the same structure
whether Carlos uses Nevis companies. Other people using Lucian,
Bahamas . . . ." *(tr. pp50-52)*;

d.      **Kepke**: "Well, let's say you wanna buy a beach house in the Keys. .
. . Instead of . . . instead of takin' the money out of the trust and
buyin' a beach house, 'cause if you take the money out, that's
taxable.  But if the trust – when I say trust, I mean the company . . .
buys the beach house itself and owns it, that's not a taxable
distribution.  That's an investment by the trust.  So now, when you
use it . . . You pay a fair rental value.  You- you rent it in other
words.  And so, you're payin' the rental value to yourself." *(tr.pp57-
58)*;

e.      **Kepke**: " So we're gonna create it, and that's where the million - . . .
you take the million dollars from your bank account . . . put it in that
bank account. . . . Now you don't own it anymore because that little
company owns it.  . . .That little company is owned by the trust . . .
And you have the signature authority over the bank account. . . .So

you have (UNINTELLIGIBLE). . . except, legally, transferred the ownership of the million dollars to the . .to an entity that you can earn tax-free." *(tr.p90)*; and

f.    **Emil**: "In this case, routing you via Carlos [Kepke], we keep everything flowing through him. . . We would keep in contact with you if you walked into our office in Belize or via online. . . In this case, to make sure everything is . . . in compliance . . . we prefer all communications and correspondence via Carlos, who then . . . We don't want to appear to be . .. engaged in the practice of law directly with giving advice to U.S. persons." *(tr.p105)*.

51.    Kepke described for UCA 3 some of his biggest clients and UCA 3 asked Kepke for references. In response Kepke suggested UCA 3 call Tamine as a reference. Specifically, Kepke stated in part:

**UCA 3**: "What's your biggest client?" **Kepke**: "I have two (2) who are pretty close, three (3).. . .. If you're tryin' . . give you his name, I can't . . ." **UCA 3**: "No, no I know, no, I know you can't do that, but I meant, like-like, amount of money they dump into somethin' like this. What would be the amount, you think?" **Kepke**: "Two (2) or three (3) Billion." **UCA 3**: "Billion, with a B? You've got to be kidding me." **Kepke**: "One's a, uh, a, uh, . . . private equity fund . . . owner of a private . . . and one is a owner of a, uh . . . what used to be a computer company that serviced all the automobile dealers in the world in the U.S., and the world." *(tr.p108)*.

52.    In a telephone conversation held on February 22, 2018, Kepke made several statements to UCA 3 about some of his other clients and his relationship with them.  Specifically, Kepke stated in part:

a.    **Kepke**: "And what I do . . . what I do for him is . . . uh . . . eh . . . Evatt pays me himself.  . .. You know, out of I'm sure out of an – eh- eh- if it doesn't come from my client, it comes from Evatt's account in Bermuda.  . .. But what's . . . what he means is, uh. . . is-uh . . . as I said, he . . . this guy was my- . . . one of my oldest clients, maybe my - . .. prob'ly my . . . well, a really long time ago.  And I-I think as I told you when you were here, at least on the phone, if I do a plan for somebody like I did for Bob – that's his name – uh . . . and it's done, and he- and he implements it, then, you know, uh . . . I may never hear from 'em again." *(tr.p8)*;

b.    **Kepke**: "He [Bob] has a - . . . he owns a-a computer company . . . which is huge and it does all the business.  Like if you were- . . . with-with car dealers, like, if you're a car dealer in New Jersey . . . *(tr.p11);* and

c.    **Kepke**: "Yeah, well-well-well, a-and since all that's happened, the guy get-muh,uh-Bob has so much money.  He's made - . . . I mean, he's a-a multi-billionaire." *(tr.p12).*

53.    Kepke further described how UCA 3 can provide funds to his cousin to create the trust.  Specifically, Kepke stated in part:

a.   **Kepke**: "You put your assets in a trust, uh . . . and if it's a . . . if it's a properly drawn foreign trust, under our tax laws, foreigners, including foreign trusts, do not pay U.S. income tax on certain things as, for example, capital gain . .." *(tr.p19)*;

b.   **Kepke**: "[speaking on the phone to UCA 3's 'cousin'] He did tell me that.  Yes, but . . . and I told him that while he cannot give you ten-thous-eight-thousand ($8,000) dollars directly to fund the trust, what he can do is buy something from you and pay you x-dollars for it.  Then you take eight-thousand ($8,000) dollars of that x-dollars and create the trust.  Now, we tossed around conver - . .. uh Robert [UCA 3], am I free to talk like this with him?  We- we he told me that-that you did not have, in –in his knowledge . . . an asset that'd be worth ten-thousand ($10,000) dollars or eight (8) . . . So-so what I t- so what I told him . . . is what I suggested to him . . . is that he makes an – a- a written agreement with you . . . to buy all the furniture . . . all- all the furnishings, everything that's in  your house or apartment, upon your death, with you havin' the right to continue to live there and own it, uh. . . . use it until  you die. *(tr.pp22-23)*;

c.   **Kepke**: "[speaking on the phone to UCA 3's 'cousin'] you have no power over the trust, you go away, you're – you're – you're not involved in the trust in any way.  Uh-uh-uh . . . you've funded it . . uh-uh . . . the funding must come from you, so once-once you and

Robert work out the deal on the furniture, he's gonna give you a check or cash, or however you do it and you - . . . I need somethin' from you so that Tom fund - . . ."*(tr. p25)*;

d.   **Kepke**: "Well, we're gonna – we're gonna phrase . . . eh – write the – uh . . . the sales agreement for your furnishings in such a way that it would be extremely difficult for anybody to say yes or no on that because we're gonna - . . . we are going to . . . list. . . in some fashion what-what we're selling, without putting a value on any particular item in there . . .." *(tr. pp35-36)*;

e.   **Kepke**: "How do you plan on giving, uh . . . nine-thousand-two-hundred ($9,200) dollars?" **UCA 3**: "Uhm . . . I was gonna prob'ly either give him a check or wire it to him or somethin' like that." **Kepke**: " Uh . . . you know what . . .What I would do, if it were me . . . I would, uh, I would give it to him in cash.  And I would make withdrawals from  your bank, not one withdrawal of nine-thousand-two-hundred (9,200), but thousand ($1,000) dollars here, a thousand ($1,000) dollars there . . .You know what I'm saying?" *(tr.p48)*; and

f.   **Kepke**: "Doesn't matter.  Whatever –whatever - . . . whichever one you wanna do to, uhm. . . you- . . . I-I'm just tryin' to say - . . . what I'm tryin' to say is that-that if you give him [UCA 3's cousin] cash, then-then his deposits don't show as-as coming from a check from you." *(tr.p49)*.

54.     In both the February 7, 2018 meeting and the February 22, 2018 telephone conversations Kepke and Arguelles explained to UCA 3 how they can create a fictitious trust-corporate structure, which on paper is "owned" by a Belize trustee, for the purpose of concealing UCA 3's United States based assets and income, but which in reality remains under the dominion and control of the UCA 3.  Kepke also described to UCA 3 and his "cousin" how to surreptitiously provide the "cousin," who is supposed to pose as the trust "creator," money to fund the trust under the guise of the purchase of furniture. Based on my training and experience, these instructions provided by Kepke and Arguelles are indicative of a fraudulent tax shelter, lacking in economic reality, and which should be disregarded for income tax purpose under Title 26, United States Code Section 7701(o).

55.     During the February 7, 2018 meeting, Kepke also told UCA 3 that he has three originals to sign of the trust document and that he, Kepke, retains one of the originals.  Kepke told UCA 3 that he stores the records of active clients in a file room, and pointed out the room to UCA 3.  Kepke said that when a client becomes inactive, Kepke moves that client's records to an offsite storage area that he maintains.  Kepke added that if he hasn't heard from a client in fifteen years, he will clean out the storage unit.

56.     Records obtained from Public Storage indicate that Kepke has paid for storage unit #1034 at the Public Storage facility located at 11770 Southwest Fwy., Houston, Texas, from January 2005 through at March 2018, when the records were obtained.  Kepke's 2017 U.S. Individual Income Tax Return, Form 1040, included a

Schedule C reflecting his business address to be                    , Houston, Texas, and on

which he claimed a business expense for storage.  Based upon evidence obtained through

the undercover, it is believed Kepke continues to maintain the same storage unit through

the present.

      57.    On or about March 23, 2018, Kepke sent an e-mail to UCA 3 [Robert

Esper] in which Kepke listed a chronology of steps that needed to be executed to

implement the plan discussed in the February 7, 2018 and February 22, 2018

conversations.  These steps included UCA 3's cousin [Tom] executing the Trust

documents and Kepke creating a limited liability corporation for UCA 3 in Nevis.  These

steps also included opening a bank and/or brokerage account(s) in the name of a Nevis

LLC and transferring the LLC to the Trust.

      58.    On or about April 23, 2018, Kepke sent an e-mail to UCA 3 indicating that

he was in possession of three (3) copies of the executed Trust documents.

      **D.**    **Kepke Client Robert Smith**

      59.    Non-content e-mail production from Yahoo! Inc. covering March 2006

through 2017 establishes that Kepke and Smith were in regular e-mail communication.

Namely:

      a.    Approximately 580 e-mails between Kepke and Smith; and

      b.    Multiple e-mails between Kepke and Vista CFO John Warnken-Brill

          at the e-mail address JWarnkenBrill@vistaequitypartners.com, the

          e-mail domain for Vista employees.

60.     The evidence gathered in this investigation establishes that in or about 2000 Kepke organized and created an offshore tax shelter structure for Robert Smith nearly identical to the structure Kepke described to UCA 3, consisting of a Belize trust – Excelsior Trust, and a Nevis limited liability company – Flash Holdings, LLC.  Smith used this structure to conceal from the IRS approximately $150 million of taxable income he earned from various Vista Private Equity Funds.

