STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, CA 95113
Telephone: (408) 535-5040
Facsimile: (408) 535-5081
Email: michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
United States Department of Justice
Telephone: (202)514-5230
Email: corey.smith@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARLOS E. KEPKE,<br><br>Defendant. | Criminal No. 3:21-CR-00155-JD<br><br>GOVERNMENT'S NOTICE OF MOTION AND MOTION IN LIMINE TO ADMIT EVIDENCE OF UNDERCOVER CONTACTS<br><br>Hearing.: September 12, 2022<br>Time: 10:30 a.m.<br>Place: Courtroom 11, 19th Floor |

## **NOTICE**

PLEASE TAKE NOTICE that on September 12, 2022, at 10:30 a.m., or as soon thereafter as the matter may be heard, before the Honorable James Donato, United States District Court, San Francisco Courthouse, Courtroom 11 – 19th Floor, 450 Golden Gate Avenue, San Francisco, California, the United States of America ("United States" or "government"), will and hereby does move the Court to admit certain evidence at trial, and states as follows in support:

**MOTION**

The government hereby moves for the admission of recordings of Defendant's contacts with undercover agents, transcripts of those contacts, and other communications exchanged between Defendant and undercover agents during the course of an undercover operation described more thoroughly below (collectively the "Undercover Evidence") because the Undercover Evidence is admissible as direct evidence of the crimes charged in the Indictment, or, alternatively, are admissible under Federal Rule of Evidence 404(b).

**BACKGROUND**

Beginning in 1999 and continuing until 2014, Defendant, an attorney, created and managed an offshore trust structure for Robert Smith, one of his clients. The offshore trust structure was designed to evade federal income taxes on approximately $225,000,000 of capital gain income Smith earned from his management of private equity funds at Vista Equity Partners ("Vista"). In October 2020, Smith signed a Non-Prosecution Agreement with the United States (available at https://www.justice.gov/opa/press-release/file/1327906/download). In connection with that Agreement, Smith signed a Statement of Facts (available at https://www.justice.gov/opa/press-release/file/1327911/download) in which he admitted that the offshore trust structure Defendant (referred to as Individual B in the Statement of Facts) created and maintained for Smith was designed and used to hide Smith's assets and tax liabilities from the IRS. As part of that conspiracy, Defendant created a false paper trail to conceal the fact that Smith controlled and used the assets and income deposited into the offshore trust structure (often with Defendant's assistance). The inconsistency between the fiction this false paper trail was designed to project and the reality of how the assets in the offshore trust structure were used reveals that the structure had no legitimate purpose other than tax evasion.

Vista is a San Francisco-based private equity partnership started in 2000 by Smith and his partners, and it is in the business of forming private equity fund partnerships that purchase companies and attempt to increase their value in order to sell them for a profit. In 1999, Smith hired Defendant to create and manage offshore entities to conceal income Smith expected to earn from his investments in Vista funds. Specifically, Smith assigned half of his eight percent general partnership interest in Vista's first fund, Vista Equity Fund II, to a limited liability company called Flash Holdings, which was created

in Nevis by Defendant for Smith in March of 2000. Flash Holdings had no employees, no offices, and never provided any service to Vista or any Vista fund. It had no business purpose other than holding assets for the benefit of Smith. Subsequently, Smith assigned portions of his interests in several other Vista funds to Flash Holdings. The gains generated by Flash Holdings' interests in various Vista funds were distributed by Vista to two offshore bank accounts. One of these accounts was held at VP Bank in the British Virgin Islands in the name of Flash Holdings, and the other was held at Banque Bonhôte Switzerland in the name of "Vista Equity Fund II, LP FBO Flash Holdings." Although these bank accounts were nominally held in Flash Holdings' name, they were actually entirely under Smith's dominion and control.

From 2005 to 2014, Vista distributed approximately $225,000,000 to Flash Holdings. As Defendant was aware, although Smith earned and retained full control over this income, he did not report or pay tax on it.

On paper, Flash Holdings was owned by the Excelsior Trust, which was created in Belize by Defendant for Smith in March of 2000. Like Flash Holdings, Excelsior Trust had no business purpose other than holding assets for the benefit of Smith. When Excelsior Trust was created, Defendant told Smith to recruit someone unlikely to ever visit the United States to designate as the nominal creator, or "Settlor," of Excelsior Trust. Smith ultimately chose the elderly uncle of his spouse at the time, who was a citizen and resident of the United Kingdom. Defendant created a false paper trail indicating that this elderly uncle was the true Settlor of Excelsior Trust. In reality, the uncle had no genuine role in the formation, management, or maintenance of Excelsior Trust. As Defendant knew, Smith was the true creator of Excelsior Trust.

