1    GRANT P. FONDO (SBN 181530)
     *GFondo@goodwinlaw.com*
2    **GOODWIN PROCTER LLP**
     601 Marshall Street
3    Redwood City, CA 94063
     Tel: +1 650 752 3100
4    Fax: +1 650 853 1038

5    Attorney for Defendant:
     CARLOS E. KEPKE
6

7

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11

12   UNITED STATES OF AMERICA,              Case No. 3:21-CR-00155-JD

13              Plaintiff,                  **CARLOS KEPKE'S OPPOSITION TO
                                            GOVERNMENT'S MOTION TO ADMIT
14        v.                                EVIDENCE OF UNDERCOVER
                                            CONTACTS**
15   CARLOS E. KEPKE,
                                            Date:        October 17, 2022
16              Defendant.                  Time:        10:30 a.m.
                                            Courtroom:   11, 19th Floor
17                                          Judge:       Hon. James Donato

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................ 1

II.   BACKGROUND ............................................................................................ 2

      A.    The Indictment Concerns Only Mr. Kepke's Work for Mr. Smith and
            Spans Fifteen Years.......................................................................... 2

      B.    The Undercover Communications Occurred Long After the Charged
            Conduct Ended, Concern Other Clients, and Include Discussions
            Dissimilar to the Charged Conduct. .......................................................... 4

      C.    The Government's Excerpts Are Incomplete............................................. 5

      D.    Discovery Confirms Dissimilarities Between the Charged Conduct and
            Undercover Communications. .................................................................. 6

III.  ARGUMENT ............................................................................................ 6

      A.    The Government Cannot Circumvent the Requirements of Rule 404(b). .............. 6

            1.    The Undercover Communications Are Not Direct Evidence of the
                  Charged Conduct............................................................................ 7

            2.    The Undercover Communications Are Not Inextricably Intertwined
                  with the Charged Conduct.............................................................. 11

      B.    The Government Fails to Meet its Burden to Show that the Undercover
            Communications Satisfy the Requirements of Rule 404(b)............................ 14

            1.    Legal Standard ............................................................................ 14

            2.    The Undercover Communications Do Not Prove a Material Point. ......... 14

            3.    The Undercover Communications Are Too Remote In Time.................. 16

            4.    The Evidence Is Insufficient to Show Mr. Kepke Committed the
                  Other Acts. ................................................................................ 19

            5.    The Undercover Communications Are Dissimilar to the Charged
                  Conduct. ................................................................................... 19

      C.    The Undercover Communications Must be Excluded under Rule 403
            Because They Have Little If Any Probative Value and Are Highly
            Prejudicial. ................................................................................ 21

IV.   CONCLUSION ............................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*H & H Pharms., LLC v. Cambrex Charles City, Inc.,*
836 F. App'x 619 (9th Cir. 2021) ........................................................................... 12

*Holmes v. Miller,*
768 F. App'x 781 (9th Cir. 2019) ........................................................................... 24

*Jankins v. TDC Mgmt. Corp.,*
21 F.3d 436 (D.C. Cir. 1994) ........................................................................... 17, 18

*Tennison v. Circus Circus Enters., Inc.,*
244 F.3d 684 (9th Cir. 2001) ........................................................................... 22, 25

*United States v. Alfonso,*
759 F.2d 728 (9th Cir. 1985) ........................................................................... 19

*United States v. Ali,*
616 F.3d 745 (8th Cir. 2010) ........................................................................... 16

*United States v. Anderson,*
741 F.3d 938 (9th Cir. 2013) ........................................................................... 13

*United States v. Ayers,*
924 F.2d 1468 (9th Cir. 2022) ........................................................................... 18

*United States v. Bailey,*
696 F.3d 794 (9th Cir. 2012) ........................................................................... 14

*United States v. Bok,*
156 F.3d 157 (2d Cir. 1998) ........................................................................... 18

*United States v. Boyd,*
595 F.2d 120 (3rd Cir. 1978) ........................................................................... 15, 17, 18

*United States v. Bradley,*
5 F.3d 1317 (9th Cir. 1993) ........................................................................... 7, 13, 22

*United States v. Cadet,*
664 F.3d 27 (2d Cir. 2011) ........................................................................... 21

*United States v. Campbell,*
142 F. Supp. 3d 298 (E.D.N.Y. 2015) ........................................................................... 16

*United States v. DeGeorge,*
380 F.3d 1203 (9th Cir. 2004) ........................................................................... 12

*United States v. Dowie,*
  411 F. App'x 21 (9th Cir. 2010) ............................................................................ 15, 24

*United States v. English,*
  No. 14-cr-0217, 2016 WL 4702102 (E.D. Cal. Apr. 22, 2016) ............................... 13

*United States v. Espinoza-Baza,*
  647 F.3d 1182 (9th Cir. 2011).......................................................................... 15, 23

*United States v. Garcia,*
  291 F.3d 127 (2d Cir. 2002)...................................................................................... 21

*United States v. Garcia,*
  730 F. Supp. 2d 1159 (C.D. Cal. 2010).................................................................... 19

*United States v. Gonzalez-Flores,*
  418 F.3d 1093 (9th Cir. 2005)................................................................................... 22

*United States v. Hernandez-Miranda,*
  601 F.2d 1104 (9th Cir. 1979).................................................................................... 20

*United States v. Hill,*
  953 F.2d 452 (9th Cir. 1991)................................................................................ 7, 22

*United States v. Hodges,*
  770 F.2d 1475 (9th Cir. 1985).......................................................................... 17, 18

*United States v. Jimenez,*
  613 F.2d 1373 (5th Cir. 1980).................................................................................... 17

*United States v. Kail*
  No. 18-CR-00172-BLF-1, 2021 WL 3773613 (N.D. Cal. Aug. 25, 2021)........................ 8, 11

*United States v. Lixiong Chen,*
  No. 18-cr-00450-JD, 2019 WL 2503654 (N.D Cal. June 17, 2019)......................... 23

*United States v. Loftis*
  843 F.3d 1173 (9th Cir. 2016)............................................................................ 8, 11

*United States v. Mehrmanesh,*
  689 F.2d 822 (9th Cir. 1982)...................................................................... 14, 15, 21

*United States v. Merino-Balderrama,*
  146 F.3d 758 (9th Cir. 1998)..................................................................................... 23

*United States v. Mota,*
  No. 13-CR-00093-JST-1, 2015 WL 580816 (N.D. Cal. Feb. 11, 2015)
  (Tigar, J.)........................................................................................................ 7, 13

*United States v. Pac. Gas & Elec. Co*
  178 F. Supp. 3d 927 (N.D. Cal. 2016) .................................................................. 13

*United States v. Quinones-Chavez,*
  641 F. App'x 722 (9th Cir. 2016) ....................................................................... 24

*United States v. Ramirez-Jiminez,*
  967 F.2d 1321 (9th Cir. 1992).............................................................................. 19

*United States v. Rizk,*
  660 F.3d 1125 (9th Cir. 2011)................................................................................. 7

*United States v. Sanchez,*
  No. CR-08-00836(A) ABC, 2011 WL 6090164 (C.D. Cal. Dec. 5, 2011)................ 13, 15, 21

*United States v. Vizcarra-Martinez,*
  66 F.3d 1006 (9th Cir. 1995)................................................................................. 12

*United States v. Watson,*
  433 Fed. App'x 284 (5th Cir. 2011)....................................................................... 16

*United States v. Wiggan,*
  700 F.3d 1204 (9th Cir. 2012)............................................................................... 21

*United States v. Yagi*
  EMC, 2013 WL 10570994 (N.D. Cal. Oct. 17, 2013) ...................................... 9, 12

**Statutes**

18 U.S.C. § 371 ............................................................................................................ 3

26 U.S.C. § 7206(2) ................................................................................................... 3, 8

**Other Authorities**

Fifth Amendment ........................................................................................................ 24

Federal Rule of Evidence 106 .................................................................................... 24

Federal Rule of Evidence 404(b) ........................................................................ *passim*

Federal Rule of Evidence 403 .................................................................... 2, 21, 23, 25

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3      Apparently, 15 years of purported evidence is not enough for the Government to prove its

4  case, as the Government's Motion now seeks to admit wide-ranging, voluminous evidence from

5  undercover communications that occurred years after the charged conduct. The Government's

6  Motion betrays its true purpose: the admission of uncharged conduct purely to invite the jury to

7  convict based on Mr. Kepke's character after the alleged conduct.