61.     The information set forth in this section is based upon evidence collected from: (1) subpoenaed bank account and other financial records; (2) trust and other offshore entity records; (3) statements made by Smith's first wife, Suzanne J. McFayden Smith; (4) an interview of Suzanne J. McFayden Smith's uncle Headley Waddington (hereinafter Waddington); (5) an interview of a London solicitor, Charles Guthrie (hereinafter Guthrie), who notarized various documents; (6) documents obtained from Smith's divorce proceeding, which was finalized in July 2014; (7) subpoenaed records related to real estate transactions and interviews with individuals who were involved with the sale, construction, and/or renovations to various parcels of real estate; (8) statements by Denise Davis, a former employee of Vista from January 2013 until March 2015, when she was terminated[4]; (9) statements of Smith's former partner Stephen Davis; and (10) documents Smith filed with the IRS and the U.S. Department of the Treasury.

62.     As shown in the table at paragraph 103, Smith reported more than $185 million in taxable income on his Forms 1040 for the tax years 2010 through 2013.

---

[4]     Denise Davis has filed two "Applications for Award for Original Information, Forms 211" with the IRS regarding her observations while employed by Vista.

However, Smith failed to report more than $150.8 million in taxable income he earned from various Vista private equity funds, including VEF II and VEPF III.  Under Smith's direction, this unreported income was distributed by Vista Equity Funds to a bank account at Banque Bonhôte in Switzerland (account   3808) in the name of "Vista Equity Fund II, LP, FBO Flash Holdings, LLC" and to a Flash Holdings, LLC bank account at VP Bank in the British Virgin Islands.[5]  Consistent with the structure Kepke described to UCA 2 and UCA 3, Flash was in turn "owned" by a Belize trust - Excelsior Trust.  In reality, however, Smith at all times retained full dominion and control over the unreported earned income deposited in these foreign bank accounts.

      63.    As part of the structure, from 2000 through at least 2013 Kepke assisted Smith in creating the following foreign entities:

- Flash Holdings – Nevis entity formed in March 2000;

- Excelsior Trust – Belize trust formed in March 2000;

- Vista Management, Ltd. – Bermuda entity formed in April of 2003;

- Flash Property Holding, LLC – Nevis entity formed in November of 2010;

- Mountain Air Recovery Trust - BVI entity formed in 2011; and

- Boulder River Ranch Recovery Settlement - BVI entity formed in December of 2012.

---

[5]    Banque Bonhôte, is a private bank located in the City of Neuchâtel, Switzerland, that participated in the Department of Justice Tax Division's Swiss Bank Program. Banque Bonhôte entered into a non-prosecution agreement under the Swiss Bank Program that required its cooperation with the U.S. government, including the disclosure to the U.S. government of accounts related to U.S. persons.

Although on paper these entities were held in the names of various nominees, Smith

retained full dominion and control over them, and the income and assets placed in bank

accounts in their names.  Analyses of bank account records from 2007 through 2015

revealed recurring payments from Smith, and from entities Smith controlled, to Kepke

totaling more than $1 million.

      64.     According to documents obtained from Smith's divorce proceeding,

in 2000 Kepke and Smith used Cititrust International Inc. (hereinafter "CITI"), located in

Belize, as the trustee for Smith's trust, Excelsior.  In 2010, the trustee for Excelsior was

changed to Orion Corporate and Trust Services Ltd. (hereinafter "Orion"), also located in

Belize.  Smith's offshore corporation, Flash Holdings, used Serco Management Limited

(hereinafter "Serco") located in the BVI, as its manager.  In December 2014, Flash

Holding's manager was changed to Jardin Holdings Limited (hereinafter "Jardin"),

located in Belize.  Emil Arguelles (hereinafter "Arguelles"), an attorney located in

Belize, appears to be the participant in the February 7, 2018 meeting at The Kepke Law

Office with UCA 3, and operates both Orion and Jardin.  In an e-mail dated December 2,

2010, Kepke referred to Arguelles as the trustee of Flash Holdings.

      65.     Kepke used Morning Star Holdings (hereinafter "Morning Star"), a

corporate management service located in Nevis, to organize Flash Holdings for Smith.

As part of Smith's divorce proceedings, Kepke provided during discovery numerous

documents which reflect Kepke's correspondance with third parties regarding Smith's

foreign entities.[6] Some examples include:

    a.    a September 29, 2000 letter from Kepke to ATU General Trust (BVI) Limited (hereinafter ATU), corporate director of Flash Holdings, refers to Smith as the principal behind Flash Holdings;

    b.    a May 9, 2003 fax from CITI to Kepke inquiring if only Serco, managing director of Flash Holdings, can sign on behalf of Flash Holdings, or if Smith can also sign Flash Holdings documents;

    c.    a September 6, 2007 e-mail from KEPKE to CITI with the subject line "Excelsior Trust" states:

The beneficial owner is reluctant to make the official request that you require since he does not wish to have it appear as if he is in control of the subject trust. Such control, where [sic] it to be manifest, could cause a harmful United States tax consequence to the beneficial owner. Accordingly, I respectfully request that you proceed with my request for the documents embodied in my e-mail to you of August 24, 2007. Should you have any questions please feel free to contact me. I remind you again that I am the attorney who authorized the incorporation of Flash Holdings, LLC and who was responsible for naming Cititrust International Inc. as Trustee of the subject trust;

    d.    an April 8, 2009 e-mail from Kepke to ATU that states, "I should think it obvious why Robert Smith's name should not appear randomly in e-mails regarding the subject entity. One of the reasons for utilizing offshore entities is legal privacy and confidentiality;"

---

[6]    To date the investigation has obtained some of Kepke's e-mails previously produced in the divorce litigation between Smith and his former wife Suzanne McFayden Smith. These e-mails were limited to items relevant to the divorce proceedings. The investigation also recently obtained Kepke's e-mails and account information from his service provider. The e-mails obtained are presently under filter review for privilege.

and

e.      an October 19, 2009 letter signed by Smith to Meridian Trust

Company in Nevis, with the subject of Excelsior and Flash Holdings

stating:

I have been asked by my attorney, Carlos Kepke, to write to you regarding
Flash Holdings, LLC, an asset of Excelsior Trust, of which I am the Trust
Protector. Mr. Kepke has asked that I advise you as to the following: 1. The
activities of Flash Holdings, LLC, consist solely of holding investment
assets; and 2. Flash Holdings, LLC (a) does not have any investment
accounts, (b) has not entered into any contracts, and (c) has not prepared
financial statements.

**Flash Holdings**

66.      Consistent with the foreign tax shelter structure Kepke described to UCA 2

and UCA 3, Flash was a Nevis limited liability corporation, ostensibly "owned" by the

Belize trust Excelsior.  After their formation, from 2000 through 2014 Smith directed

approximately $150 million of his income to be wire transferred to foreign bank accounts

under the name of Flash Holdings or "Vista Equity Fund II, LP FBO Flash Holdings,

LLC." Pursuant to Title 26, United States Code Section 679,[7] a United States person who

transfers property to a foreign trust that has a United States beneficiary is treated as the

owner of the portion of the trust that is attributable to the transferred property.

---

[7]      Title 26, United States Code Section 679 provides that a United States person who
transfers property to a foreign trust that has a United States beneficiary is treated as the owner of
the portion of the trust that is attributable to the transferred property.  Any person treated as the
owner of the trust is taxed directly on the income earned by the property placed in the trust. A
United States person treated as the owner of a trust is required to report his share of trust income,
deductions, and credits as if those items were received or paid directly by the United States
person

67.     According to documents obtained from various sources during this investigation, Flash Holdings was incorporated in Nevis on March 9, 2000, and Smith was listed as the "Director" of Flash Holdings.  Upon its formation, Flash Holdings issued eleven (11) Bearer Unit Certificates [or shares] representing ownership of Flash Holdings.  Initially, according to documents obtained from Smith's divorce proceeding, these Bearer Units were issued to Smith.

68.     Both Nevis Trust, Ltd., and Morning Star Holdings, Ltd., which are located in Charlestown, Nevis, have served as Flash Holdings' registered agent.  On or about March 24, 2006 Smith directed the registered agent for Flash Holdings to be changed to Morning Star Holdings, Ltd.

69.     On or about March 30, 2000, Smith and his partners formed a partnership entitled "Emerging Technologies Investment Fund, L.P.," (later "Vista Equity Fund II," or "VEF II").  As shown in the Second Amendment to Limited Partnership Agreement of VEF II, Smith held a 4.0% general partnership interest in VEF II through an entity called "VEFIIGP, LLC." Flash Holdings held a 4.0% general partnership interest in VEF II. Financial records and other document obtained from Vista pursuant to a grand jury subpoena show that Flash Holdings subsequently acquired both general and limited partnership interests in additional Vista funds and Vista Parallel Funds, including VEPF III.

70.     On or about May 31, 2018 Smith's partner, Stephen Davis, stated that he does not know exactly who "owns" Flash Holdings or why they are a general partner in these funds, but that it has something to do with Smith. He also stated that he is not

aware of anyone from Flash Holdings performing any services for VEF II while he was at Vista.

71.     Bank records obtained from Vista and Banque Bonhôte, Switzerland reveal that Smith is the signatory on account  3808 in the name of "Vista Equity Fund II, LP FBO Flash Holdings, LLC."  Flash also has a bank account at VP bank in British Virgin Islands.

72.     According to Vista's former Director of Finance, Denise Davis, she was routinely instructed to distribute carried interest income to Flash's bank accounts in the BVI and/or Banque Bonhôte.  Vista's CFO John Warnken-Brill informed Davis that Flash Holdings was Smith's "offshore entity."  Warnken-Brill further instructed Denise Davis never to associate Smith with Flash Holdings.

73.     In an e-mail dated September 5, 2007, Warnken-Brill responded to a question from Deloitte, LLP, Vista's outside auditor, regarding the identity of the general partner/owners of VEF II that Smith owns 40% of VEF II; 20% through the general partner – VEF II GP, LLC, and 20% through Flash Holdings, a "family trust vehicle."