Both Flash Holdings and Excelsior Trust were affiliated with offshore individuals and entities such as trustees and management companies hired and managed by Smith with Defendant's assistance. The purpose of these offshore individuals and entities was to create the illusion that Flash Holdings and Excelsior Trust were controlled by independent professionals. In fact, as Defendant knew, these offshore individuals and entities took direction from Smith, either directly or through Defendant, with respect to assets held in the names of Excelsior Trust or Flash Holdings. For example, one of the Trustees of the Excelsior Trust was a Belizean entity known as Orion Corporate & Trust Services, Ltd

("Orion"). Orion was operated by a Belizean attorney named Emil Arguelles who had a long-standing business relationship with Defendant. Although Defendant sought to convince others that Orion independently managed or controlled assets held in the names of Excelsior Trust, in fact, Orion took direction from Smith, either directly or through Defendant, with respect to those assets.

Thus, the offshore trust structure Defendant created and maintained for Smith was designed, on the one hand, to hide Smith's income, assets, and tax liabilities from the IRS by creating the appearance that Flash Holdings and Excelsior Trust were independent foreign entities such that their assets were not attributable to Smith, while, on the other hand, ensuring that Smith maintained control over those assets.

## THE UNDERCOVER EVIDENCE

Beginning in 2017, the IRS initiated an undercover operation concerning Defendant's marketing of tax shelters. The Undercover Evidence consists of recordings of Defendant's contacts with undercover agents, transcripts of those contacts, and other communications exchanged between Defendant and undercover agents during the course of the undercover operation which have already been produced to Defendant in connection with this prosecution.

The undercover operation utilized multiple undercover agents. The first undercover agent posed as a prospective client seeking to protect his assets. The undercover agent presented himself to Defendant as an automobile broker based in Pennsylvania with an elderly grandmother who was preparing to leave him a farm in her will. The undercover agent told Defendant that he wanted to protect this farm from creditors and his future wife, and Defendant told the undercover agent that setting up offshore trusts "is my practice for twenty-five (25), thirty (30) years, that's all I do. I don't do anything else. . . . Never been to court, I'm not one of those kinds of lawyers. I just do this . . . kind of planning."[1]

Defendant recommended that the undercover agent create a foreign trust and a foreign holding company, and explained that the offshore trust would own the offshore company which would "own" the undercover agent's assets.[2] Defendant referred to this as "asset protection."[3] Defendant went on to

---

[1] IRS-Kepke-0000202.

[2] IRS-Kepke-0000215 – 16.

[3] IRS-Kepke-0000208.

state that "far away the best for what I'm doing and including asset protection is Belize. . . . [The] owner of the assets through a bank account or the brokerage account, that corporation I typically use is from, is from Nevis."[4] Defendant also recommended that the undercover agent pick a name for his trust like "Excelsior Trust."[5] Defendant told the undercover agent that he "wouldn't put a trust in Bermuda today for anything because what's-what's happened with Bermuda is that it's become a sieve to the U.S. Internal Revenue Service in all . . . I mean, they almost just pass freely information about everything."[6] Defendant explained that he used offshore administrators to act as nominal trustees for clients' offshore structures, but made clear that those administrators followed clients' instructions and were not independent.[7] Defendant told the undercover agent "you will not give up control of the trust."[8] In addition, Defendant told the undercover agent that he had high net worth clients whose wives have no idea how much money they held offshore,[9] and also described how he created a false $100,000 business deduction for a client.[10]

The second undercover agent presented himself to Defendant as a friend of the first undercover agent, and a small-business owner with money he wished to protect. Again, Defendant suggested that the undercover agent create a trust in Belize and an offshore holding company, and assign the assets the

---

[4] IRS-Kepke-0000231 – 32.

[5] IRS-Kepke-0000256.

[6] IRS-Kepke-0000231.

[7] **Kepke:** "[I]f you follow my recommendations it would be a ... a trust company, it's been in business forever and it's been ... excellent. And they don't really do anything, you-you gotta understand the te-... what...you don't want a trustee who's gonna se-... .let-let's assume that you got your money and you want to ... and you want, and you want to ... buy a ... a building. ... You don't want a trustee, you don't want to have to go to the trustee and say, and he says ... ah, you know, I don't think that's a good deal. ... I-I don't... think you're pa-... you want a trustee that says, 'Where do I sign.' ... So, that's what you're getting and ... and that's-that's what you pay an annual trustee for, not for...you're not hiring a man to look over your investments and tell me, you're just hiring a guy that basically, uh ... files the papers within ... Belize government and blah-blah-blah.

**Undercover Agent:** He ... he does what I say. (CHUCKLES)

**Kepke:** Does what you say, you know ... Exactly." IRS-Kepke-0000232 – 34.

[8] IRS-Kepke-0000214.