8      First, the Government seeks to circumvent the application of Federal Rule of Evidence

9  404(b) by arguing that the undercover communications are direct evidence of the charged

10  scheme. But the undercover communications concern an entirely separate set of conduct taking

11  place years after the expiration of the alleged conspiracy. The charges are limited to Mr. Kepke's

12  work for one client, Robert F. Smith, while the undercover communications reflect

13  communications with various undercover agents posing as prospective clients. And according to

14  the Government's own allegations, the creation of the alleged sham trust structure took place in

15  1999–2000, and Mr. Kepke's work for Mr. Smith ended in December 2014, while the undercover

16  communications that concern tax planning did not begin until December 2017—or between 3 to

17  18 years later.

18      Second, in arguing that the undercover communications are admissible under Rule 404(b)

19  to prove intent, the Government advances theories that are illogical. The Government argues that

20  Mr. Kepke's intent in 2017 and 2018 can be projected backward in time to tax years 2012–2014,

21  or even all the way back to 1999–2000 when Mr. Smith's trust was created. To the contrary,

22  appellate courts regularly reverse and remand when evidence has been admitted on the basis of

23  this irrational theory. The Government also points to statements in the undercover

24  communications regarding the use of "sham" transactions and structuring to satisfy the

25  requirement that the settlor fund the corpus of the trust, but fails to mention that its own witness,

26  Mr. Smith, says that Mr. Kepke advised him that the settlor *was* required to fund the trust relevant

27  to this case, and that Mr. Smith told Mr. Kepke that the settlor had done so. Thus the very point

28  for which the Government is trying to use the uncharged conduct does not apply to this case.

1

1    There are many other dissimilarities between the undercover communications and charged

2    conduct, as well, including that the former involves some conversations only about asset

3    protection while the latter involves tax planning, the former concerns clients hiding assets from

4    their wives while the latter does not, and the former references a client who took a $100,000

5    deduction while the latter does not. As a result, there is no logical connection between the

6    undercover communications and Mr. Kepke's intent *in the charged case*. The Government has

7    fallen far short of meeting its burden to show that Rule 404(b) is satisfied.

8    Third, the Government devotes less than a sentence to its consideration under Rule 403 of

9    the potential prejudice Mr. Kepke would suffer if the undercover communications were admitted.

10   The Government's indifference to the myriad types of prejudice that would result here speaks

11   volumes. Admission of the inflammatory undercover communications would create an untenable

12   risk that the jury might convict Mr. Kepke regardless of his actual guilt as to the charged conduct.

13   Juror confusion is also highly likely given significant factual and temporal differences between

14   the undercover communications and the charged conduct. Allowing the Government to present

15   this additional evidence would also require a mini-trial that could implicate the calling of three

16   undercover agents, consideration of almost 12 hours of recordings and 700 pages of transcripts,

17   and numerous evidentiary rulings as to admissibility. Other less prejudicial evidence that directly

18   concerns the charged conduct is available—including the testimony of Mr. Smith and other

19   witnesses—further weighing against the admission of communications Mr. Kepke had three years

20   later with undercover officers who were trying to engineer the most incriminating conversation

21   possible.

22   Because the undercover communications have little legitimate probative value, create an

23   unacceptably high risk of prejudice, and would require an extensive mini-trial on collateral issues,

24   the Government's Motion must be denied.

25   **II.    BACKGROUND**

26   **A.    The Indictment Concerns Only Mr. Kepke's Work for Mr. Smith and Spans**

27   **Fifteen Years.**

28   On April 15, 2021, the Government indicted Mr. Kepke for one count of Conspiracy to

2

1    Defraud the United States in violation of 18 U.S.C. § 371, and three counts of Aiding and

2    Assisting in the Preparation of a Materially False Income Tax Return in violation of 26 U.S.C.

3    § 7206(2). According to the Indictment, the basis for the charges is Mr. Kepke's assistance to

4    Robert F. Smith, the founder, Chairman, and CEO of Vista Equity Partners, a private equity firm

5    headquartered in San Francisco, in Mr. Smith's efforts to evade paying his personal income taxes

6    and file materially false income tax returns. (*E.g.*, Indict. ¶¶ 2–3, 15, 52.)

7        The charges focus on Mr. Kepke's work for only one client—Mr. Smith. The object of the

8    charged conspiracy was allegedly to conceal Mr. Smith's income from the IRS by using offshore

9    entities Excelsior Trust and Flash Holdings to create the appearance that Mr. Smith's income was

10   not taxable to Mr. Smith. (Indict. ¶ 15.) And the § 7206(2) charges are for the filing of Mr.

11   Smith's income taxes, not the taxes of any other client. (*Id.* ¶ 52.)

12       The charges also make clear that Mr. Kepke's primarily role in the alleged conspiracy was

13   in advising Mr. Smith prior to setting up the trust and in helping Mr. Smith set up the trust and

14   related entities. According to the Government, "[t]he tax returns failed to report income

15   distributed and deposited into foreign bank accounts held in the name of Flash Holdings, for the

16   benefit of the taxpayer, *as part of a foreign trust structure created by KEPKE*, devised to conceal

17   the taxpayer's true ownership and control over said income." (*E.g.*, Indict. ¶ 52 (emphasis added);

18   *see also id.* ¶ 15 (discussing the creation of offshore entities with Kepke's direction and

19   assistance).)

20       Mr. Kepke's advice and creation of the foreign trust structure occurred at the very outset

21   of the alleged fifteen-year conspiracy. Mr. Kepke began working for Mr. Smith in December

22   1999. (Indict. ¶ 2.) The Government alleges that Mr. Kepke helped to create Excelsior Trust from

23   December 1999 through April 2000, including drafting and finalizing the trust indenture,

24   notifying the trustee of the settlor's identity, and directing the settlor to pay $7,500 as the initial

25   corpus of Excelsior Trust. (*Id.* ¶¶ 29–30, 32–34, 36.) And according to the Government, Mr.

26   Kepke caused the incorporation of Flash Holdings in March 2000. (*Id.* ¶ 31.) Much of the

27   remainder of the conspiracy and §7206(2) charges are based merely on the continuation of the

28   structure set up in 2000. For example, the § 7206(2) charges implicate Mr. Kepke only through

the foreign trust structure, not because he had any active role in helping to prepare the tax returns. (*Id.* ¶ 52.). Mr. Kepke ceased working for Mr. Smith entirely on December 31, 2014. (*Id.* ¶ 2.)

**B.      The Undercover Communications Occurred Long After the Charged Conduct Ended, Concern Other Clients, and Include Discussions Dissimilar to the Charged Conduct.**

The Government seeks to admit "Recordings of Defendant's contacts with undercover agents, transcripts of those contacts, and other communications exchanged between Defendant and undercover agents during the course of the undercover operation." (Mot. (ECF No. 66) at 4.) The Government devotes nearly a third of its brief, much of it single-spaced, to quoting communications between Mr. Kepke and three undercover agents. (*Id.* at 4–9.) The Government also summarizes other portions of the communications that it does not quote and for which it includes no record citations. (*Id.*) The Government does not specify the universe of the statements it seeks to admit, nor does it limit what it seeks to admit to the statements it quotes or summarizes. (*Id.* at 4.)