74.     One of Denise Davis' duties while at Vista was to set up wire transfers of funds from VEF II's bank account to a Flash Holdings account in the BVI.  Denise Davis said that in performing these assigned duties she learned that Flash Holdings had no taxpayer identification number.  Davis further testified that it was her understanding that the funds she was instructed to distribute to the "Flash" Banque Bonhôte account constituted a portion of Smith's carried interest income.

75.     On May 14, 2014, Warnken-Brill was deposed pursuant to the Smith and McFayden Smith divorce proceedings.  According to Denise Davis, around this time Warnken-Brill directed Davis to cease distributions from VEF II to Flash Holdings. Warnken-Brill also confided to Davis that Smith's attorneys told him to say he did not know what Flash Holdings was during the divorce proceedings.  Davis recalled that at some point she was told to transfer certain partnership interests held by Flash Holdings to another entity named Fario Investments, LLC (hereinafter "Fario Investments.")

76.     On or about April 5, 2018 a former employee of a Bonhôte Trust, a subsidiary of Banque Bonhôte, testified in the Grand Jury that from 2007 to 2012 she handled Smith's relationship with Bonhôte Trust.  She further testified that under Smith's instructions she routinely initiated the withdrawal of funds from the Flash Holdings account at Banque Bonhôte to make personal expenditures and/or investments for Smith. She testified that she does not recall receiving instructions from anyone other than Smith with regard to the Flash Holdings bank account at Banque Bonhôte.

### Excelsior Trust

77.     According to documents obtained from the Smith and McFayden Smith divorce, on or about March 29, 2000, Kepke assisted Smith with the formation of Excelsior Trust in Belize.  The circumstances, and particulars, of the formation of Excelsior Trust are identical to the strategy described by Kepke to UCA 3 on February 7, 2018 and February 22, 2018.  Documents obtained from Belize and the Cayman Islands indicate that on or about November 25, 2009, the eleven Flash Holdings Bearer Units were directed by Smith to be transferred to Orion Corporate & Trust Services Ltd as

trustee for Excelsior.

78.     According to Excelsior's Trust Indenture, McFayden Smith's uncle, Waddington, was the settlor of Excelsior trust and delivered to the Trustee $7,500 as the initial corpus of the trust.  Smith was appointed the Trust Protector. Excelsior's beneficiaries were Smith, Smith's family members, and unnamed U.S., United Kingdom, and Jamaican charities.

79.     According to documents obtained from the Smith and McFayden Smith divorce proceedings, "on or about February 23, 3004 [sic]" Kepke purportedly transferred to Waddington the eleven Flash Holdings Bearer Unit [Share] Certificates.

80.     According to McFayden Smith, while she was married to Smith, Smith asked her to contact Waddington to ask if he would be willing to participate in a trust Smith was forming.  This procedure is nearly identical to the procedure Kepke described to UCA 3, i.e. using a relative, preferably a foreign relative, to pose as the "creator" of a foreign trust.

81.     McFayden Smith's uncle, Waddington, was born in Jamaica in 1929, has a grade-school education, and has lived in London, England since 1954.  He has been retired since the mid-1990s. Previously he was self-employed in the building trade, performing building renovations.

82.     According to Waddington, he spoke with Smith before signing the trust indenture, but afterwards dealt with Smith's lawyers through mail correspondence. Waddington stated that the lawyer he primary dealt with was from California, but could not remember his name.

83.     Waddington claimed he agreed to be the Settlor of Excelsior because Smith asked him, but he did not know any of the details. Waddington stated that he thought Smith wanted him to be a "sleeping partner."

84.     Waddington further stated in a deposition on November 18, 2013 that he did not contribute any money to the trust, nor did he have the financial means to do so.

85.     McFayden Smith stated that she did not know who Kepke was until the commencement of her divorce proceedings. She claimed that during the divorce she learned that Kepke was the attorney that had set up Excelsior and Flash Holdings for Smith, in addition to other offshore entities.

86.     McFayden Smith reviewed an affidavit obtained by IRS CI from Belize authorities, purportedly signed by Waddington on May 13, 2014, and purportedly notarized by London solicitor Guthrie.  This affidavit stated that Waddington delivered the $7,500 initial corpus into the trust, contradicting Waddington's deposition testimony on November 18, 2013.  According to McFayden Smith, Smith pressured her to get Waddington to sign the affidavit, telling her that he had IRS problems and that this affidavit could help fix those problems.  McFayden Smith agreed to ask Waddington to sign the affidavit (hereinafter "Affidavit 1").

87.     As part of this investigation, IRS CI asked Guthrie to review Affidavit 1. Guthrie stated that it was a forgery.  Guthrie provided IRS CI with a copy of the affidavit that he had notarized (hereinafter "Affidavit 2").  Guthrie stated that it appeared that someone else had signed Waddington's signature on Affidavit 1, as he did not think that it looked like Waddington's signature when comparing Affidavit 1 with Affidavit 2.

Guthrie further stated that his signature had been forged on Affidavit 1, and that

paragraph 3 of Affidavit 1 had been altered.  According to Guthrie, Paragraph 3 of the

affidavit he notarized, Affidavit 2, stated that Waddington *did not* provide $7,500 to form

the Excelsior Trust.

88.    McFayden Smith was subsequently asked to review Affidavit 2. She stated

that she had received an unsigned copy of Affidavit 1 from Smith attached to an April 27,

2014 e-mail that stated that Waddington had provided $7,500 as the initial corpus of the

Excelsior Trust upon its formation.  McFayden Smith knew that the language in

paragraph 3 of Affidavit 1 was incorrect because Waddington had not provided

the $7,500 to fund Excelsior from his own assets.  McFayden Smith created Affidavit 2

on her computer by changing paragraph 3 to correctly state that the $7,500 of initial

corpus had come from Smith.  McFayden Smith stated that she wanted to have a signed

copy of Affidavit 2 in her possession in case she ever needed it for leverage against

Smith.  McFayden Smith stated that she believed she sent unsigned copies of both

Affidavit 1 and Affidavit 2 to Waddington in London for his signature.  McFayden Smith

further stated that she believed that she received the executed originals of both

Affidavit 1 and Affidavit 2 from Waddington via Federal Express.  McFayden Smith

provided IRS CI with the executed original of Affidavit 2 signed by Waddington that she

had maintained in a safe in her home. She also provided IRS CI with several executed

copies of Affidavit 1 that she had also maintained in her safe.  McFayden Smith stated

that she had the executed original of Affidavit 1 delivered to Smith at his Austin, Texas

residence in 2014. Shortly thereafter, Smith and McFayden Smith finalized the terms of

their divorce.

## Smith's Expenditure of Funds
## From Flash Holding Offshore Bank Accounts

89.    After Kepke assisted Smith in forming Excelsior Trust and Flash Holdings, LLC., from 2000 through 2014 Smith used unreported taxable income deposited into Flash offshore bank accounts for personal purposes.

90.    The evidence indicates that Smith exercised complete dominion and control over the income and assets placed under Flash Holdings' name.  Smith was the sole authorized signatory on the Flash Holdings account at Banque Bonhôte - "Vista Equity Fund II, LP FBO Flash Holdings LLC."  Flash Holdings, and bank accounts in Flash Holdings' name, appears to have had no business purpose other than holding income and assets for Smith.  There does not appear to be any evidence that Flash Holdings provided any services to Vista or any of its related entities or funds.

## Sonoma, California Property

91.    In or about December 2005, based on the review of correspondence, real estate records, and the statements of McFayden Smith, Smith caused approximately $2.5 million to be wired from the Flash Holdings bank account in the BVI to California Land Title of Marin for the purchase of                        in Sonoma, California (hereinafter "Sonoma Property"), which Smith eventually used as a vacation home for his family.

92.    The sellers of the Sonoma Property said they met with Smith and his family and were told the property was going to be a weekend home for the Smiths.  The sellers

also said that Smith showed them a copy of a bank account statement for some offshore accounts.

93.     Sonoma County records show that the deed for the Sonoma Property was titled in the name of Flash Holdings LLC.  Instructions on the deed directed the deed be sent, after recording, to Flash Holdings LLC c/o Vista Equity Partners, 150 California St., 19th Fl., San Francisco, California 94111.

94.     In November 2005, Smith created Flash Property Management LLC (hereinafter "FPM"), an Oregon Limited Liability Company.  Smith is FPM's owner/director.  FPM established a bank account at Bank of America that was used for the ongoing maintenance expenses of the Sonoma Property.  Starting in 2006 and continuing into 2013, Smith and McFayden Smith renovated the Sonoma Property. McFayden Smith hired Zumaooh Inc. (hereinafter Zumaooh) to design and oversee the Sonoma Property renovations.  Zumaooh's owner, Michelle Wempe (hereinafter "Wempe"), stated that McFayden Smith hired her to run the project.  This project included constructing a pool house and home on the Sonoma Property.  Wempe stated that she did not report to anyone except McFayden Smith and Smith in relation to the renovation of the Sonoma Property.

95.     According to McFayden Smith, the Sonoma Property was their second home and was bought for the purpose of weekend getaways with their children. McFayden Smith worked with Wempe to design and furnish the home.

96.     An analysis of bank account records from 2011 through 2013 revealed that Zumaooh was paid from the Flash Holdings' bank account in the BVI and Vista Equity

Fund II, LP FBO Flash Holdings LLC bank account at Banque Bonhôte in Switzerland. Records of these accounts reveal that approximately $6 million was wired from these accounts to Zumaooh and Caletti Jungsten Construction to pay for construction costs. Additionally, Zumaooh was sent approximately $1.5 million from Smith's personal bank accounts at Bank of America.

### Properties in France

97.     Smith used Flash Property Holding LLC, White Mulberry SARL, and the Mountain Air Recovery Settlement Trust to hold title to two ski condominiums and a downtown restaurant/nightclub, the White Pearl Restaurant, in Megève, France.  In 2010 Kepke formed Flash Property Holding LLC for Smith in Nevis.  Megève is a ski resort village located near the France-Switzerland border in the French Alps.  On December 29, 2010, Smith closed the sale with a payment of €5.3 million that was transferred from the Vista Equity Fund II, LP FBO Flash Holdings account at Banque Bonhôte, account number   3808-1.