[9] **Kepke:** "I mean, I do have numbers of clients that ... have a lot of money on foreign structures like this and I'll guarantee their wives do not know about it. (CHUCKLES)." IRS-Kepke-0000260.

[10] **Kepke:** "[H]is U.S. company bought a hundred thousand dollar tax deduction [for a feasibility study]. Which it had to pay for, you know, it paid a hundred thousand but paid it to its offshore company, so he paid himself essentially, if you follow what I mean." IRS-Kepke-0000248.

undercover agent sought to protect to the offshore structure.[11] Defendant told the undercover agent that although it would appear on paper as if the undercover agent no longer owned assets held in the structure, the undercover agent would continue to maintain full dominion and control over those assets.[12] Defendant explained to the undercover agent that his structure was designed to avoid tax,[13] and suggested that the undercover agent use a nominee "creator" of the undercover agent's trust. The undercover agent told Defendant that he had a cousin with terminal cancer who may be willing to act as the "creator" of his trust, but the cousin did not have any money to fund the trust. In response, Defendant recommended that the undercover agent engage in a sham transaction in order to transfer the money to fund the trust to his cousin.[14] Defendant warned the undercover agent that if this sham were exposed, and if it were revealed that, in fact, the undercover agent were the true funder of the trust, "[a]ll the tax benefits are demolished."[15] Defendant also described to the undercover agent that the "trustee"

---

[11] **Kepke:** "So what they require, all trustees require that you create a corporation ... that- ... well, and we create a corporation that is owned by the trust, and the assets are actually lodged in that corporation, so we would have the Belize trust that owns an off-shore corporation. The off-shore corporation has the million dollars, it's the one that gives the note, and it's the one's name on the bank account on the - ... in the Pennsylvania bank. ... So the trust ends up being nothing more than a owner of a corporation. You follow me?" IRS-2018-0000390.

[12] **Kepke:** "[Y]ou have to understand that legally you no longer own those assets, although they are still yours to deal with. Uh ... that's ... and that's, that in a nutshell is what asset protection planning is. ...
**UCA 2:** [W]hat if you want it back?
**Kepke**: Then you take it out of the trust, end of story." IRS-2018-0000349 & IRS-2018-0000362 – 63.

[13] **Kepke:** "[I]f you're a creator [of the trust] you don't have the tax advantage. So, what you have to do is you have to sell your assets to the trust ... I'll be happy to get into you on that with you if you're really cons- ... if you think this is a real possibility. And it's ... it's significantly better, uh ... because you – you – you end up – to make it your example, two (2) million dollars in the trust – uh – that is – that earns tax free ... For example ... Assuming your cousin's dead now, you gotta wait ' til your cousin dies ... But you got two (2) million bucks over there ... so let's say you go to stock market and you buy stocks and you sell 'em. Normally you pay a capital gains tax. You would pay no tax." IRS-2018-0000368 – 69.

[14] **Kepke:** "Let's say, and I'll just use an example, let's say that your cousin has a car or a painting or a piece of furniture or something that you like. You buy it from him ... and if you don't pay him seventy-five hundred dollars. You pay him ... you know, eight-thousand – seven dollars or whatever – not the same amount of money that he's gonna create the trust with, if you follow me... And you buy it and you take it, and you get - ... I mean you give him a little some- ... a little- ... have a written document that shows that you bought it ... from him and you take possession, whatever it is ... Well, and you can't ... and you can't just give him a gift. Y-you can't – I'm givin' a g-I'm making you a gift of ten-thousand ($10,000) dollars and then, you know, one week later, seventy-five hundered (7,500) of it is put in a trust. That-that won't work." IRS-2018-0000400 – 401.

[15] **Kepke:** "[W]hat you- ... what you don't want is-is the-the ability to the I- ... for the IRS or anybody to go and say, "your cousin didn't really create this trust. You created the trust ' cause you gave him the

in the proposed offshore structure would also be a nominee, and that the undercover agent would retain the ability to control assets and income held in the trust because the trustee would always follow the undercover agent's instructions.[16]

In a meeting held on February 7, 2018, at Defendant's home office in Houston, Texas, Defendant introduced the undercover agent to an individual he identified only as "Emil" and described as an attorney from Belize who could serve as the trustee of the undercover agent's foreign trust. During their recorded conversation, Emil told the undercover agent that he had been working with Defendant for over fifteen years.[17] Both Defendant and Emil explained that the trustee would always follow the undercover agent's instructions with respect to trust assets,[18] and those instructions were often received through Defendant.[19] During the meeting, the undercover agent asked Defendant about his other clients, and

---

money." ... And that makes you the creator. And that's- ... and that's exactly the- ... and therefore, you're the creator. All the tax benefits are demolished, you've been making all these gains and not paying taxes and you should've paid taxes on it, and you're in big trouble because you didn't- ... because you are the creator and you didn't pay taxes on it." IRS-2018-0000400.