The recorded undercover communications took place from March 24, 2017, through August 17, 2018. The undercover communications reflected in recordings and transcripts consist of about 12 hours of recordings and 700 pages of transcripts and concern conversations on approximately two dozen dates. It is unclear how voluminous the "other communications exchanged between Defendant and undercover agents" are. (Mot. at 4.)

The undercover communications fall into two sets. The first set of communications revolves around an undercover agent who presented himself as an automobile broker whose grandmother was preparing to leave him a farm in her will, and the agent's objective was "to protect this farm from creditors and his future wife." (Mot. at 4.) All statements in this first set of communications—including Mr. Kepke's assertion that he had been doing similar work for 25 or 30 years—are directed toward the objective of *asset protection*, not tax planning. (*Id.* at 4–5; IRS-Kepke-0000202, IRS-Kepke-0000208, IRS-Kepke-0000214–16, IRS-Kepke-0000231–34, IRS-Kepke-0000248, IRS-Kepke-0000256, IRS-Kepke-0000260.) This set of communications took

place from March 24, 2017, to November 14, 2017. The Government is not alleging any crimes relating to asset protection.

The second set of communications was recorded by two additional undercover agents, one of whom posed as a small business owner whose objective was to protect his income through tax planning and one of whom posed as the small business owner's U.S.-based cousin and would-be settlor. (Mot. at 5–6; IRS-2018-0000349, IRS-2018-0000362–63, IRS-2018-0000368-69, IRS-2018-0000387, IRS-2018-0000390, IRS-2018-0000400–401, IRS-2018-0000550, IRS-Kepke-2019-0000023–25, IRS-Kepke-2019-0000028, IRS-Kepke-2019-0000050–52, IRS-Kepke-2019-0000074–75, IRS-Kepke-2019-0000102–103, IRS-Kepke-2019-0000159, IRS-Kepke-2019-0000161–62.) In the course of these communications, the agent who was posing as the small business owner specifically sought advice about creating a foreign trust using a *domestic settlor*, where that domestic *settlor did not have enough money* to fund the corpus of the trust. (*Id.*; IRS-2018-0000400–401, IRS-Kepke-2019-000023.) These communications did not begin until December 4, 2017, and ran through August 17, 2018. The Government is not alleging Mr. Smith's settlor was a domestic settlor, he was not, or that Mr. Kepke had any discussions with Mr. Smith about his settlor having insufficient funds to fund the corpus of the trust. He did not. Moreover, Mr. Kepke never set up for the undercover agents the foreign trusts discussed in the undercover communications.

**C.   The Government's Excerpts Are Incomplete.**

The excerpts the Government cites in its brief are misleadingly incomplete. For example, completely missing from these excerpts are the interactions showing that the undercover agents sought out Mr. Kepke and formulated background stories designed to incriminate him. The first undercover agent reached out to Mr. Kepke, saying he had inherited his grandparents' farm and "would like to position it . . . I've been kind of researching and reading about it and looking online for different people who do . . . you know, offshore structures where I could put that potentially there. The uhm . . . and I'm-I'm looking to get married towards the end of the year, here, and. . . . And I'm-I'm a skeptical person. (CHUCKLES) And, uhm . . . you know, if something were to not work out, uhm . . . I-I would like that to be, you know, my nest egg and-

1   and . . . something that I could fall back on without her being able to, you know, access it." (IRS-

2   Kepke-0000200.) Several months later, the first undercover agent referred the second undercover

3   agent, who told Mr. Kepke "I've always been keen on . . . you know, I saw you had out there that

4   asset protection stuff and . . . you know, whether that will help me out and, uh . . . 'cause I don't

5   want somebody to friggen slip and fall, next thing you know they take all my money I earned."

6   (IRS-Kepke-2018-0000196.)

7          The Government concludes with a conversation that occurred after the search of Mr.

8   Kepke's home office, in which Mr. Kepke discusses the IRS's focus on trust creation. (IRS-2018-

9   0000550.) The Government leaves out a great deal of this conversation, however. For instance, in

10  that conversation, Mr. Kepke advised the undercover agent that he was concerned about the way

11  the undercover agent had decided to fund the trust, and that instead of a tax trust funded by the

12  undercover agent's cousin, Mr. Kepke would only assist him in the creation of an asset protection

13  trust, with no tax benefits. (IRS-2018-0000524–532.) Mr. Kepke provided this advice in the face

14  of persistent resistance from the undercover agent. (*Id.*)

15         **D.     Discovery Confirms Dissimilarities Between the Charged Conduct and**

16                 **Undercover Communications.**

17         One of the pieces of the undercover communications the Government emphasizes most is

18  Mr. Kepke's discussion of "sham" transactions and structuring in order to evade the requirement

19  that the settlor fund the corpus of the trust. (Mot. at 6, 8–9, 10, 14.) But the Government's own

20  witness, Mr. Smith, makes clear this discussion is inconsistent with Mr. Kepke's advice to Mr.

21  Smith. In statements to the Government, Mr. Smith told the Government that Mr. Kepke

22  informed Mr. Smith that the settlor must fund the initial corpus of the trust. (Declaration of Grant

23  P. Fondo ("Fondo Decl.") ¶ 2.) Mr. Smith said he never told Mr. Kepke that the settlor did not

24  provide enough money to settle the trust and that Mr. Smith used his own money to do so. (*Id.*)

25  **III.    ARGUMENT**

26         **A.     The Government Cannot Circumvent the Requirements of Rule 404(b).**

27         Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or

28  act is not admissible to prove a person's character in order to show that on a particular occasion

1    the person acted in accordance with the character," and allows for the admission of other acts

2    evidence only if "admissible for another purpose, such as proving motive, opportunity, intent,

3    preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b) "is

4    designed to avoid a danger that the jury will punish the defendant for offenses other than those

5    charged, or at least that it will convict when unsure of guilt, because it is convinced that the

6    defendant is a bad man deserving of punishment." *United States v. Bradley*, 5 F.3d 1317, 1321

7    (9th Cir. 1993) (internal quotation marks omitted).

8         Though Rule 404(b) does not apply "where the evidence the government seeks to

9    introduce is directly related to, or inextricably intertwined with, the crime charged in the

10   indictment," *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011), the Ninth Circuit has

11   cautioned that this doctrine "should be applied narrowly" to avoid abuse, *United States v. Hill*,

12   953 F.2d 452, 457 n.1 (9th Cir. 1991), as amended (Dec. 16, 1991); *see also United States v.*

13   *Mota*, No. 13-CR-00093-JST-1, 2015 WL 580816, at *3 (N.D. Cal. Feb. 11, 2015) (Tigar, J.)

14   (discussing dangers of the doctrine).

15        The Government attempts to circumvent the important protections of Rule 404(b) by

16   incorrectly characterizing the undercover communications as direct and inextricably intertwined

17   evidence.

18                    **1.      The Undercover Communications Are Not Direct Evidence of the**

19                            **Charged Conduct.**

20        The Government argues that the undercover communications are admissible as direct

21   evidence because they prove the existence of the charged scheme. (Mot. at 11–12.) The

22   Government's logic seems to be that the communications prove the existence of the scheme

23   because, first, Mr. Kepke's statements are "akin" to an admission that Mr. Kepke participated in

24   the unrelated prior conspiracy, and second, the statements show an uncharged attempt to

25   perpetuate a similar scheme. (*Id.*)

26        That word "akin" speaks volumes. There is a reason the Government wants to stay away

27   from Rule 404(b), as they know the undercover evidence will not pass muster under that standard.