98.     According to the testimony of a former Bonhôte Trust employee, Smith caused and directed Flash Property Holding, LLC to form White Mulberry SARL; White Mulberry SARL in turn owned SCI Thisbe and SCI Pyramus.  White Mulberry SARL also owned the entity Éclair Location EURL, which managed the Megève condominiums for Smith.  The condominiums were titled in the name of SCI Thisbe and SCI Pyramus. The former Bonhôte Trust employee also testified that all direction and instructions in this regard came from Smith and all funding came from the Vista Equity Fund II, LP FBO Flash bank account at Banque Bonhôte.

99.    Further, according to the former Bonhôte Trust employee, in addition to Smith directing the acquisition of the Megève properties using funds on deposit in the Flash Holdings account at Banque Bonhôte, he directed these funds also be used to purchase furnishings for the properties, to fund his family's travel, and to make a number of personal sundry purchases for Smith and his family. This former Bonhôte Trust employee testified that she does not recall receiving instructions from anyone but Smith in this regard.

100.    According to McFayden Smith, while living in Geneva, Switzerland, the family used the ski condominiums as a weekend and holiday getaway where their children learned how to ski. The condominiums were available to rent when the Smith family was not using them.

101.    To date, Smith has never reported to the IRS the income he expended to purchase or renovate the property in Megève. Instead, Smith purported to pay rent to Éclair Location EURL for his use of the Megève condominiums – an entity he controlled through White Mulberry SARL and Flash Holdings, LLC.

### Colorado Ranch

102.    Starting in 2009 and continuing through 2013, Smith acquired parcels of land in Gilpin County, Colorado, that collectively make up an approximately 300 acre parcel called the Boulder River Ranch (hereinafter "the Ranch"). Bank records show that Smith repatriated in excess of $12.0 million of untaxed funds from the Vista Equity Fund II, LP FBO Flash Holdings LLC account   3808-1 at Banque Bonhôte for these acquisitions. Smith also used personal funds to rehabilitate the Ranch. Collectively

Smith spent approximately $34.0 million on the Ranch.  Records show Smith directed offshore funds held at Banque Bonhôte to be wired to attorney Wayne Vaden's (hereinafter "Vaden") trust account.  Vaden, Smith's cousin, is the registered agent for some of the entities through which Smith bought the Colorado land, and the disbursement agent for these offshore funds.  Vaden established domestic bank accounts on behalf of Smith to receive funds from Banque Bonhôte that in turn, were used to pay contractors for improvements to the Ranch.  In addition, approximately $3-4 million of these funds were transferred to one or more charitable entities.

### Smith's Attempt to Enter Into the
### IRS's Voluntary Disclosure Program

**103.**   As shown in the table below, in his original U.S. Individual Income Tax Returns, Forms 1040, for the tax years 2010 – 2013, Smith reported to the IRS a total of $185.1 million in income.  Smith, however, failed to report $150.8 million of additional income earned from various Vista funds and distributed to Flash Holdings.

ROBERT SMITH
Reported & Unreported Income
For the Tax Years 2010 – 2013

| Particulars | 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|
| Income Reported on Form 1040 | 72,367,630 | 12,278,242 | 50,783,812 | 49,681,356 | 185,111,040 |
| Unreported income<br>K-1s issued to Flash Holdings<br>from various Vista Funds<br>(K-1s were filed with IRS) | 23,058,169 | 215,219 | 37,734,627 | 29,748,805 | 90,756,820 |
| K-1s issued to Flash Holdings<br>from VEF II only<br>(K-1s were not filed with IRS) | 53,028,894 | (283,680) | 4,177,639 | 3,103,031 | 60,025,884 |
| Total income received by Flash Holdings | 76,087,063 | (68,461) | 41,912,266 | 32,851,836 | 150,782,704 |
| Corrected Taxable Income | 148,454,693 | 12,209,781 | 92,696,078 | 82,533,192 | 335,893,744 |

104.   In March 2014 Smith requested pre-clearance to apply to the Offshore

Voluntary Disclosure Program (hereinafter "OVDP").  The IRS performed a routine pre-

clearance check as part of this request, and in April 2014 the IRS denied Smith's entry

into the OVDP.[8]

105.   On May 21, 2015, Smith filed a Form 14654, Certification by U.S. Person

Residing in the United States in an attempt to enter into the "Streamlined Voluntary

Disclosure Program.[9]  As part of this disclosure, Smith filed a Form 8275 narrative and

amended his Forms 1040, U.S. Individual Income Tax Returns, for the 2010, 2011, 2012

and 2013 tax years.  Form 14654 requires filers to certify that the form includes

"amended income tax returns, including all required information returns, for each of the

most recent three years for which the U.S. tax return due date has passed," and for which

the filer failed to report income from one or more "foreign financial assets during the

reporting period."  Smith's amended income tax returns reported that he received

approximately $21.3 million of distributions from Excelsior which had not been

previously reported to the IRS.  Smith also failed to report more than $130 million in

taxable income earned by Flash Holdings from various Vista private equity funds,

---

[8]      The OVDP is a voluntary disclosure program specifically designed for taxpayers with
exposure to potential criminal liability and/or substantial civil penalties due to a willful failure to
report foreign financial assets, to pay all tax due with respect to those assets, and to avoid
criminal prosecution.

[9]      The Streamlined Voluntary Disclosure Program was a program parallel to the OVDP
permitting a taxpayer to voluntary disclosure foreign bank accounts to the IRS and pay all
associated delinquent taxes and penalties, provided that the taxpayer's conduct was not "willful"
and the taxpayer was not already being audited by the IRS.  This program was designed
primarily for taxpayers who had inherited funds in a foreign bank account or who had
maintained foreign bank account while living and working outside of the United States.

including VEF II and VEPF III.  In his certification, Smith claimed that his conduct was

non-willful, and he indicated that he did not rely on a professional advisor in regards to

his failure to timely report this income to the IRS.

106.    As part of Smith's Streamlined Voluntary Disclosure filing he submitted a

Form 8275, that contained the following statement:

> [VEF II] was created as the result of a substantial investment from a single
> limited partner, Point Investments Limited ("Point"), which has at all times
> been wholly owned by a third party unrelated to Mr. Smith. The [VEF II]
> partnership agreement provides that allocations to general partners are
> subject to being repaid to the limited partner to fund a guaranteed rate of
> return (hurdle) to Point by the general partners under the partnership
> agreement. [VEF II's] partnership agreement also gave Point a veto right
> over [VEF II's] purchase or sale of assets. To secure Point's claim on
> allocations to general partners and to assure a forum favorable to Point,
> Point required that, as a condition of establishing and funding [VEF II,] a
> foreign trust be created to own a 4% [VEF II] general partnership interest.
> The Excelsior Trust ("Excelsior"), created in 2000, is that foreign trust, and
> it has a corporate trustee in Belize. Although the Excelsior trust indenture
> permits the trustee to make discretionary distributions to charities and to
> Mr. Smith and his family members, Point could prohibit or limit
> distribution of trust assets to secure the repayment obligation to Point
> and/or to ensure assets are used for charitable purposes.

> Excelsior holds its [VEF II] 4% general partnership interest through a
> wholly-owned Nevis entity named Flash Holdings LLC ("Flash"). The
> Excelsior trust indenture names Mr. Smith as trust protector with the right,
> among other rights, to replace the trustee with another corporate trustee.
> Those rights, however, are subject to Point's ability to prohibit or limit
> distributions to secure repayment obligations or ensure charitable use of
> funds, as described above. Mr. Smith also serves as an investment advisor
> to Flash, is managing general partner of [VEF II], and in that capacity has
> signatory authority over certain Flash-related bank accounts, which held
> funds to secure the obligations of the general partners in Fund II to pay a
> preferential rate of return to Point. Flash holds and has held illiquid general
> partner and limited partner interests in other Vista Funds. . . .

> Excelsior created two additional trusts, Mountain Air Recovery Trust
> ("MART") and Boulder River Ranch Recovery Settlement ("BRRR") in

2010 and 2011, respectively, using proceeds from general partnership interests in Visa Funds. BRRRS settled a third trust, Zoelimax International Foundation ("ZIF") in 2013. MART, BRRRS, and ZIF have British Virgin Islands corporate trustees. The trust indentures for these three trusts name as trust protector a Swiss company of which Mr. Smith currently serves as one of the three directors. The trust protector has the right, among other rights, to replace the trustee of each trust with another corporate trustee. Those rights, however, are subject to Point's prohibition or limitation of distributions to secure repayment obligations or ensure charitable use of funds, as described above.

Allocations from the Vista Funds to Excelsior/Flash, and income from investments generated by those allocations, are not included on Mr. Smith's Forms 1040.

## Smith Delinquent Report of Foreign Bank Accounts

107.    In April 2015, SMITH filed delinquent Reports of Foreign Bank Accounts (hereinafter FBAR)[10] for the years 2008 through 2012, and a revised 2013 FBAR disclosing numerous foreign bank accounts over which he had signatory authority (listed in paragraph 108), including four bank accounts at Banque Bonhôte with an aggregate balance of over $52 million. These four bank accounts at Banque Bonhôte were all titled in the name of "Vista Equity Fund II, LP FBO Flash Holdings."

108.    The bank accounts at Banque Bonhôte were primarily funded from unreported and untaxed distributions from the VEF II and VEPF III funds. Smith had sole signature authority over these four accounts at Banque Bonhôte, and over at least 28 additional bank accounts located in Switzerland, France, Luxembourg, the BVI and

---

[10]     An FBAR is a report that is required to be filed annually with the U.S. Department of the Treasury. All U.S. persons who have a financial interest in or signature authority over a foreign financial account, including a bank account, brokerage account, mutual fund, trust, or other type of foreign financial account, must file this report if the aggregate value of all financial accounts exceeded $10,000 at any time during the calendar year.