[16] **Kepke:** "They'll [Trustee] be happy to come up and see you and they're good people. I've been doin' business with them for twenty (20) years, more ... Well, actually, them - ... you're not trusting them with your money ... They're not gonna have your money. Your money is gonna go wherever you want it. You wanna keep it in the Pennsylvania bank account ... it's in the Pennsylvania bank account ... Where- ... you don't move your money. You don't move anything unless you want to." IRS-2018-0000387.

[17] IRS-Kepke-2019-000074.

[18] **Undercover Agent:** "[y]ou seem like nice guys, but, right, I'm handin' over, say, five-million dollars. I wanna make sure that it's stayin'...

**Kepke**: You control the money.

**Undercover Agent:** That's what I wanna do – what most clients do.

**Emil**: But we-we don't want to be in control of your money.

**Undercover Agent:** Alright, so I never really ... I never lose control of my money.

**Kepke**: You never lose control ... You, you're just playin' with bank accounts actually. You don't physic ... in ... the company ... the underlying company that we created ... we'll open a bank account and you will ... where you now have your million dollars will go into that bank account in the name of the ABC company ... And you will be the signature on that account." *(tr.pp49-50)*;

[19] **Emil:** "Carlos [Kepke] comes in with ... We – we – we provide the offshore structure and service. He provides the, uhm ... domicile US legal advice and-and-and we work together. We take instructions, largely from Carlos in respect of the US clientele." IRS-Kepke-2019-000075.

...

**Emil:** "In this case, routing you via Carlos [Kepke], we keep everything flowing through him ... We would keep in contact with you if you walked into our office in Belize or via online ... In this case, to make sure everything is ... in compliance ... we prefer all communications and correspondence via Carlos, who then ... We don't want to appear to be ... engaged in the practice of law directly with giving

Defendant made a veiled reference to Smith.[20]

In a telephone conversation held on February 22, 2018, the second undercover agent introduced a third undercover agent to Defendant. The third undercover agent presented himself as the second undercover agent's cousin. Defendant had previously suggested that the second undercover agent use his terminally-ill cousin as the nominal "creator" of his trust, and Defendant elaborated on that plan during the February 22nd call. Defendant reiterated that the purpose of his plan was to avoid tax,[21] and that the scheme required a foreign trust. Defendant explained that the trust would require a nominee creator, and that, ideally, this nominee would not be a U.S. citizen, but that an American nominee would work if no foreigner were available.[22] Defendant made clear that the creator would be a mere nominee with no actual power over the trust.[23] Defendant then gave detailed instructions for the two undercover agents to engage in a sham transaction in order to transfer the money to fund the trust from the second undercover agent to the third, going so far as to suggest that the two pretend the payment were for home

---

advice to U.S. persons." IRS-Kepke-2019-000159.

[20] **UCA 2**: "What's your biggest client?"
**Kepke**: "I have two (2) who are pretty close, three (3) ... If you're tryin' ... give you his name, I can't ...
**Undercover Agent:** No, no I know, no, I know you can't do that, but I meant, like- like, amount of money they dump into somethin' like this. What would be the amount, you think?
**Kepke**: Two (2) or three (3) Billion.
**Undercover Agent:** Billion, with a B? … You've got to be kidding me.
...
**Kepke**: One's a, uh, a, uh, ... private equity fund ... owner of a private ... and one is a owner of a, uh ... what used to be a computer company that serviced all the automobile dealers in the world in the U.S., and the world." IRS-Kepke-2019-000161 – 62.

[21] **Kepke**: "I'll give you- ... I'll give you the general. Uh ... what I do ... eh-eheh, one of the-the main things I do is what- ... is what I'm planning on doing with [the second undercover agent], which is ... helping people to take their-their assets, their liquid assets, and put them in a structure that allows them to, uh ... e-essentially reduce their tax and earn, if it's- ... if it's cash, earn tax-free." IRS-Kepke-2019-000021.

[22] **Kepke**: "[T]he creator has to be a foreign relative pry- ... uh ... for, uh ... let me say the optimal case is if the creator of the trust is a foreign relative ... because, well ... b-because the tax law says that ... If you don't have a foreign relative, a-and apparently [the second undercover agent] doesn't, then what we look for is a U.S. relative with the understanding that the trust will not work tax fr- ... tax free until that U.S. relative dies ... So, a-and that's where you come in to the picture. IRS-Kepke-2019-000023.