28   But the Government's direct evidence theory of admissibility is not supported by the caselaw it

                                              7

cites. The primary case on which the Government relies, *United States v. Loftis*, explains that conduct that is not expressly charged as a specific execution of a conspiracy or scheme is nonetheless direct evidence of the charge where it proves the existence of the conspiracy or scheme. 843 F.3d 1173, 1176 (9th Cir. 2016). *United States v. Kail*, the only other case the Government cites on this point, similarly stands for the proposition that uncharged executions of a scheme are admissible as direct evidence of the existence of the scheme. No. 18-CR-00172-BLF-1, 2021 WL 3773613, at *4, *12 (N.D. Cal. Aug. 25, 2021).

The undercover communications here, however, do not reflect specific executions of the charged scheme. Instead they concern an entirely separate event that never came to pass. The scope of the Indictment is limited substantively and temporally. The object of the charged conspiracy is the concealment of a portion of Mr. Smith's income from the IRS. (Indict. ¶ 15.) The only client the § 7206(2) charges reference is likewise Mr. Smith. (*See id.* ¶ 52.) In addition to being limited to work Mr. Kepke did for Mr. Smith, those charges are based on Mr. Kepke's advice and activities during a discrete time period. Mr. Kepke provided advice and helped set up the foreign trust structure from December 1999 to April 2000. (*Id.* ¶¶ 29–36.) Much of the remainder of the charges turn simply on the continuation of that structure. (*See, e.g., id.* ¶ 52.) Significantly, Mr. Kepke stopped working for Mr. Smith entirely on December 31, 2014. (*Id.* ¶ 2.)

The undercover communications stand in stark contrast. The communications are not between Mr. Kepke and Mr. Smith or between Mr. Kepke and others in the course of Mr. Kepke's work for Mr. Smith. Instead, as the Government concedes, the communications reflect conversations between Mr. Kepke and undercover agents who posed as prospective clients with their own made up circumstances and objectives. (Mot. at 4–5, 8.) Notably, the undercover communications do not begin at all until March 2017, and the undercover communications that concern tax planning do not begin until December 2017. This is many years after Mr. Kepke undertook to create the trust structure at issue in this case, many years after Mr. Kepke fully stopped working for Mr. Smith, and several years after the filed tax returns at issue.

The Government's own filings confirm that the undercover communications concern a

1    totally separate set of conduct. The Government chose to charge Mr. Kepke in an indictment that

2    makes no reference, direct or indirect, to the undercover communications. And the Government

3    says in its own Motion that the undercover communications reflect an attempt to perpetuate a

4    scheme "very similar" to the charged conduct "with different participants but the same victim."

5    (Mot. at 11–12.) A scheme "with different participants" is not "very similar" to the charged

6    conduct, particularly when the unifying element between the schemes is only that the victim is the

7    United States government. Even more importantly, a scheme that is "similar" to the charged

8    scheme is, by definition, a separate scheme. And a separate scheme is classic "other acts"

9    evidence that is subject to Rule 404(b).

10        The opinion in *United States v. Yagi* is illuminating. There the government sought to

11   introduce evidence of acts that were not charged as overt acts in furtherance of the charged

12   conspiracy to commit theft concerning a federally funded program. No. CR-12-0483 EMC, 2013

13   WL 10570994, at *9 (N.D. Cal. Oct. 17, 2013) (Chen, J.). Some of those acts occurred before the

14   conspiracy and some occurred during the conspiracy. *Id.* The court concluded that the acts that

15   occurred during the conspiracy were admissible because the jury was entitled to determine

16   whether they were in fact in furtherance of the conspiracy. *Id.* But the court found that acts that

17   predated the conspiracy, namely the defendant's possession of a Rolex, "clearly falls outside the

18   temporal scope of the conspiracy and is subject to Rule 404(b)." *Id.* (also citing *United States v.*

19   *Barnes*, 49 F.3d 1144 (6th Cir. 1995) for the proposition that "[w]hen the other crimes or wrongs

20   occurred at different times and under different circumstances from the offense charged, the deeds

21   are termed 'extrinsic.'").

22        The same result follows here. The undercover communications are not direct evidence,

23   but instead are other acts evidence that must be evaluated under the framework of Rule 404(b).

24        The Government also contends that the undercover communications are direct evidence

25   because they are "akin" to admissions that Mr. Kepke participated in the charged conspiracy.

26   (Mot. at 10–12.) Not a single case the Government cites supports this theory of admissibility as

27   direct evidence. (*Id.*) Furthermore, the facts do not back up the Government's characterization of

28   the communications as "akin" to admissions. The Government portrays the undercover

communications as full of express references to the charged conspiracy with Mr. Smith. (Mot. at 11.) In reality, Mr. Kepke alluded to Mr. Smith only once in nearly 12 hours of audio recordings, and he did not bring the subject up on his own, but was prompted by an undercover agent's questions: "What's your biggest client?"; and "[L]ike, amount of money they dump into somethin' like this. What would be the amount, you think?" (Mot. at 8 n.20; IRS-2019-0000161–62.) Mr. Kepke's response may reflect an admission that Mr. Kepke worked for Mr. Smith and that Mr. Smith had a lot of money, but nothing more. It is undisputed that Mr. Kepke worked for Mr. Smith and that Mr. Smith is wealthy; the Government does not need to resort to a veiled and isolated statement in a large set of confusing and irrelevant undercover communications to prove an undisputed fact. Additionally, the Government attaches significance to Mr. Kepke's reference to "Excelsior Trust." (Mot. at 5.) But Mr. Kepke did no more than rattle off "Excelsior Trust" as an example trust name once in twelve hours of conversations with three undercover agents. (IRS-Kepke-0000256.) And there is no dispute that Mr. Kepke helped to establish the Excelsior Trust for Mr. Smith. That singular reference does not provide any reason to introduce hours of attempted sting-undercover calls.

Additionally, the undercover conversations are inconsistent with the charged conspiracy in significant ways, demonstrating that these conversations are not about the charged conduct. The first set of undercover communications regard an undercover agent who was posing as a prospective client whose grandmother was preparing to leave him a farm in her will, and which he wanted to protect from creditors and his future wife. (Mot. at 4; IRS-Kepke-0000202.) These communications are about asset protection, not tax fraud as is charged in the Indictment.

The second set of undercover communications with the second and third undercover agents, upon which the Government places great emphasis (Mot. at 6, 8–9, 10, 14), do concern tax planning, but nonetheless involve circumstances significantly different from the charged conduct. In this second set of communications, in an apparent attempt to create some incriminating recordings, the undercover agent said that he had a cousin who was willing to act as the settlor of the trust, but that the *cousin was American* and did not have money to fund the corpus of the trust. (Mot. at 6, 8–9; IRS-2018-0000400–401, IRS-Kepke-2019-000023, IRS-

1  Kepke-2019-000024–25, IRS-Kepke-2019-000050–51.) But these are not the facts underlying the

2  charged conduct. *The settlor of Smith's trust was not American, but a foreign national*. (Indict.

3  ¶ 10.) And whereas Mr. Kepke discussed with the undercover agents the possibility of certain

4  types of transactions (which the Government refers to as sham transactions) in order to deal with

5  the fact that the fictional settlor could not fund the trust, Mr. Kepke advised Smith that the settlor

6  must fund the trust with the settlor's own funds, and there is no allegation that Mr. Kepke had any

7  discussions relating to using sham transactions to fund Smith's trust. (Fondo Decl. ¶ 2.)

8       There are also many other inconsistencies between the charged conduct and the statements

9  the Government seeks to admit. The Government cites a reference by Mr. Kepke to clients who

10  hid money from their wives, even though the charged conduct does not involve hiding money

11  from a spouse. (Mot. at 5 & n.9 (citing IRS-Kepke-0000260). The Government also references

12  Mr. Kepke's discussion of a client who took a $100,000 tax deduction, which the Government

13  conclusorily describes as "false," even though the charged conduct does not involve any false

14  deductions. (Mot. at 5 & n.10 (citing IRS-Kepke-0000248).)