Belize. The delinquently filed FBARs reported previously undisclosed bank accounts

with millions of dollars on deposit.  Included among these bank accounts were

approximately seventeen accounts that reported the high balances as unknown.  The

accounts disclosed were as follows:

| Financial Institution | Name of Account Holder |
|---|---|
| CIBC First Caribbean International | Smith |
| Banque Bonhôte & CIE SA | Smith |
| Mirabaud | Smith |
| Banque Bonhôte & CIE SA | Smith and McFayden Smith |
| Banque Bonhôte & CIE SA | Smith and McFayden Smith |
| Banque Bonhôte & CIE SA | Smith and McFayden Smith |
| Banque Bonhôte & CIE SA | VEF II |
| Banque Laydernier | Éclair Location Eurl |
| Banque Bonhôte & CIE SA | SCI Thisbe |
| Lombard Odier & CIE | Lincoln Hills Capital SA/Priviledge |
| Banque Bonhôte & CIE SA | Fario Investments, LLC |
| Banque Bonhôte & CIE SA | Zoelimax Investments, LTD |
| Banque Bonhôte & CIE SA | Neuchâtel Fishing Services, SA |
| Banque Bonhôte & CIE SA | Vista Equity Fund II, LP FBO Flash Hldgs, LLC |
| Banque Bonhôte & CIE SA | Vista Equity Fund II, LP FBO Flash Hldgs, LLC |
| Banque Laydernier | SCI Pyramus |
| Banque Laydernier | SCI Thisbe |
| Banque Bonhôte & CIE SA | Éclair Location Eurl |
| Banque Bonhôte & CIE SA | Boulder River Ranch Recovery Settlement |
| EFG Bank | Fario Investments, LLC |
| Banque Bonhôte & CIE SA | SCI Pyramus |
| Banque Bonhôte & CIE SA | Lincoln Hills Capital SA/Priviledge |
| Societe Generale Bank & Trust | White Mulberry Sarl |
| Banque Bonhôte & CIE SA | Flash Alternative Investment MGMT, LTD |
| Banque Bonhôte & CIE SA | Flash Property Holdings, LTD BVI |
| Banque Bonhôte & CIE SA | Vista Equity Fund II, LP FBO Flash Hldgs, LLC |
| Banque Bonhôte & CIE SA | Vista Equity Fund II, LP FBO Flash Hldgs, LLC |
| Banque Bonhôte & CIE SA | SCI Pyramus |
| Banque Bonhôte & CIE SA | SCI Thisbe |

| | |
|---|---|
| Banque Bonhôte & CIE SA | White Mulberry Sarl |
| VP Bank (BVI) Limited | Vista Equity Fund II, LP FBO |
| | Flash Hldgs, LLC |
| Banque Bonhôte & CIE SA | Zoelimax Foundation |

## Flash Holdings Forms 1120F

109.    In June of 2016, Smith caused Flash Holdings to delinquently file with the

IRS Forms 1120F, U.S. Income Tax Return of a Foreign Corporation for the 2006

through 2014 tax years.  IRS records do not disclose any prior tax returns by Flash

Holdings. The delinquent Forms 1120F reported approximately $78,000 of income that

Flash Holdings earned from Vista equity funds sited in the United States.  As reflected in

the table at paragraph 103, using the foreign trust-corporate structure created for Smith by

Kepke, from 2010 through 2013 Smith earned approximately $150.8 million of income

from Vista funds sited in foreign jurisdictions which he directed to be deposited into bank

accounts in Flash Holdings's name.  Other than approximately $21.3 million Smith

reported on his amended federal income tax returns for 2010 through 2013, in the

aggregate, as distributions from Excelsior Trust, to date Smith has not fully reported this

income to IRS.

110.    As depicted in paragraph 103, from 2010 through 2013, Flash Holdings

purportedly earned approximately $150.8 million of income from several Vista private

equity funds that was not timely reported on any federal income tax returns.  This income

amount was compiled from two sources.  First, various Vista equity funds, other than

VEF II, issued Forms K-1 to Flash Holdings that were filed with the IRS which totaled

$90.8 million. Second, VEF II issued Forms K-1 to Flash Holdings totaling $60.0 million

but did not file these Forms K-1 with the IRS. The government, in the course of this investigation, obtained copies of these Forms K-1 through the issuance of grand jury subpoenas to Vista and several accounting firms. Former Vista employee Denise Davis testified that initially she was instructed by Vista's CFO to send Flash K-1s to Smith. Later she was instructed to simply, "hold onto" the Flash Holdings' K-1s.

111.   Based on my training and experience it appears that Excelsior Trust was created through a fraudulent conveyance, using Smith's ex-wife's uncle Waddington as a nominee settlor. Further, that Excelsior Trust and Flash Holdings do not have a significant independent business purpose other than acting as nominees for a portion of Smith's income earned from various Vista funds, for the purpose of concealing this income from the IRS.

112.   Based on the statements and representations Kepke made to UCA 2 and UCA 3, Kepke's offshore structures, consisting of trusts and limited liability companies, require the preparation of extensive paperwork by Kepke, a copy of which Kepke stated he maintains in his office and/or storage unit. Kepke also stated to UCA 2 and UCA 3 that he prepares a variety of transactional paperwork for the structures he creates for his clients, such as bills of sale, deeds, invoices, payment histories, etc. According to UCA 3, these client files appear to be maintained by Kepke in his home office at

Houston, Texas or in a closet in the home just outside the home office. UCA 3 also observed that Kepke's home office contains a computer which Kepke apparently used to create and store client files. Kepke stated that he also maintains this client paperwork at his office and/or storage unit. Given the identical nature of the

offshore entities and structures Kepke described to UCA 2 and UCA 3, and the structure Kepke formed for Smith, i.e. Excelsior Trust and Flash Holdings, LLC, which Smith used to conceal assets and taxable income from the IRS, there is probable cause to believe that Kepke has retained copies of formational and transactional documents for Smith's offshore structure in his home office and/or storage unit.

### E.    Kepke Client Robert Brockman

#### Brockman's Businesses

113.    Consistent with the foreign tax shelter structure Kepke described to UCA 2 and UCA 3, Brockman utilized a structure consisting of a foreign trust, which in turn owned a foreign company, to conceal tens of millions dollars of taxable income from the IRS.  The information set forth in the sections below describes how Brockman placed some of his income-producing business interests into the foreign company – Spanish Steps, which was in turn "owned" by the foreign trust – the A. Eugene Brockman Charitable Trust (previously the A. Eugene Brockman Children's Trust).  Brockman also used another foreign company, Point Investments, LTD to hold his investments in Smith's private equity company, Vista Equity Funds.  Point Investments was also owned by a foreign trust – The Point Purpose Trust.  The income and assets Brockman concealed using the Kepke structure have not been reported to the IRS.

114.    As set forth in Paragraph 33 above, during an IRS civil audit, Kepke provided IRS civil examination client invoices he used to bill 102 clients for legal services during the years 1995 and 1996. Brockman was one of the clients identified.

115.    During the course of this investigation, IRS-CI has obtained bank account

records for Kepke's bank accounts at Amegy Bank, Wells Fargo, and Chase through the issuance of grand jury subpoenas.  IRS-CI has also obtained copies of Kepke financial records from E-Trade and American Express.

116.   An analysis of Kepke's bank account records reflect that from 2011 through the present he received more than $45,000 from Brockman and Brockman-related entities, including a $25,000 wire transfer dated August 15, 2016 from Butterfield Bank – Bermuda in the name of St. John's Trust Company (see below), and several checks from Brockman's company, Dealer Computer Services (hereinafter "DCS").

117.   Kepke's e-mail account reflects that Kepke was in regular e-mail communication with Brockman or his associates.  Specifically:

      a.    Approximately 100 e-mails between Kepke and Evatt Tamine (a trustee);

      b.    Approximately 25 e-mails between Kepke and Donald Jones (former CFO of Universal Computer Systems and financial advisor to Brockman; also known as Don Jones); and

      c.    Approximately 15 e-mails between Kepke and Brockman.

118.   Brockman is the Chairman and CEO of Universal Computer Systems Holding (hereinafter "UCSH") which was incorporated in December 1987.  According to Brockman's internet biography, he founded Universal Computer Services, Inc. (UCSH's predecessor) in 1970 "as a service bureau to provide data processing services to automotive dealerships."  UCHS in turn owns all of the stock of DCS.

119.    In response to a grand jury subpoena, Amegy Bank provided a

February 2013 Credit Presentation related to DSC that stated:

> [DCS] is the Texas based holding company under Reynolds & Reynolds
> ("R&R") that is the leading provider of integrated solutions for automotive
> retailers. The company was incorporated in 1991 by Robert Brockman. In
> 2006, DCS purchased the then public company R&R and took the entire
> company private. . . . In 2006, R&R merged with Universal Computer
> Systems, Inc. ("UCS"), which is headquartered in Dayton, Ohio and has
> more than 5,000 associates worldwide.
>
> . . .
>
> [DCS] is comprised of a tiered ownership structure, with Spanish Steps
> owning 93% of this entity. UCS is a subsidiary of Spanish Steps and a
> parent company of DCS. Finally, DCS is the established parent company of
> R&R.

120.    The "tiered ownership structure" referenced by Amegy Bank is depicted in

the document by the chart reproduced below. A footnote to this chart states that "Spanish

Steps is Bob Brockman's investment vehicle."



121.    The information in the previous paragraphs corroborates other documents

and information reviewed and obtained in the course of this investigation.  According to

the IRS Form 851 – Affiliations Schedule, filed with UCSH's 1996 Form 1120, United

States Corporate Income Tax Return, UCSH owns 100% of the common stock of DCS, a

U.S. corporation with the address 1209 Orange Street, Wilmington, Delaware.

According to the State of Delaware Division of Corporation's database, DCS was incorporated on March 20, 1995. According to IRS records, DCS continues to be 100% owned by UCSH as of 2016.On April 17, 2017, UCSH filed a 2016 FBAR identifying its financial interest in 31 foreign accounts, including an account held in the name of the Bermuda entity DCS Risk Management, which owns St. John's Trust Company according to information obtained from Bermuda Financial Intelligence Agency.