[23] **Kepke**: "You-you sign- ... you will- ... you will sign the trust as a creator ... you have no power over the trust, you go away, you're-you're you're not involved in the trust in any way. IRS-Kepke-2019-000028.

furnishings in order to disguise the payment's true nature and purpose,[24] that the payment be made in cash in order to make it difficult to trace,[25] and the that the second undercover agent structure the cash used to make the payment out of his bank account.[26]

Finally, on August 17, 2018 – just two days after agents raided his home office on August 15th – Kepke spoke with the second undercover agent (who Defendant still believed to be a client), and made the following statement: "I been doin' this a long time. Every now and then the government, the IRS says, 'you know, there's so damn much money being saved by taxpayers offshore' so they just appoint a whole bunch of new agents and they start lookin' at offshore trusts. . . . And I'm not sayin' that we are in that wave right now, but somethin' has keyed them into-into starting looking at the creation. Most-most of the time they don't look at the creation, how it was created. . . . But now their-their folks know . . . I think they're gettin' smarter, really is one of the problems."[27]

## ARGUMENT

Recordings of Defendant's contacts with the undercover agents during the course of the undercover operation, transcripts of those contacts, and other communications exchanged between

---

[24] **Kepke**: "[W]e're gonna fund the trust with about, I think, eight-thousand ($8,000.00) dollars ... [The second undercover agent], uh ... he cannot- ... uh ... the law says that [the second undercover agent] cannot give you the money to fund the trust ... [W]hat he can do is buy something from you and pay you x-dollars for it. Then you take eight-thousand ($8,000.00) dollars of that x-dollars and create the trust ... [The second undercover agent] me that-that you [the third undercover agent] did not have ... an asset that'd be worth ten-thousand ($10,000.00) dollars or eight (8) ... So-so what It- so what I told him ... is what I suggested to him ... is that he makes an- a-a written agreement with you ... to buy all of the furniture ... all-all the furnishings, everything that's in your house or apartment, upon your death, with you havin' the right to continue to live there and own it, uh ... use it until you die ... So they would- ... it would be rather difficult for anyone, years from now, if we ever get- ... if he ever got audited, which he won't ... to be able to decide whether those furnishings were worth eight thousand ($8,000.00) dollars or not." IRS-Kepke-2019-000024 – 25.

[25] **Kepke**: "[W]hat I'm tryin' to say is that-that if you give him cash, then-then his deposits don't show as-as coming from a check from you." IRS-Kepke-2019-000052.

[26] **Kepke:** "How do you plan on giving, uh ... nine-thousand-two-hundred ($9,200) dollars?

**Undercover Agent**: Uhm ... I was gonna prob'ly either give him a check or wire it to him or somethin' like that.

**Kepke**: "Uh ... you know what? Uh-uh-eh-eh-eh-uh ... what I would do, if it were me ... I would, uh ... I would give it to him in cash ... And I would m-make withdrawals from your bank, not one withdrawal of nine-thousand-two-hundred (9,200), but thousand ($1,000.00) dollars here, a thousand ($1,000.00) dollars there." IRS-Kepke-2019-000050 – 51.

[27] IRS-2018-0000550.

Defendant and the undercover agents during the course of the undercover operation (collectively the "Undercover Evidence") is admissible as direct evidence of the crimes charged in the Indictment, or, alternatively, are admissible under Fed. R. Evid. 404(b).

The parallels and connections between the Undercover Evidence and the conduct charged in the Indictment are remarkable. The scheme Defendant tried to sell to two undercover agents was identical to the scheme he sold to Smith. Both involved: Using a relative as a nominee to establish a sham trust using funds surreptitiously provided by the client; installing a nominee, offshore trustee to create the false appearance that the trust was under independent control; creating an offshore holding company; installing a nominee, offshore manager to create the false appearance that the company was under independent control; assigning assets to the holding company; and then allowing the client to control those assets by filtering instructions to the offshore nominees through Defendant. Defendant introduced one of the undercover agents to Emil Arguelles, a Belizean attorney whose company, Orion, actually served as trustee of Smith's Excelsior Trust for several years. Defendant also made multiple veiled references to Smith during the undercover, including the suggestion that the agents give his offshore trust the same name as Smith's – the Excelsior Trust. Perhaps most importantly, Defendant's advice to the undercover agents was obviously corrupt, and – as Defendant himself repeatedly advised the undercover agents – specifically designed to defeat taxation on assets held within the offshore structure.