15       It also bears emphasis that the undercover communications are just that—

16  communications. Mr. Kepke did not set up any foreign trusts for the undercover agents. It is thus

17  entirely speculative what precise actions Mr. Kepke would have taken if he had moved beyond

18  talking to acting. Neither of the two cases the Governments cites regarding direct evidence

19  involve mere statements. *Loftis*, 843 F.3d at 1176; *Kail*, 2021 WL 3773613 at *12.

20       The Government's motion is so rife with statements that have nothing to do with the

21  charged conduct that allegedly took place several years before that the only reasonable conclusion

22  is that the Government's purpose is not to prove the charged conduct, but to portray Mr. Kepke as

23  a bad person. The statements are not direct evidence of the charged conduct, and they must be

24  excluded as improper propensity evidence.

25            **2.      The Undercover Communications Are Not Inextricably Intertwined**

26                 **with the Charged Conduct.**

27       Evidence of other acts is admissible as inextricably intertwined only where the other acts

28  and charged conduct "clear[ly]" constitute a single criminal transaction, or the other acts evidence

1    is "necessary" to provide a "coherent and comprehensible" narrative about the commission of the

2    charged conduct. *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012–13 (9th Cir. 1995).

3           Though the Government cites the standard that applies to inextricably intertwined

4    evidence, it does not actually argue the undercover communications are inextricably intertwined

5    with the charged conduct. (Mot. at 10–12.) It has accordingly waived this argument. *See H & H*

6    *Pharms., LLC v. Cambrex Charles City, Inc.*, 836 F. App'x 619, 620 (9th Cir. 2021). In any case,

7    there is no legitimate argument to be made that the undercover communications are inextricably

8    intertwined with the charged conduct.

9           First, the undercover communications clearly are not part of the same, single criminal

10   transaction as the charged conduct. To be part of the same transaction, the uncharged conduct

11   must have occurred during the temporal scope of the charged conspiracy and have a sufficient

12   substantive connection to the conspiracy. *Yagi*, 2013 WL 10570994 at *9. Neither is true here. As

13   discussed, the charged and uncharged conduct involve different clients, different time periods,

14   different circumstances, and different advice. *Supra* at 8–11.

15          In situations like these, the Ninth Circuit finds that the uncharged conduct is not

16   inextricably intertwined. In *United States v. DeGeorge*, which the Government cites, the Ninth

17   Circuit concluded that evidence of the sinking of three prior ships was not inextricably

18   intertwined with the charged conduct of conspiring to fraudulently collect insurance proceeds for

19   sinking a ship. 380 F.3d 1203, 1220 (9th Cir. 2004). The Court reasoned that the prior sinkings

20   were "too far removed in both time and circumstance to be linked with the alleged fraud in this

21   case as part of a single criminal episode." *Id.* (internal citation and quotations omitted). Similarly,

22   in *United States v. Vizcarra-Martinez*, which the Government also cites, the Ninth Circuit

23   concluded that evidence of the defendant's personal use of methamphetamine was not a part of

24   the charged drug conspiracy where there was no evidence the methamphetamine was obtained

25   from a member of the conspiracy. 66 F.3d 1006, 1013 (9th Cir. 1995). And in *United States v.*

26   *Anderson*, the Ninth Circuit held that the uncharged improper sale of software to an undercover

27   agent six months after the charged conduct for copyright infringement was "too far removed in

28   time to constitute a part of the charged transaction." 741 F.3d 938, 950 (9th Cir. 2013). District

1   courts in the Ninth Circuit reach the same result. *E.g., Mota*, 2015 WL 580816 at *3 (concluding

2   that evidence of a prior robbery was not part of the transaction with the charged bank robbery);

3   *See United States v. Sanchez*, No. CR-08-00836(A) ABC, 2011 WL 6090164, at *7 (C.D. Cal.

4   Dec. 5, 2011) (finding that various categories of uncharged conduct were not inextricably

5   intertwined with the charged conspiracy where they occurred before or after the conspiracy).

6         Second, the undercover communications are entirely unnecessary to tell a comprehensible

7   story about the charged conduct. The two sets of conduct concern different clients and different

8   circumstances, and were separated in time by years. *Supra* at 8–11. The Government has not

9   come forward with any reason the undercover communications would be "necessary" to tell the

10  story of the charged conduct. Indeed, the Indictment itself does not so much as allude to the

11  undercover communications. (*See* Indict. generally.) And conduct that occurs after the charged

12  conduct "does not illuminate the 'background and development of the conspiracy' because it

13  occurred after the conspiracy that is the subject of the indictment here ended." *Bradley*, 5 F.3d at

14  1321.

15        Courts consistently hold that uncharged conduct is not necessary to tell a story in

16  situations like this. In *United States v. English*, where the government charged the defendant with

17  filing six false tax returns and sought to admit evidence of seven other tax returns, the court

18  concluded that the evidence was "clearly not necessary for the jury to understand the

19  government's theory as to the six counts charged." No. 14-cr-0217, 2016 WL 4702102, at *1

20  (E.D. Cal. Apr. 22, 2016). And in in *United States v. Pac. Gas & Elec. Co.*, where the

21  government charged PG&E with violating certain federal recordkeeping regulations in relation to

22  an explosion and sought to admit evidence of PG&E's failure to report an uncharged

23  recordkeeping violation, the court concluded that "the Government will not be hampered in

24  telling a coherent story," because the "[indictment] does not even mention" the uncharged

25  conduct. 178 F. Supp. 3d 927, 940–41, 965 (N.D. Cal. 2016) (Henderson, J.).

26        The Government has failed to show that the undercover communications are direct

27  evidence of or inextricably intertwined with the charged conduct. Rule 404(b) thus applies. As

28  argued below, the Government fails to meet its burden to show that the undercover

1   communications meet the exceptions of and are admissible under Rule 404(b).

2   **B.    The Government Fails to Meet its Burden to Show that the Undercover**

3   **Communications Satisfy the Requirements of Rule 404(b).**

4   **1.    Legal Standard**

5   Other acts evidence may be admitted for another purpose under Rule 404(b) only if: (1)

6   the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the

7   evidence is sufficient to support a finding that defendant committed the other act; and (4) the act

8   is similar to the charged conduct. *United States v. Bailey*, 696 F.3d 794, 799 (9th Cir. 2012). The

9   Government bears the burden of proving all four of these requirements. *Id.*

10   **2.    The Undercover Communications Do Not Prove a Material Point.**

11   In order to show that other acts evidence tends to prove a permissible material point, the

12   Government "must articulate precisely the evidential hypothesis by which a fact of consequence

13   may be inferred from the other acts evidence." *United States v. Mehrmanesh*, 689 F.2d 822, 830

14   (9th Cir. 1982).

15   The Government argues that the undercover communications are relevant to Mr. Kepke's

16   state of mind, including intent, plan, knowledge, and absence of mistake or accident. (Mot. at 14.)

17   To support its argument, the Government cites Mr. Kepke's statements that Bermuda has become

18   a sieve to the IRS and what the Government labels as "nominee" creators, "sham" transactions,

19   and structuring relating to the funding of the trust. (*Id.*) According to the Government, these

20   statements are inconsistent with good faith and thus constitute circumstantial evidence that Mr.