122.    In or about 2006 DCS merged with a competitor, Reynolds and Reynolds, (hereinafter "R&R"). R&R filed a Schedule 14A Proxy Statement with the Securities and Exchange Commission on September 21, 2006 in relation to the UCSH and R&R merger. Section 5.08 of the Schedule 14A Proxy Statement disclosed that UCSH and the investor group expected that approximately $2.96 billion of debt and equity financing would be necessary to complete the merger. The equity financing was to be provided by GS Capital Partners V Fund, L.P., Spanish Steps, and Vista Equity Fund II, L.P. in an aggregate amount of approximately $420 million. The lenders had committed to provide debt financing in an aggregate amount of approximately $2.54 billion.

### Spanish Steps

123.    According to records obtained from the government of Bermuda, Spanish Steps was incorporated on March 20, 1989, in the BVI. The 2015 federal income tax return for UCSH reported that Spanish Steps owns 93% of UCSH's common stock.

124.    The A. Eugene Brockman Charitable Trust, a Bermuda entity, owns

Spanish Steps.[11] The A. Eugene Brockman Charitable Trust was settled on May 26, 1981;

its beneficiaries are Brockman, Dorothy Kay Brockman, Thomas David Brockman,

Victoria Brockman, and a charitable organization to be named later.  The trustee of the A.

Eugene Charitable Trust is the Bermuda company, the St. John's Trust Company.  Evatt

Tamine is the director of the St. John's Trust Company.

125.    According to records obtained from Bermuda Commercial Bank, the St.

John's Trust Company is owned by the Waterford Charitable Trust, whose trustee is the

Bermuda company, Cabarita PTC Limited.[12]  Evatt Tamine is the director of Cabarita

PTC Limited.  According to an analysis conducted by the government of Bermuda of the

banking activity of: Spanish Steps; the A. Eugene Charitable Trust; the Waterford

Charitable Trust; and Cabarita PTC Limited, there is no record of any charitable banking

activity by these entities for the 19 month period from July 2016 to February 19, 2018.

These entities do not appear to have any business purpose other than to act as nominees

for Brockman's assets and income.

### Point Investments

126.    The evidence acquired during the course of this investigation indicates that

form 2000 through 2014 Brockman, through Point Investments, was a limited partner

---

[11]    The A. Eugene Brockman Charitable Trust was formerly known as the A. Eugene
Brockman Children's Trust.  Aquitaine Protectors, Ltd. was listed as the trust protector of the
A. Eugene Brockman Children's Trust.  Trevor Lloyd, now believed to be deceased, was listed
as the 100% owned of Aquitaine Protectors, Ltd.

[12]    As indicated in paragraph 121 above, records from another source indicate that a different
entity owns St. John's Trust Company.

investor in several of Smith's Vista Funds.  The income earned and distributed to

Brockman/Point from these investments has not been reported to the IRS.

127.   A "Memorandum of Continuance of Point Investments, Ltd." obtained

from Bermuda states that Point was incorporated in the BVI on July 14, 1999.  On

November 30, 1999, Point was registered with the Registrar of Companies in Bermuda.

Evatt Tamine, the Director of Point, simultaneously filed other documents with the

Registrar of Companies stating that the address of the registered office for Point was now

located in Bermuda.

128.   Point Investments is owned by the Nevis entity, "Point Investments, LLC,"

which in turn is owned by "The Point Purpose Trust," a Bermuda Trust.  Evatt Tamine is

the trustee of The Point Purpose Trust and has signatory authority over the associated

bank accounts in Bermuda.  Previously, Spanish Steps owned approximately 25% of

Point Investments' preferred stock.  Point Investments is a registered mutual fund in

Bermuda. However, based upon the evidence, these entities do not appear to have any

business purpose other than to act as nominees for Brockman's investments in various

Vista investment partnerships.

129.   Previously, the Massengill Grandchildren's Trust purportedly owned Point

Investments. The Massengill Grandchildren's Trust, along with the Louise C. Massengill

Family Trust and Massengill Children's Trust, appear to have been used by Brockman to

move and hide the true ownership of hundreds of millions of dollars. Tamine established

two Charles Schwab brokerage accounts in the names of Augustus Investments LLC and

Spartacus Investments LLC in late 2007. At the beginning of 2008, the value of the

accounts exceeded $287 million. In correspondence, Tamine represented to Charles Schwab that the Massengill Children's Trust and the Louise C. Massengill Family Trust owned these two brokerage accounts. However, e-mail communications between Kepke and Don Jones dated January 27, 2011, indicate that there was very little activity with respect to the three Massengill Trusts over the last ten years, which is inconsistent with the opening of financial accounts worth hundreds of millions of dollars.

### Evatt Tamine

130.    According to information obtained from the government of Bermuda, Tamine is a director, signatory, and/or trustee of the following entities: Spanish Steps; Addington Trading LLC; Cabot Global Investment, Ltd; Cascade Holdings LLC; Edge Capital Investments, Ltd; Harrison Capital Investments; Kiama Management LLC; Legend Investments LLC; Outdoor Rehabilitation Trust; Pilot Management, Ltd; Regency Management, Ltd; Tangarra Consultants Limited; and Wedge Consulting, Ltd.

131.    A Bermuda police officer recently advised IRS-CI Special Agents that he personally knows Tamine. According to this police officer, Tamine is a lawyer who came to Bermuda in approximately 1993. A wealthy individual from Texas hired Tamine to work for his educational trust in Bermuda. Initially the police officer could not recall the name of this individual from Texas. The police officer believes that Tamine works exclusively for this individual from Texas, who had set up an educational trust in Bermuda with a lot of money to distribute for educational purposes. The police officer further advised that he would be surprised if Tamine were involved in anything illegal since Tamine's wife was a former regulator for the Bermuda Monetary authority who

often spoke out against illegal trust activities.

132.    On April 23, 2010, Tamine obtained a Texas state driver's license listing

Houston, TX as his address on the driver's license.  This address is the

same as the Houston headquarters of Brockman's company UCSH.

### Brockman's Unreported Income Earned
### From Vista Through Point Investments

133.    On the last page of a copy of the VEF II Partnership Agreement, dated in or

about 2000, produced by Kepke during the Smiths' divorce proceedings, the document

footer contains the following reference:        9258 v6 – Brockman-Cayman L.P."

134.    On or about January 12, 2000, in conjunction with the establishment of

VEF II's initial bank account at First Caribbean International Bank in the Cayman Islands

(hereinafter "CIBC"), Ben Gillooly (hereinafter Gillooly), General Manager - Trust

Division of CIBC, authored and submitted a reference letter dated January 12, 2001, on

behalf of VEF II.  In his reference letter Gillooly stated the following:

- The Limited Partner in VEF II is a BVI company called Point:

- Point is a mutual fund registered to do business in Bermuda;

- The voting shares of Point are owned by a trust which is based in Bermuda;

- The investors in Point are a number of holding companies of certain U.S.

    operating companies;

- The funds utilized for investment purposes were originally paid out from the

    U.S. companies as fully taxed dividends to the holding companies;

- The holding companies in Bermuda are owned by a number of trusts for the

benefit of Brockman and his family;

- Brockman and his main advisor, Don Jones, have been known to me since the early 1980's;

- Don Jones is based in Bermuda and is the manager of the offshore structures;

- Brockman is the CEO of the U.S. operating companies that sell computer services to major car dealerships all over the United States;

- Brockman has significant wealth and the trusts have assets well in excess of $1.0 billion;

- I can assure you the funds are legitimate and the capital commitment of $300 million is well within their capabilities;

- I have had personal dealings with Brockman and Don Jones over the last 17 years; and

- The voting shares of Point are owned by a trust based in Bermuda (i.e. the A. Eugene Brockman Children's Trust). In addition, the funds invested in Point were paid out from the U.S. companies (i.e. UCSH) as fully taxed dividends to the holding companies (i.e. Spanish Steps).

135.   In a September 20, 2011 e-mail obtained from a grand jury subpoena issued to Vista, Vista's CFO, Warnken-Brill, responded to an inquiry from Ahman Dirks, a private equity senior analyst for Pension Consulting Alliance, Inc., requesting the identity of the "one private investor" in VEF II. Warnken-Brill responded that: "The actual LP of VEF II is Point Investments, Ltd. The CEO of what was Universal Computer Systems (and is now Reynolds and Reynolds) is Bob Brockman."

136.   On May 18, 2017, Warnken-Brill testified in the grand jury, that "there is, or may be, some affiliation [between Point and Brockman]," although in regards to Point, he primarily dealt with Don Jones and Tamine.

137.   On or about May 31, 2018 Stephen Davis, Vista founding partner stated that:

        a.    Brockman was the person behind Point in regards to the VEF II Fund;

        b.    Brockman was the source of the initial $300 million investment into VEF II and had an influence on the creation and operation of VEF II;

        c.    Point existed prior to the formation of VEF II and its CFO was a man named Don Jones; and

        d.    Brockman was involved in Vista's participation in the purchase of Reynolds & Reynolds by UCSH.

138.   Denise Davis, former Vista Director of Finance testified that Brockman was the individual that controlled Point. Denise Davis also stated that she learned this from conversations she had with her supervisor at Vista – Vista CFO John Warnken-Brill.  Denise Davis was instructed by Warnken-Brill to never associate Brockman with Point.

139.   Denise Davis also stated that she took instruction from Tamine with respect to accounting work she performed at Vista for Point.

140.   On or about September 25, 2004, Brockman sent a memorandum to "Robert Smith Vista Equity Partners" with the subject line "Applied Systems, Inc.," one

of the companies in the VEF II portfolio. The Brockman memorandum discussed

software issues that Brockman identified in evaluating Applied Systems' use of

Microsoft's software products. The memorandum begins:

> As your consultant . . . . My observations are as follows . . . . Therefore, my
> recommendation is as follows: Applied should license (on terms that are
> vastly more financially favorable then Microsoft products) the Power
> Workstation/PowerServer environment from UCS. This proven
> environment overcomes all of the issues with the Microsoft approach.