***A. The Undercover Evidence is admissible as direct evidence of Defendant's crimes***

As a general rule, relevant evidence is admissible under Fed. R. Evid. 402, unless otherwise proscribed. Direct evidence of an element of a charged crime is admissible without regard to Rule 404(b), even if the evidenced transaction itself is not charged, because such evidence is not "other acts" evidence. *See United States v. Loftis*, 843 F.3d 1173, 1177 (9th Cir. 2016). Moreover, even if the evidence at issue is not direct evidence of an element of a charged crime, it can still be admitted without regard to Rule 404(b) if it is "inextricably intertwined" with a charged offense. *See United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004). There are two categories of cases in which arguably "other act" evidence is inextricably intertwined with the charged crime. *See id.* "First, evidence of prior acts may be admitted if the evidence 'constitutes a part of the transaction that serves as the basis for the criminal charge.' Second, prior act evidence may be admitted 'when it was necessary to do so in order

to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'" *Id.* (quoting *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995)) (citation omitted); *see also United States v. Rrapi*, 175 F.3d 742, 750 (9th Cir. 1999); *see, e.g., United States v. Whitfield*, 37 F.3d 1503 (8th Cir. 1994) (unpublished) (evidence of undercover operation during which defendant falsified an undercover IRS agent's tax return was not "other act" evidence, and was thus admissible to prove defendant's method of operation with respect to preparing other false tax returns (evidence was also proper under Rule 404(b))).

Here, the Undercover Evidence, including Defendant's advice that the undercover agents implement schemes virtually identical to the one charged in the Indictment combined with his direct references to Smith, are admissible as direct evidence without regard to Rule 404(b) because they reveal the existence of the charged scheme. In cases involving schemes to defraud, the Ninth Circuit has recognized that evidence establishing the existence of the underlying scheme is admissible as direct evidence. *See Loftis*, 843 F.3d at 1177 ("The uncharged transactions, therefore, are part of the charged offense – the fraudulent scheme as a whole – not 'other' crimes or 'other' acts evidence. Rule 404(b) thus does not preclude the government from introducing evidence of uncharged transactions to prove the first element of wire fraud – the existence of a scheme to defraud."). "This principle is well-settled. Indeed, it is this logic that blunts the effect of Fed. R. Evid. 404(b) and allows for the introduction of uncharged transactions to prove the existence of a scheme to defraud." *United States v. Kail*, 18-cr-00172-BLF, 2021 WL 3773613, *4 (N.D. Cal. Aug. 25, 2021) (citing *Loftis*). The Undercover Evidence includes Defendant's repeatedly invoking the same fraudulent scheme alleged in the Indictment. Defendant explained that, on paper, the undercover agent would "no longer own those assets, although they are still yours to deal with . . . that in a nutshell is what asset protection planning is." He suggested that one undercover agent name his trust something akin to "Excelsior," the exact same name used by the Belizean trust Defendant created and maintained for Smith. Defendant also boasted of his billionaire clients, making an obvious reference to Smith (the "owner" of a "private equity fund"). Defendant directly connected the services he was marketing to the undercover agents to those he provided to Smith, stating, "that's all I do. I don't do anything else. . . . I just do this kind of planning." This evidence is akin to an admission that Defendant engaged in the alleged conspiracy with Smith, and also akin to an

uncharged, attempt to perpetuate the charged scheme, or one very similar to it (with different participants but the same victim). As such, the Undercover Evidence should be admitted as direct evidence.

***B. The Undercover Evidence is admissible under Rule 404(b)***

In the alternative, the Undercover Evidence is admissible under Rule 404(b) which provides that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith," but may be admitted for other purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Fed. R. Evid. 404(b). Rule 404(b) is a rule of inclusion, *see United States v. Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995), and evidence of other acts is admissible under Rule 404(b) unless it tends to prove only propensity. *See United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991). Although Rule 404(b) if often described as covering "prior" acts, it does apply to subsequent acts – meaning acts which occurred after the charged conduct – as well. *See id.* Similarly, Rule 404(b) applies to all "other acts," not just bad ones. *See United States v. Vega*, 188 F.3d 1150, 1154 (9th Cir. 1999). Rule 404(b) evidence is often accompanied by limiting instructions.

The Ninth Circuit applies a four-part test to determine whether evidence of other acts should be admitted:

> Evidence of prior criminal conduct may be admitted if (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged.

*United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994); *see also United States v. Verduzco*, 373 F.3d 1022, 1027 (9th Cir. 2004). Such evidence must also pass scrutiny under Rule 403. *See Ayers*, 924 F.2d at 1473. "So long as the evidence is offered for a proper purpose, such as to prove intent, the district court is accorded wide discretion in deciding whether to admit the evidence, and the test for admissibility is one of relevance." *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997).