21   Kepke acted willfully. (*Id.*)

22   Though the Government discusses many more statements in its summary of the

23   undercover evidence (Mot. at 4–9), it is unclear exactly which statements it seeks to admit and the

24   Government attempts to justify the relevance of only a handful of statements. (Mot. at 14.) In

25   addition, although the Government says that it seeks admission of the undercover

26   communications to show intent, plan, knowledge, and absence of mistake or accident, the

27   Government argues the relevance of only the first of those—intent. The Government's "shotgun

28   approach" to three witnesses and 12 hours of recordings is "simply inadequate." *See Sanchez*,

14

1   2011 WL 6090164 at *8 ("The Government does not specify with any particularity which of the

2   other acts in its catalog of proposed testimony are relevant . . . . This showing is simply

3   inadequate."). The Government has thus failed to "articulate precisely" its "evidential

4   hypothesis." *Mehrmanesh*, 689 F.2d at 830. The Court should exclude the undercover

5   communications for this reason alone.

6        To the extent the Government does argue that the few cited statements (Mot. at 14) are

7   relevant to the issue of intent, the Government's argument is illogical. The Government focuses

8   in particular on Mr. Kepke's statements regarding "sham" transactions and structuring regarding

9   the funding of the trust as inconsistent with good faith. (Mot. at 6, 8–9, 10, 14.) But these

10  statements cannot reflect Mr. Kepke's bad faith with respect to the charged conduct because the

11  Government's own cooperator, Mr. Smith, has informed the Government that Mr. Kepke advised

12  him that the settlor must fund the corpus of the trust, and that Mr. Smith never told Mr. Kepke

13  that he (Mr. Smith) had secretly funded it instead. (Fondo Decl. ¶ 2.)

14       Furthermore, the Government utterly fails to explain how the undercover statements can

15  show that Mr. Kepke's earlier acts were undertaken willfully. Even assuming that the statements

16  evince bad faith at the time they were made, it is illogical that intent in 2017 or 2018 proves

17  willfulness years earlier. As the Third Circuit observed in a case involving the admission of post-

18  conspiracy conduct for the purpose of proving intent, "[t]he logic of showing prior intent or

19  knowledge by proof of subsequent activity escapes us." *United States v. Boyd*, 595 F.2d 120, 126

20  (3rd Cir. 1978) (reversing and remanding for new trial); *see also United States v. Dowie*, 411 F.

21  App'x 21, 27 (9th Cir. 2010) (affirming exclusion of evidence where conduct after conspiracy

22  period had "little probative value to [the defendant's] state of mind during the conspiracy"). This

23  is particularly so given that Mr. Kepke had not been charged for either set of conduct when the

24  statements were made. Relatedly, in light of this timeline, the inference the Government suggests

25  is pure speculation. *See United States v. Espinoza-Baza*, 647 F.3d 1182, 1190 (9th Cir. 2011)

26  (excluding evidence where other acts evidence was speculation, not proof, where it could result in

27  the relevant inference only with additional facts).

28       The Government does not cite any cases with similar facts. Rather the Government cites

1    cases in which a defendant claimed the inclusion of false information in a tax return was a

2    mistake. *See United States v. Watson*, 433 Fed. App'x 284, at *2 (5th Cir. 2011); *United States v.*

3    *Ali*, 616 F.3d 745, 752-53 (8th Cir. 2010); *United States v. Campbell*, 142 F. Supp. 3d 298, 301

4    (E.D.N.Y. 2015). In those cases, the courts concluded that other acts evidence showing instances

5    in which the defendant filed tax returns with information the defendant knew was false were

6    relevant to show lack of mistake or knowledge that the representations were false. Mr. Kepke will

7    not be arguing at trial that he mistakenly created the trust structures at issue. Lack of mistake and

8    knowledge of falsity are not at issue here, as reflected by the Government's failure to make any

9    argument otherwise.

10        The Government also contends that the undercover communications are admissible to

11   corroborate Mr. Smith's testimony. (Mot. at 15–16.) Again the Government fails to specify which

12   statements it believes are relevant to this purpose. Many of the statements could not plausibly be

13   necessary for corroboration as they are subjects about which Mr. Smith should not be testifying in

14   the first place because he has no personal knowledge, they are irrelevant, they are unfairly

15   prejudicial, or they are improper for other reasons. The Government also fails to explain why this

16   particular evidence is necessary for corroboration, where there are likely several other sources of

17   evidence that could corroborate Mr. Smith's testimony and that do not involve the inherently

18   prejudicial evidence of an undercover sting operation.

19               **3.        The Undercover Communications Are Too Remote In Time.**

20        The undercover communications are too remote in time to be considered relevant. The

21   Government alleges that Mr. Kepke created a foreign trust structure to allow Mr. Smith to avoid

22   paying income taxes in 1999 and 2000, and that Mr. Kepke stopped working for Mr. Smith

23   altogether on December 31, 2014. (Indict. ¶¶ 2, 14, 29–36.). Yet the undercover communications

24   that concern a foreign trust structure for tax planning purposes did not begin until December

25   2017. There is thus a 17-year gap between Mr. Kepke's creation of the foreign trust structure and

26   undercover communications on the same topic, and a three-year gap between the end of Mr.

27   Kepke's representation of Mr. Smith and such undercover communications. These long gaps in

28   time make the undercover communications irrelevant to the charged conduct. This is particularly

16

so because the Government seeks to use subsequent communications as proof of earlier intent. But "[p]rojection of an evil purpose backward in time seems weaker than inferring its continuation. The temporal (as well as the logical) relationship between a defendant's later act and his earlier state of mind attenuates the relevance of such proof." *Jankins v. TDC Mgmt. Corp.*, 21 F.3d 436, 441 (D.C. Cir. 1994) (citation and internal quotations omitted) (reversing and remanding where district court admitted other acts evidence that followed charged conduct by between four months and two and a half years to prove intent).

*United States v. Hodges*, 770 F.2d 1475 (9th Cir. 1985) is illustrative. There the Ninth Circuit considered the admission of evidence that defendant attempted to extort $5,000 from a co-conspirator five months after the end of the charged conspiracy to defraud lending institutions. *Id.* at 1479–80. The government argued the extortion attempt was relevant to whether the defendant was aware of the illegal nature of the loan scheme at the time he participated in the relevant loan transactions. *Id.* at 1479. The Ninth Circuit rejected this argument, reasoning in part that although the extortion attempt "may be illustrative of [defendant's] state of mind at the time the offer was made, there is some question whether it is probative of what the state of his mind was some five months earlier." *Id.* at 1480. The Ninth Circuit reversed the conviction and remanded for a new trial. *Id.* at 1481.

Similarly, in *United States v. Jimenez*, the Fifth Circuit reversed and remanded where the district court had admitted evidence of uncharged cocaine possession that followed the charged heroin trafficking by a year. 613 F.2d 1373, 1376 (5th Cir. 1980). The Fifth Circuit reasoned that "[a]lthough we do not suggest that subsequent extrinsic offense evidence could never be admitted under rule 404(b), it certainly bears substantially less on predisposition than would a prior extrinsic offense" and that the "expiration of a considerable length of time in this case depleted the extrinsic offense of any relevance[.]" *Id.* The Third Circuit reached a similar conclusion in *Boyd*, in which the court reversed a conviction in which evidence post-dating a conspiracy by six months had been admitted to prove prior intent, as did the D.C. Circuit in *Jankins*, in which the court reversed and remanded for a new trial where evidence post-dating alleged misrepresentations by four months to two and a half years had been admitted to show earlier

17

1    intent. *Boyd*, 595 F.2d at 126–27; *Jankins*, 21 F.3d at 441, 445.

2           The same is true here. The undercover communications may be relevant to Mr. Kepke's

3    state of mind at the time of the communications in 2017 and 2018, but they provide little if any

4    insight into his state of mind during the alleged conspiracy. The facts here are even more

5    egregious than those in *Hodges*, *Jimenez*, *Boyd*, and *Jankins*, because the Government is not

6    seeking to project Mr. Kepke's state of mind backward in time by merely five months or a year,

7    but by up to 17 years.