141.  A September 25, 2006 e-mail from Warnken-Brill to Don Jones and

Tamine, obtained pursuant to a grand jury subpoena issued to Vista, discussed "the

estimated distribution of the proceeds from the Applied sale . . . .as soon as the proceeds

have reached the VEF II account." Warnken-Brill further stated in the e-mail: "Per the

partnership agreement, we need your approval to make the distribution." The spreadsheet

attached to the e-mail calculates a total sales proceeds distribution of $508,344,312.80, of

which Flash Holdings and Point were allocated $208,594.01 and $507,327,624.17,

respectively, while the balance of the sale proceeds were allocated to the other VEF II

partners. The spreadsheet referenced paragraphs 6.3 of the VEF II Partnership Agreement

– "Distributions Attributable to Portfolio Investments".

142.   Data compiled from financial records obtained from Vista pursuant to a

grand jury subpoena indicates that during the years 2000-2014, Point made capital

contributions to VEF II and received distributions from VEF II as shown in the table

below.

Point Investment
Activity for Vista Equity Fund II, LP

| Year | Contributions | Distributions |
|------|---------------|---------------|
| 2000 | 18,050,000 | - |
| 2001 | 6,805,446 | - |
| 2002 | 18,278,001 | - |
| 2003 | 62,366,015 | 5,868,598 |
| 2004 | 332,123,254 | 43,309,792 |
| 2005 | 69,300,867 | 287,917,862 |
| 2006 | 155,021,946 | 524,459,244 |
| 2007 | 262,041,264 | 68,175,023 |
| 2008 | 2,908,836 | 17,891,797 |
| 2009 | 1,635,806 | 1,835,806 |
| 2010 | 716,721 | 1,003,842,484 |
| 2011 | - | 21,379 |
| 2012 | 665,653 | 68,183,574 |
| 2013 | 1,158,185 | 47,342,689 |
| 2014 | 900,000 | 345,618,920 |
| Total | 931,971,994 | 2,414,467,168 |

143.    Bank records from a VEPF II bank account at CIBC indicate that profits from Vista funds earned by Point were transmitted to Point bank accounts at Bermuda Commercial Bank – Bermuda and Mirabaud & Cie SA – Switzerland.  None of this income has been reported on any U.S. federal income tax return.

144.    On or about July 21, 2014 Smith received approximately $75 million from Point's account at Mirabaud Bank in Switzerland that was wired into his bank account at Bank of America (account no. ********4194).

145.    On or about July 25, 2014 Smith transferred $55 million from account no. ********4194 at Bank of America - the same amount as the upfront cash settlement Smith owed to his ex-wife McFayden Smith in their divorce settlement.

146.    Brockman did not report any of these foreign bank accounts on an FBAR
(See footnote 10 for the definition of an FBAR).  Brockman's sole FBAR filing, for
calendar year 2014, reported that he had signature authority, but no financial interest, in a
JP Morgan Chase & Company account in Toronto, Canada.

147.    As shown in the table below, data compiled from accounting records
obtained from Vista pursuant to a grand jury subpoena indicates that Point, the sole
limited partner of VEF II, received income totaling $1,482,729,096 in the years 2000-2014
that has not been reported to the IRS.

Point Investment
Income from Vista Equity Fund II, LP

|  |  |
|---|---|
| 2000 | (1,659,788) |
| 2001 | (1,318,309) |
| 2002 | (1,354,192) |
| 2003 | (3,063,991) |
| 2004 | 5,121,048 |
| 2005 | 202,524,453 |
| 2006 | 299,350,626 |
| 2007 | 760,206 |
| 2008 | (9,853,660) |
| 2009 | (1,602,427) |
| Subtotal 2000-2009 | 488,903,966 |
|  |  |
| 2010 | 738,433,913 |
| 2011 | (2,093,306) |
| 2012 | 67,614,235 |
| 2013 | 46,587,410 |
| 2014 | 143,282,878 |
| Subtotal 2010-2014 | 993,825,130 |
|  |  |
| Total 2000-2014 | 1,482,729,096 |

148.    As shown in the table below which summarizes information contained in
IRS records, from 2010 to 2014 Brockman reported an aggregate income of $44.1 million

on his federal income tax returns. This is in contrast to the income distributed by Vista to Point. Based upon the information developed in the investigation, Brockman, using the foreign structure designed and created by Kepke, failed to report, and pay federal income taxes on, approximately $1.0 billion.[13]

ROBERT BROCKMAN
Estimate of Unreported Income Diverted to Point Investments
For the Tax Years 2010 – 2014

| Particulars | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|
| Taxable Income Reported on Form 1040 | 4,367,939 | 4,883,517 | 3,923,221 | 5,152,696 | 25,792,300 | 44,119,673 |
| Unreported income from VEF II | 738,433,913 | (2,093,306) | 67,614,235 | 46,587,410 | 143,282,878 | 993,825,130 |
| Corrected Taxable Income | 742,801,852 | 2,790,211 | 71,537,456 | 51,740,106 | 169,075,178 | 1,037,944,803 |

149.     A review of IRS records reveals that Point, Spanish Steps, and the A. Eugene Charitable Trust have not filed any federal income tax returns with the IRS. These entities do not appear to have any significant business purpose other than holding Brockman's investments in various Vista funds, and for purposes of Title 26, United States Code Section 7701(o) should be disregarded for federal income tax purposes.

150.     Based on the statements and representations Kepke made to UCA 2 and UCA 3, Kepke's offshore structures, consisting of trusts and limited liability companies, require the preparation of extensive paperwork by Kepke, a copy of which Kepke stated he maintains in his office and/or storage unit. Kepke also stated to UCA 2 and UCA 3 that he prepares a variety of transactional paperwork for the structures he creates for his clients, such as bills of sale, deeds, invoices, payment histories, etc. According to

---

[13]     Since Brockman resides in Texas, a community property state, approximately 50% of this additional income may be allocated to his spouse.

UCA 3, these client files appear to be maintained by Kepke in his home office at

Houston, Texas, or in a closet in the home just outside the home office.

UCA 3 also observed that Kepke's home office contains a computer which Kepke

apparently uses to create and store client files.  Kepke stated to UCA 3 that he also

maintains this client paperwork at his office and/or storage unit.  Given the similarity of

the offshore structures Kepke described to UCA 2 and UCA 3 to the structure Kepke

formed for Brockman, which he used to conceal assets and taxable income from the IRS,

together with the evidence that Brockman is a Kepke client, there is probable cause to

believe that Kepke has retained copies of formational and transactional documents for

Brockman's offshore structure in his home office and/or storage unit.

### Other Kepke Clients

151.    In addition to Smith and Brockman, the analysis of Kepke's business bank

account identified other clients that utilized Kepke's structure to conceal taxable income

offshore.  These clients include Roy and Ron Whitley (father and son), and Enrique

Gasca (hereinafter "Gasca").  The Whitleys own and operate a company named Ranger

Steel, which is reportedly the largest importer of steel plates in the United States.

152.    Both of the Whitleys entered into the Offshore Voluntary Disclosure

Program in 2009 and admitted that they used Kepke to create an offshore structure for

them.  Below is a summary of their responses documented by the IRS Revenue Agent

handling their OVDP submissions:

a.    Ron Whitley – "The taxpayer [Ron Whitley] did not say what was

provided but said the offshore entities were set up for tax avoidance,

there was no legitimate business purpose for forming the entities;"

and

b.      Roy Whitley – "The taxpayer [Roy Whitley] was told to set up the

offshore entities by Carlos Kepke. He [Kepke] advised them [the

Whitleys] that it was necessary for asset protection and tax savings.

The offshore entities served no purpose other than to reduce tax

liability. The entities were collapsed during the certification."

153.    Gasca entered into the OVDP in 2014; he is currently under examination by

Civil IRS as part of the OVDP process. Gasca had an undisclosed account in Switzerland

at Credit Suisse, which has since been closed. Gasca advised that his attorney Kepke

assisted him with creating the offshore trust structure that held this account. Gasca used

trust management services from companies located in Belize, the BVI and Nevis.

## IV.   DOCUMENTARY AND ELECTRONIC RECORDS

154.    Based on my training, experience, knowledge and participation in this and

other criminal investigations, and accumulated knowledge from consultations with other

law enforcement agents, including debriefings and interviews of known offenders in

other cases, I also know and contend that the following traits are common practices of

offenders involved in various types of fraud:

a.      fraud is frequently a continuing activity over many months and

years;

b.      offenders who commit fraud keep records of their illegal activities

for a lengthy period of time, even extending substantially beyond the time during which

they actually produce, market, sell, and profit from their crimes;

      c.    offenders who commit fraud commonly maintain hard copy and computer files, books, records, receipts, notes, ledgers, journals, diaries, address books, and other sundry materials, and papers relating to their crimes; and

      d.    offenders who commit fraud often possess evidence, fruits, and instrumentalities relating to such offenses in their places of business, including home offices.

155.   I am aware that people frequently use both business and personal cellular telephones (commonly called cell phones) for personal and professional communications and purposes. Many cell phones have advanced capabilities, including: internet browsing, text and e-mail, photography and video storage, notes, calendars, and data file storage. I am also aware, through training and experience, that people use cell phones to communicate with each other via voice, direct connect, text message, and e-mail ; store valuable data such as names, and addresses; obtain and store directions and maps; search the Internet; and capture audio, image, and video files.

156.   As described above and in **Attachment B** this application seeks permission to search for records that might be found at **The Kepke Law Office** in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive (including a server, such as an e-mail server) or other storage media, including "smart" cellular telephones. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

157.   I submit that if a computer or storage medium is found at the **The Kepke Law Office**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used

for, and who has used it. To give a few examples, this forensic

evidence can take the form of operating system configurations,

artifacts from operating system or application operation, file system

data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence,

because special software is typically required for that task. However,

it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or

"cache."

e.   Based on actual inspection of other evidence related to this

investigation, including e-mail and spreadsheets, I am aware that

computer equipment was used to generate, store, and print

documents used in the fraud scheme described herein. There is

reason to believe that there is at least one computer currently located

at the **The Kepke Law Office**.