Other acts evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). In criminal tax cases the government carries the heavy burden of establishing that the defendant

acted willfully,[28] and willfulness is often a contested issue in criminal tax trials. Given that direct evidence of a defendant's intent is unusual, the government may (and invariably does) rely on circumstantial evidence to prove the defendant's subjective state of mind. *See United States v. Woodley*, 9 F.3d 774, 779 (9th Cir. 1993); *United States v. Conforte*, 624 F.2d 869, 875 (9th Cir. 1980) ("Direct proof of a taxpayer's intent to evade taxes is rarely available. Willfulness may be inferred, however, by the trier of fact from all the facts and circumstances of the attempted understatement of tax.") (citing *Spies v. United States*, 317 U.S. 492, 499 (1943)). Accordingly, a very broad range of circumstantial evidence can be relevant to a defendant's state of mind (including motive, intent, preparation, plan, knowledge, or absence of mistake or accident) in criminal tax cases. *See United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989) ("[P]roof of willfulness usually must be accomplished by means of circumstantial evidence. This being so, trial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind. No evidence which bears on this issue should be excluded unless it interjects tangential and confusing elements which clearly outweigh its relevance.") (citations omitted); *see also United States v. Daraio*, 445 F.3d 253, 264 (3d Cir. 2006) ("Inasmuch as it was essential for the government to make a showing of intent or willfulness to meet its burden of proof in this case, the district court properly admitted evidence of [defendant's] prior tax non-compliance under Rule 404(b)."); *see, e.g.*, *United States v. Imariagbe*, 679 Fed. App'x 261, 262 (4th Cir. 2017) (unpublished) (evidence consisting of a chart of non-charged tax returns that defendant prepared that contained Schedule C information similar to the false Schedule C information on the charged tax returns, was properly admitted under Rule 404(b)); *United States v. Watson*, 433 Fed. App'x 284, at *2 (5th Cir. 2011) (unpublished) (evidence that defendant, a professional tax preparer charged with aiding and assisting in preparing and presenting false and fraudulent tax returns, had filed false personal tax returns was relevant to issues of his intent and the absence of mistake); *United States v. Ali*, 616 F.3d 745, 752-53 (8th Cir. 2010) (in prosecution of defendant who operated tax preparation business, testimony of four taxpayers whose returns did not form the basis for any of the indicted counts

[28] In the criminal tax context, willfulness is the "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991); *United States v. Powell*, 955 F.2d 1206, 1210 (9th Cir. 1992). "Bad purpose" or "evil motive" is not required. *United States v. Pomponio*, 429 U.S. 10, 12 (1976); *United States v. Kelley*, 539 F.2d 1199, 1204 (9th Cir. 1976).

was properly admitted under Rule 404(b)).

Here, the Undercover Evidence reveals Defendant's attempts to create a foreign trust structure for undercover agents that was virtually identical to the one Defendant formed for Smith in January 2000, and continued to manage until 2015, as described in the Indictment. While Defendant has not responded to government inquiries regarding the nature of his defense, given the weight of the evidence establishing that Defendant participated in creating and maintaining Smith's fraudulent tax scheme, it appears likely that he may seek to convince the jury that he did not act willfully. The Undercover Evidence is highly probative of this point because it reveals the truth: The tax shelter Defendant promoted was not designed to create any legitimate tax benefits, but rather to create an illegal, offshore hiding place that would be difficult for authorities to find. Defendant's advice that undercover agents avoid Bermuda because it has "become a sieve to the U.S. Internal Revenue Service," use nominee creator to create the illusion that the agent was not the true creator (which Defendant knew was not true), and manufacture sham transactions and structure cash withdrawals in order to funnel money to the nominee creator, are all inconsistent with any possible good faith, and thus constitutes circumstantial evidence that Defendant acted willfully. Thus, the Undercover Evidence satisfies the first *Mayans* factor because it tends to prove a material point, namely it is highly probative of Defendant's state of mind (including intent, plan, knowledge, and absence of mistake or accident). *See, e.g., United States v. Campbell*, 142 F. Supp. 3d 298, 301 (E.D.N.Y. 2015) ("It is hard to imagine a more clear-cut example of appropriate Rule 404(b) evidence than [evidence of undercover operation during which defendant falsified an undercover IRS agent's tax return]. . . . That return and evidence of the undercover meeting are therefore highly probative of [defendant's] knowledge, intent, and lack of mistake in preparing similar false returns for his clients.").

Second, the Undercover Evidence is not too remote in time. The conspiracy alleged in the Indictment extended from 1999 until October 2015, and the Undercover Evidence was collected in 2017 and 2018. While courts are hesitant to establish bright-line rules for the timeliness of Rule 404(b) evidence, the Ninth Circuit "repeatedly has upheld the admission of evidence of prior acts that are more than seven years old," *United States v. Iverson*, 162 F.3d 1015, 1027 (9th Cir. 1998) (citing cases), and "[a] lapse of almost two years is not too long." *United States v. Quezada-Daza*, 232 F.3d 898, at *3 (9th