8           The Government cites two cases for the proposition that subsequent uncharged acts are

9    not too remote. Both are distinguishable. The Government first cites *United States v. Ayers*, 924

10   F.2d 1468, 1474 (9th Cir. 2022). In *Ayers*, the Ninth Circuit considered whether defendant's

11   concealment of income (payments to a third party to bring luggage with large amounts of cash

12   from California to Miami and defendant's false customs declaration denying he was carrying

13   $10,000 on a return trip from the Bahamas) were relevant to the charge of conspiring to defraud

14   the United States by concealing income where the conspiracy ended in March 1985 and the

15   uncharged conduct began in a few months later. *Id.* at 1473–74. The Ninth Circuit concluded the

16   uncharged conduct was relevant to the issue of intent because these efforts to conceal the

17   ownership of the cash from the government tended to prove the defendant's intent to defraud the

18   United States. *Id.* at 1473–74. The Government also cites *United States v. Bok*, 156 F.3d 157, 165

19   (2d Cir. 1998). *Bok* addressed the admission of evidence that defendant had failed to file personal

20   and corporate taxes in years during and immediately following the years for which he was

21   charged with attempted personal tax evasion and making false statements on an income tax

22   return. *Id.* at 166. In both *Ayers* and *Bok*, however, not only did the uncharged conduct overlap

23   with or occur very shortly after the charged conduct, but for all intents and purposes the

24   uncharged conduct was actually part of the charged conspiracies to evade the defendants' taxes.

25          The probative value of a subsequent act to show prior intent necessarily diminishes with

26   time. Where, as here, years passed between the charged conduct and the undercover

27   communications, the probative value is minimal and the risk of unfair prejudice is extremely

28   high.

**4.      The Evidence Is Insufficient to Show Mr. Kepke Committed the Other Acts.**

Despite the Government's burden to establish the alleged other bad acts, it devotes a single sentence to arguing that the evidence is sufficient to show Mr. Kepke committed the other acts. (Mot. at 15.) The undercover communications may show that Mr. Kepke made statements, but they do not show that he engaged in any conduct. In fact, Mr. Kepke did not set up any trusts for the undercover agents. The statements must also be considered in context—they were general conversations initiated by the undercover agents, made in an effort to court new clients, who fabricated back stories designed to elicit incriminating responses, not specific actions undertaken on behalf of those clients. The devil is always in the details, and the trusts were never created. In light of the weakness of this evidence, any relevance is highly attenuated.

**5.      The Undercover Communications Are Dissimilar to the Charged Conduct.**

"When the evidentiary hypothesis is intent, the Ninth Circuit requires substantial similarity between the bad acts evidence and the crime charged." *United States v. Garcia*, 730 F. Supp. 2d 1159, 1172 (C.D. Cal. 2010). This is because "if the prior act is not similar, it does not tell the jury anything about what the defendant intended to do in his later action." *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1326 (9th Cir. 1992) (internal quotations and citation omitted). "Proof of an intent to do one thing on an earlier occasion proves little about an intent to execute a dissimilar act at a later time." *United States v. Alfonso*, 759 F.2d 728, 740 (9th Cir. 1985).

As has already been discussed at length, there are significant differences between the charged conduct and the undercover communications. *Supra* at 8–11. In but one example, the Government mentions over and over again Mr. Kepke's statements during the undercover communications about "sham" transactions and structuring in order to get around the fact that the fictitious settlor did not have enough money to fund the corpus of the trust. (Mot. at 6, 8–9, 10, 14.) But the charged conduct involved no such circumstances. According to Mr. Smith, Mr. Kepke expressly told him that the settlor must fully fund the corpus of the trust. (Fondo Decl. ¶ 2.) Thus, the very heart of this 404(b) evidence sought by Government is highly likely to

19

1    confuse and mislead the jury.

2        In *United States v. Hernandez-Miranda*, the Ninth Circuit helpfully illustrated how to

3    approach the question of similarity. 601 F.2d 1104, 1108 (9th Cir. 1979). In that case, the

4    government sought to admit evidence that the defendant had smuggled marijuana across the

5    border in a backpack on a prior occasion where the defendant was currently charged with

6    smuggling heroin across the border in a car. *Id.* The Ninth Circuit explained that the government

7    was required to establish a logical basis from which intent could be inferred, and that logical basis

8    could exist only if the charged conduct and uncharged conduct were similar enough: "That logical

9    thread is missing unless common human experience demonstrates that it is more probable than

10   not that a person who has knowingly smuggled marijuana on his person will know of the presence

11   of contraband concealed in a vehicle. The inference is not permissible because experience does

12   not permit that connection between the two events to be made." *Id.*

13       As in *Hernandez-Miranda*, here there can be no logical inference that, because Mr. Kepke

14   allegedly acted in bad faith during the undercover communications, he also acted in bad faith

15   during the conspiracy where the conspiracy did not involve the very things that allegedly reflect

16   his bad faith during the undercover communications. In fact, the incongruity between the charged

17   conduct and uncharged conduct shows that not only would the undercover communications not

18   prove Mr. Kepke's willfulness at the time of conspiracy, but as a logical matter they would

19   actually suggest he did *not* act willfully at the time of the conspiracy. It is thus apparent that the

20   true purpose of this evidence is to impugn Mr. Kepke's character and invite the jury to draw an

21   improper inference. The fact that the most inflammatory statements the Government cites have no

22   corollary in the charged conduct is telling.

23       The Government asserts that the undercover evidence is "remarkably similar" to the

24   charged offense. (Mot. at 15.) But this can be considered true only at the highest level of

25   generality. And it is not enough that the undercover communications discuss conduct in the same

26   category of crime as the charged conduct. "The Government may not invoke Rule 404(b) and

27   proceed to offer, carte blanche, any prior act of the defendant in the same category of crime."

28   *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002). The very cases the Government cites

show this. In *United States v. Cadet*, for example, the defendant argued false information in tax returns was attributable to his clients or mistake, but the Court found that defendant's inclusion of inflated deductions in both charged and uncharged conduct showed that defendant was aware of the falsity of the tax returns. 664 F.3d 27, 22 (2d Cir. 2011). Here, in contrast, not only are the charged and uncharged conduct dissimilar, *but they are in conflict*.

In the absence of substantial similarity, the undercover communications provide no logical basis from which to infer that Mr. Kepke acted willfully at the time of the charged conduct. This evidence is not relevant to the pending charges and the only conceivable reason the Government would want to offer it is for propensity purposes. This is precisely what Rule 404(b) is intended to guard against.

**C.    The Undercover Communications Must be Excluded under Rule 403 Because They Have Little If Any Probative Value and Are Highly Prejudicial.**

Other acts evidence that is found to meet the requirements of Rule 404(b) must nonetheless be excluded under Rule 403 unless the Government shows that its probative value is outweighed by its prejudicial impact, *Mehrmanesh*, 689 F.2d at 830, such as "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403. "'Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury.'" *United States v. Wiggan*, 700 F.3d 1204, 1213 (9th Cir. 2012) (quoting *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992)).

The Government asserts that the undercover communications "present[] little risk of unfair prejudice." (Mot. at 16.) They cannot actually believe that—if they did then almost certainly they would not be trying so hard to have this evidence admitted. Tellingly, the Government engages in no further analysis under Rule 403. The Government's failure to seriously undertake any Rule 403 balancing fatally undermines its Rule 403 argument and Motion as a whole. *See Sanchez*, 2011 WL 6090164 at *8 (denying the government's motion to admit evidence under Rule 404(b) where "the Government has wholly failed to reckon with Rule 403").