158.  As further described in Attachment B, this application seeks permission to

locate not only computer files that might serve as direct evidence of the crimes described

on the warrant, but also for forensic electronic evidence that establishes how computers

were used, the purpose of their use, who used them, and when. There is probable cause to

believe that this forensic electronic evidence will be on any storage medium at the **The**

**Kepke Law Office** because:

Affidavit—Page 75 of 84

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information,

communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example,

images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

159.   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary

to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the

Premises. However, taking the storage media off-site and reviewing

it in a controlled environment will allow its examination with the

proper tools and knowledge.

c.     Variety of forms of electronic media. Records sought under this

warrant could be stored in a variety of storage media formats that

may require off-site reviewing with specialized forensic tools.

160.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I

am applying for would permit seizing, imaging, or otherwise copying storage media that

reasonably appear to contain some or all of the evidence described in the warrant, and

would authorize a later review of the media or information consistent with the warrant.

The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human

inspection in order to determine whether it is evidence described by the warrant.

161.   I understand that **The Kepke Law Office** is a functioning entity that has

ongoing business operations. The seizure of the computers may limit **The Kepke Law

Office's** ability to conduct its ongoing business. As with any search warrant, I expect that

this warrant will be executed reasonably. Reasonable execution will likely involve

conducting an investigation on the scene of what computers, or storage media, must be

seized or copied, and what computers or storage media need not be seized or copied.

Where appropriate, agents or their qualified analysts will copy data, rather than

physically seize computers, to reduce the extent of disruption.  If requested, the agents

will, to the extent practicable, attempt to provide copies of data that may be necessary or

important to the continuing function of **The Kepke Law Office's** legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it as soon as is practicable.

162.    The items to be seized will likely involve items potentially protected by the attorney-client communications privilege or the attorney work product doctrine. To insure that the investigation team and prosecution team does not improperly review any materials protected by these privileges, procedures will be adopted and followed in this search.  A filter team consisting of Department of Justice attorneys, legal assistants, and federal law enforcement agents from the Internal Revenue Service Criminal Investigations will take possession of all materials described in Attachment B from the law enforcement personnel conducting the Attachment B review.

163.    The filter team will identify all material that is neither privileged nor potentially privileged, and segregate this from any privileged and potentially privileged material seized during the execution of the search warrant. "Privileged" information includes attorney-client information, attorney work product information, and client confidences.

164.    After the filter team has located all privileged and potentially privileged material in the seized information, the filter team will segregate the material that does NOT contain any privileged or potentially privileged information and provide the non-privileged information to the investigation/prosecution team.

165.    The filter team will file an Ex Parte Motion with the United States District Court requesting a Finding and Order regarding the privileged nature of any material that the filter team deems privileged or potentially privileged. The filter team may also ask the District Court to make a Finding and Order on any exceptions to the attorney-client communication privilege and attorney work product doctrine, including the crime/fraud and third party disclosure exceptions, and their applicability to the subject e-mails.

166.    Once a final judicial determination is made regarding the material that does NOT contain communications covered by the attorney-client communication privilege and/or attorney work product privilege, and the applicability of any exceptions to that privilege/doctrine, the filter team will provide that judicially cleared material to the Prosecution Team.

167.    No member of the filter team shall disclose the contents of any material obtained pursuant to the search warrant as identified in Attachment B, to members of the Prosecution Team except in accordance with the procedures outlined above.

## V.    **CONCLUSION**

168.    Based on the facts presented, there is probable cause to believe that evidence, fruits, and instrumentalities of the violations of Title 26, United States Code Sections 7201 [tax evasion], 7203 [failing to file tax returns], 7206(1) [making and subscribing false tax returns], and 7206(2) [aiding and assisting in the preparation of false tax returns], Title 18, United States Code Section 371 [conspiracy to defraud the United States], and Title 31, United States Code Section 5322 [failing to file reports of foreign bank accounts], will be found at **The Kepke Law Office**, and Kepke's offsite storage

facility.

169.   Accordingly, I respectfully request that the Court issue a search warrant for

**The Kepke Law Office**, which is located at _____ Houston, Texas 77056-

1417, as described in Attachment A for the items listed in Attachment B and the seizure

and examination of any items found.


_____

Trista Merz
Special Agent
Internal Revenue Service-Criminal Investigation

Subscribed and sworn to me in My Presence on August ___14___, 2018, and

I find probable cause.


_____

NANCY K. JOHNSON
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
### Location to be Searched

1.    A single residence located at                    Houston, Texas 77056-1417, in the Southern District of Texas, occupied by Carlos Kepke, and used by Kepke as law office.  More particularly described as a red brick two story town home with the address "149" just to the right of the front door.

## ATTACHMENT B
### Items to be seized

1.      Any record, paper, document, correspondence, mail item/parcel, folder, index card, ledger, notebook, booklet, journal, or any electronic/digital/computerized form of such records that relates to the ownership, formation, creation, maintenance, management, opening and management of financial accounts, distribution of income and profits, investment in, accounting for, or federal and state tax return preparation, relating to the time period from 1992 to the present for:

        a.      Robert Smith;

        b.      Flash Holdings, LLC;

        c.      Flash Property Management, LLC;

        d.      Excelsior Trust;

        e.      Vista Equity Partners;

        f.      Vista Management Ltd.

        g.      Vista Equity funds;

        h.      Vista Equity Fund II LP;

        i.      Vista Equity Partners Fund III LP;

        j.      Vista Equity Partners Fund IV LP;

        k.      Vista Foundation Fund I LP;

        l.      Robert Brockman;

        m.      Evatt Tamine;

        n.      Trevor Lloyd;

o.      Donald Jones, also known as Don Jones;

p.      Spanish Steps;

q.      Point Investments, LLC;

r.      Roy Whitley;

s.      Ron Whitley; and

t.      Enrique Gasca.

2.      Any documentary evidence, records, correspondence, and/or digital evidence indicating that the following entities were created, maintained, and/or managed for the purpose of concealing income and/or assets taxable in the United States from the United States Internal Revenue Service for the tax years 1992 through the present:

a.      Excelsior Trust;

b.      Flash Holdings, LLC;

c.      Vista Management Ltd.

d.      Flash Property Holding, LLC;

e.      Flash Property Management, LLC;

f.      White Mulberry SARL;

g.      Mountain Air Recovery Trust;

h.      Boulder River Ranch Recovery Settlement;

i.      SCI Thisbe;

j.      SCI Pyramus;

k.      Universal Computer Systems;

l.      Universal Computer Systems Holdings;

m.      Dealer Computer Services;

n.      DCS Risk Management, Ltd.;

o.      Reynolds and Reynolds;

p.      Spanish Steps Holdings, Ltd.

q.      Spanish Steps LLC;

r.      Point Investments, Ltd.;

s.      Point Investments LLC;

t.      The Point Purpose Trust;

u.      A Eugene Brockman Charitable Trust;

v.      A. Eugene Brockman Children's Trust;

w.      Massengill Children's Trust;

x.      Massengill Grandchildren's Trust;

y.      Louise C. Massengill Family Trust;

z.      St John's Trust Company;

aa.     Cabot Global Investment, Ltd.;

bb.     The Outdoor Rehabilitation Trust;

cc.     Waterford Charitable Trust;

dd.     Cabarita PTC Limited;

ee.     Addington Trading LLC;

ff.     Cascade Holdings LLC;

gg.     Edge Capital Investments, Ltd.;

hh.     Harrison Capital Investments;

ii.     Kiama Management LLC;

jj.     Legend Investments LLC;

kk.    Pilot Management, Ltd.

ll.     Regency Management, Ltd.

mm.   Tangarra Consultants Limited; and

nn.    Wedge Consulting, Ltd.

3.     Any record, paper, document, correspondence, mail item/parcel, folder, index card, ledger, notebook, booklet, journal, or any electronic/digital/computerized form of such records, that relates to the ownership, formation, creation, maintenance, management, opening and management of financial accounts, distribution of income and profits, investment in, accounting for, or preparation and presentation of federal and state tax returns, relating to the time period from 1992 to the present for:

a.   Carlos E. Kepke;

b.   The Robert E. Kepke Trust;

c.   Westford Financial Corporation;

d.   Vex Tex; and

e.   Lion Securities.

4.     Any records, documentary evidence, correspondence, and/or digital evidence indicating that the following entities were created, maintained, and managed for the purpose of concealing income and assets taxable in the United States from the United States Internal Revenue Service for the tax years 1995 through 2017:

a.   The Robert E. Kepke Trust;

    b.  Westford Financial Corporation;

    c.  Vex Tex; and

    d.  Lion Securities

5.     Carlos E. Kepke's client list of his legal practice operating out of his home at 149 Sage Road, Houston, Texas 77056-1417, in the Southern District of Texas, in any form, paper or digital, to include past and former clients from 1992 to the present.

6.     Such records pertaining to the individuals and entities listed in paragraphs 1 through 4 above to include:

    a.  Correspondence, business plans, financial projections, financial models, proposals, memoranda, quotes, estimates, bids, deeds, titles, trust indentures, partnership agreements, articles of incorporation, registrations, licenses, appraisals, agreements, contracts, stock certificates, confirmations, receipts, bills of sale, statements, invoices, checks, drafts, vouchers tax forms, work papers, and tax returns;

    b.  Other accounting/business/ financial documents such as balance sheets, profits & loss statements, cash flow statements, audit work papers, deposits and withdrawal tickets, wire transfer records, ATM receipts/memos, account statements, lease agreements; and

    c.  Any other domestic and foreign documents required by federal, state, county, municipal and foreign governmental bodies for the formation, maintained, and management of the described entities and related transactions.

7.    Any electronic or mechanical item or device that could contain the type of records described herein, such as any type of computer or computerized record keeping storage system, such as a personal digital assistant, flash drive, thumb drive, portable hard drive, computer, tablet, smart phone, pager, fax machine, electronic planner, diskette, CD, DVD, Memory stick drive, roll-a-dex, address/phone book, calendar, or diary.

8.    Any passwords, encryption keys, and other access devices that may be necessary to access any computer, computerized record keeping storage system or electronic file.