Cir. 2000) (unpublished) (citing *Ayers*, 924 F.2d at 1474 ("[Defendant's] subsequent acts of concealment were not too remote in time. The alleged conspiracy ended on or about March of 1985. The subsequent acts occurred between late 1985 . . . and February 1987 . . . .")). Nor is evidence necessarily inadmissible simply because it relates to events which occurred after the charged offense was completed. *See Ayers*, 924 F.2d at 1473-74 (acts subsequent to time period covered by alleged conspiracy to defraud the United States in the collection of income taxes were admissible under Rule 404(b) to prove defendant's state of mind during the time of the conspiracy); *see also United States v. Bok*, 156 F.3d. 157, 165 (2d Cir. 1998) (evidence of defendant's failure to file tax returns for years before and after those included in the indictment was permissible under Rule 404(b) to establish defendant's willfulness, particularly in light of defendant's legal education). In this case, the interim between the charged and uncharged conduct is particularly negligible given the duration of the alleged conspiracy and Defendant's boast to an undercover agent that he had been engaged in similar schemes for twenty-five to thirty years.

Third, there can be no dispute that the Undercover Evidence is evidence of Defendant's conduct.

Fourth, Defendant's intent is at issue, and the acts documented in the Undercover Evidence are remarkably similar to the charged offense. *See, e.g., United States v. Cadet*, 664 F.3d 27, 33 (2d Cir. 2011) ("[Defendant's uncharged] preparation of a false return for [an undercover IRS agent] was 'sufficiently similar' to the charged conduct to be relevant to – and indeed 'highly probative of' – knowledge and intent. . . . Evidence that [defendant] knowingly and intentionally prepared a false tax return for [the agent] by inserting inflated deductions on the Form 1040 thus provided a reasonable basis to infer that the inflated deductions that formed the basis for the 16 counts of conviction were likewise entered knowingly and intentionally."); *see also Ayers*, 924 F.2d at 1473 (defendant's acts of concealment following completion of alleged conspiracy to defraud the United States were sufficiently similar to the offense conduct, and admissible to prove defendant's state of mind during the commission of the conspiracy).

In addition, if Smith testifies at trial that Defendant gave Smith similar advice, Smith's testimony could be challenged by the defense given the amount of time that has elapsed since Defendant first advised Smith, and the outlandishness of the advice. The Undercover Evidence would corroborate

Smith's anticipated testimony that Defendant gave Smith the same fraudulent advice he gave the undercover agents. The fact that the Undercover Evidence is highly corroborative of a crucial witness's anticipated testimony militates towards admission. *See United States v. Pitts*, 6 F.3d 1366, 1370-71 (9th Cir. 1993) (evidence may be admitted under Rule 404(b) to corroborate crucial prosecution testimony if the matter corroborated is significant and the corroboration is direct) (citing *United States v. Everett*, 825 F.2d 658 (2d Cir. 1987)); *see also United States v. James*, 169 F.3d 1210, 1214 (9th Cir. 1999) ("The law of this circuit is crystal-clear that corroboration of a key prosecution witness by the introduction of criminal records is permissible, even at the risk of some prejudice to the defendant on trial."); *see, e.g., United States v. Baker*, 522 F. App'x 244, 247-48 (5th Cir. 2013) (unpublished) (evidence of undercover operation during which defendant falsified an undercover IRS agent's tax return was admissible under Rule 404(b), in part, because it corroborated testimony of clients for whom defendant prepared the tax returns underlying the charges); *United States v. Oskowitz*, 294 F. Supp. 2d 379, 382 (E.D.N.Y. 2003) (evidence of undercover operation during which three undercover IRS agents posed as clients and asked defendant to prepare their tax returns could "properly be used to corroborate the government's witnesses' accounts of their interaction with [defendant].").

Finally, since the Undercover Evidence is highly probative of a material issue and presents little risk of unfair prejudice, and because any potential prejudice can be effectively mitigated by a cautionary instruction limiting the jury's consideration of Rule 404(b) evidence to the purpose for which it is offered, both at the time the evidence is received and during the Court's final charge, the Undercover Evidence should not be excluded under Rule 403. *See United States v. Montgomery*, 150 F.3d 983, 1001 (9th Cir. 1998) ("[A]n appropriate instruction limiting the purpose for which the jury could consider evidence of a defendant's prior conviction is a factor weighing in favor of admission of Rule 404(b) evidence."); *see also United States v. Johnson*, 186 Fed. App'x 938, 939 (11th Cir. 2006) (unpublished) (district court did not abuse discretion by admitting evidence of, inter alia, undercover investigation, under Rule 404(b) because the evidence was relevant to show intent, knowledge, and absence of mistake, and potential undue prejudice did not substantially outweigh probative value, particularly in light of limiting instruction).

## CONCLUSION

Accordingly, the government respectfully requests a ruling from the Court that the Undercover Evidence is admissible during the trial of this matter as direct evidence, or, alternatively, pursuant to Rule 404(b) subject to limiting instructions.

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

s/ Michael G. Pitman
COREY J. SMITH
Senior Litigation Counsel
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America