Despite the Government's lack of concern about creating reversable error, it is apparent

that the minimal probative value of the undercover communications is far outweighed by their prejudicial impact. First, the undercover communications are unfairly prejudicial. They would likely "'lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'" *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997))). The danger is especially high here. As noted above, any alleged statements with the undercover operatives about sham transactions or structuring to avoid the requirement that the settlor fund the trust are directly contrary to the proof relevant to the trust at issue in the charged conduct, creating substantial likelihood of jury confusion and unfair prejudice. In addition, Mr. Kepke's responses to statements from the undercover agents about, as the Government characterizes it, hiding assets from wives and taking unjustified deductions are inflammatory, and have nothing to do with the charged case. That Mr. Kepke was never charged or found guilty with respect to the undercover communications may make the jury more likely to feel the need to punish Mr. Kepke by finding him guilty, regardless of whether they believe he is guilty of the charged crimes. The Government would also undoubtedly need to explain to the jury that the statements were made to federal law enforcement agents in the course of an undercover operation, which in itself suggests that Mr. Kepke did something wrong. All of these things create an enormous risk that the jury would find Mr. Kepke guilty for reasons unrelated to the proof of the charged crimes.

Courts in the Ninth Circuit frequently hold that similar evidence must be excluded. In *Tennison v. Circus Circus Enters., Inc.*, the Ninth Circuit upheld the district court's exclusion of evidence of prior acts of discrimination in a hostile work environment case because admitting those incidents "would create a significant danger that the jury would base its assessment of liability on remote events involving other employees, instead of recent events concerning Plaintiffs." 244 F.3d 684, 690 (9th Cir. 2001). In *United States v. Hill*, the Ninth Circuit reversed and remanded where the other acts evidence created a danger the jury would believe the defendant more likely to participate in a drug transaction. 953 F.2d 452, 457–58 (9th Cir. 1991), as amended (Dec. 16, 1991). In *United States v. Bradley*, the Ninth Circuit reversed and remanded, finding that other acts evidence was unfairly prejudicial because it would adversely

affect the jury's attitude toward the defendant, noting this danger was especially great because "the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged." 5 F.3d at 1321–22. And in *United States v. Lixiong Chen*, the court excluded other acts evidence when the materials the government sought to admit did not themselves prove that defendants had engaged in a criminal act. No. 18-cr-00450-JD, 2019 WL 2503654, *2 (N.D Cal. June 17, 2019) (Donato, J.). The same risks exist here. The evidence should be excluded.

Moreover, there are alternative sources of evidence that would not present these same risks of unfair prejudice. For example, in addition to Mr. Smith's testimony, the Government has produced in discovery Mr. Kepke's former website, on which Mr. Kepke described his work on foreign trust structures. (KepkeLaw.com excerpts, attached to Declaration of Grant P. Fondo as Ex. A.) The Government has also provided Memoranda of Interviews, interview transcripts, and grand jury transcripts for the trust company, among dozens of others, of witnesses who will be able to testify about the structure used in Mr. Smith's case and instructions provided by Mr. Smith and Mr. Kepke. Where there is less prejudicial alternative evidence that speaks to the same issues, the court should "discount the value" of the challenged evidence under Rule 403. *United States v. Merino-Balderrama*, 146 F.3d 758, 761 (9th Cir. 1998) (*quoting Old Chief v. United States*, 519 U.S. 172, 182–83 (1997)). Excluding the undercover communications would not prevent the Government from putting on any evidence about Mr. Kepke's advice about foreign trust structures in 1999 and 2000, it would simply prevent the Government from putting on evidence that is unfairly prejudicial. There are also 22 alleged overt acts in the Indictment (Indict. ¶¶ 29–50), "more than enough for the government to work with to carry its burden at trial." *Lixiong Chen*, 2019 WL 2503654 at *2.

Second, the undercover communications would confuse the jury. "[E]ven a small risk of misleading the jury substantially outweighs the probative value of minimally probative evidence." *Espinoza-Baza*, 647 F.3d at 1190 (internal quotation omitted). The undercover communications may seem superficially similar to the charged conduct, but as already discussed, they are actually different in significant ways. *Supra* at 8–11. Combined with the complexity of the subject matter,

1    these dissimilarities create a significant risk that the jury would convict Mr. Kepke on the basis of

2    things he said but never did and for which he was never even charged. *Dowie*, 411 F. App'x at 27

3    (affirming exclusion of evidence where admission would "likely confuse the jury as to the

4    conspiracy period").

5         Third, the undercover communications would result in a trial within a trial, distracting the

6    jury and wasting time. The Government has informed the Court that the presentation of its case

7    will require approximately four weeks. The Government should be seeking ways to streamline

8    this trial, not lengthen it. The admission of the undercover communications would very likely

9    require the testimony of the three undercover agents who participated in the communications,

10   playback of up to 12 hours of audio recordings, and review of hundreds of pages of transcripts.

11   Mr. Kepke would have no choice but to thoroughly dispute and interrogate this evidence. Mr.

12   Kepke would also be entitled to present any portions of the recordings and transcripts necessary

13   to provide context and avoid misleading the jury. *United States v. Quinones-Chavez*, 641 F.

14   App'x 722, 732 n.4 (9th Cir. 2016) (explaining that Federal Rule of Evidence 106 and the

15   common law rule of completeness allow a criminal defendant to present more fulsome excerpts of

16   recordings or transcripts without having to waive his Fifth Amendment privilege when necessary

17   to avoid misleading the jury). For example, the defense likely would seek to ask questions and/or

18   admit excerpts about the details of the fabricated circumstances presented to Mr. Kepke, the

19   differences between those circumstances and the charged conduct, the nuances and complexities

20   of the advice discussed, and the many instances in which Mr. Kepke advised the undercover

21   agents that their proposed actions would violate the tax laws. The Government would likely

22   dispute the defense's proposed excerpts, requiring numerous contested evidentiary rulings.

23        Admission of the undercover communications would thus result in an irrelevant and time

24   consuming sideshow. This is not a case in which the other act can be proven through the

25   admission of a certified record of conviction. Instead proving the other acts would be time

26   consuming and involved. The Ninth Circuit regularly upholds decisions to exclude other acts

27   evidence in order to avoid mini-trials like this. *E.g., Holmes v. Miller*, 768 F. App'x 781, 784 (9th

28   Cir. 2019) (in habeas corpus petition concerning ineffective assistance of counsel, upholding

1   district court's exclusion of evidence of counsel's disciplinary history and lack of candor in

2   statements made to other courts because "[s]uch evidence likely would have resulted in mini-

3   trials"); *Tennison*, 244 F.3d at 690 (upholding district court's exclusion of prior incidents of

4   harassment because they "might have resulted in a 'mini-trial,' considering that much of [the]

5   testimony was disputed by Defendants").

6       Admission of the undercover evidence would result in unfair prejudice, juror confusion,

7   and waste of time through the need for a mini-trial. Alternative evidence is available that does not

8   create any of these risks. The court should accordingly exclude the undercover communications

9   under Rule 403.

10  **IV.    CONCLUSION**

11      For the foregoing reasons, the Government's attempt to admit irrelevant, highly

12  prejudicial character evidence must be rejected. The Government's motion should be denied in its

13  entirety.

14

15                                          Respectfully submitted,

16  Dated:  August 24, 2022         By:  /s/ *Grant P. Fondo*
                                         GRANT P. FONDO
17                                       *GFondo@goodwinlaw.com*
                                         **GOODWIN PROCTER LLP**
18
                                         Attorney for Defendant:
19                                       CARLOS E. KEPKE

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the

3   United States District Court for the Northern District of California by using the CM/ECF system

4   on **August 24, 2022**. I further certify that all participants in the case are registered CM/ ECF users

5   and that service will be accomplished by the CM/ECF system.

6        I certify under penalty of perjury that the foregoing is true and correct. Executed on

7   **August 24, 2022**.

8

9                                         /s/ *Grant P. Fondo*
                                         GRANT P. FONDO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Motion to Admit                                    Case No. 3:21-CR-00155-JD