# EXHIBIT A



**U.S. Department of Justice**

Tax Division

*Western Criminal Enforcement Section*
*P.O. Box 972*
*Washington, D.C. 20044*
*202-514-5762 (v)*
*202-514-9623(f)*

REZ:LJW:CJSmith
DJ 5-11-24264
CMN 2019200585

October 9, 2020

Mark Filip
Kirkland & Ellis, LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004

Re:     Robert F. Smith – Non-Prosecution Agreement

Dear Mr. Filip,

As you know, the U.S. Department of Justice Tax Division, the United States Attorney's Office for the Northern District of California, and the Internal Revenue Service-Criminal Investigation ("IRS-CI") have been investigating your client, Robert F. Smith, in regard to suspected criminal violations of the Internal Revenue Code, Title 26, United States Code and related violations of Title 31, Report of Foreign Bank and Financial Accounts ("FBAR"). After careful consideration of Robert F. Smith's conduct and all of the surrounding circumstances, the Tax Division and the United States Attorney's Office for the Northern District of California hereby extends this Non-Prosecution Agreement (the "Agreement") to Robert F. Smith per the following terms and conditions:

1.      **Term of the Agreement.** The term of this Agreement shall be five (5) years, beginning on the date of signing this agreement, unless there is a breach as set forth in paragraph 4 and 5. Obligations hereunder survive the term of this Agreement only where this Agreement expressly so provides.

2.      **Acknowledgment of Facts.** Robert F. Smith acknowledges and agrees that the Statement of Facts as set forth in Attachment A, is truthful and accurate. He acknowledges and agrees that the Statement of Facts accurately describes the tax evasion scheme in which he participated, namely that he used the Excelsior Trust and Flash Holdings entities to willfully conceal taxable income paid to those entities, that he completely and unilaterally controlled said income which he knew was taxable to him, and further, that he affirmatively acted to conceal the income from the Internal Revenue Service ("IRS") (the "Scheme"). In addition, Robert F. Smith acknowledges that as a part of the Scheme, he willfully did not timely and accurately

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 2 -*

report to the IRS and the United States his financial interest in, and signatory authority over, the foreign bank accounts described in the Statement of Facts.

   3.  **Cooperation**. It is understood that during and under the terms of this Agreement Robert F. Smith shall continue to cooperate by:

   (a) truthfully and completely disclosing all information with respect to the activities of himself, and others, concerning all matters about which the United States including but not limited to the Department of Justice Tax Division, IRS-CI, and the United States Attorney's Office for the Northern District of California inquires of him, which information can be used for any purpose;

   (b) truthfully and completely providing full and meaningful cooperation to the United States, including but not limited to the Department of Justice, IRS-CI, and the United States Attorney's Office for the Northern District of California regarding other individuals involved in the Scheme, and other similar schemes of which he has knowledge, and such other matters that the United States may inquire of him. Any assistance Robert F. Smith may provide to federal criminal investigators shall be pursuant to the specific instructions and control of the United States and its designated investigators. Robert F. Smith's cooperation under this Agreement shall continue for a period of five (5) years from the date this Agreement is fully executed, however, he shall cooperate fully with the United States in all matters the United States inquires of him during this Agreement until the conclusion of such matters, whether those matters are concluded within the five-year term of this Agreement;

   (c) withdrawing from any and all joint defense agreements previously entered into with other individuals who were involved in the Scheme, or were involved in similar schemes;

   (d) attending all meetings at which the United States requests his presence, at a mutually convenient location;

   (e) providing to the United States, upon request, any document, record, or other tangible evidence, except for those subject to valid claims of attorney-client privilege, work product protections, or other privileges, if any, other than those expressly waived including those described in Paragraph 3(g), relating to matters about which the United States, or any designated law enforcement agencies, inquire of him;

   (f) truthfully testifying before the grand jury, at any trial, and other court proceeding as requested by the United States, except for testimony subject to valid claims of attorney-client privilege, work product protections, or other privileges, if any, other than those expressly waived including those described in Paragraph 3(g);

   (g) withdrawing, and otherwise waiving, any and all objections in proceedings involving the review of evidence, both electronic and documentary, seized by IRS-CI including signing and filing in the respective federal district courts at the time of execution of this Agreement, the attached pleadings entitled, "Robert Smith's Withdrawal of Objections and Waiver of Privilege" (Attachments B and C), said pleadings intended to constitute a full waiver of any and all attorney/ client and attorney work product privileges applicable to this evidence, and otherwise abandoning any litigation contesting the United States' requests for this evidence, and waiving attorney-client privilege, work product protection, and other applicable privileges, if any, as to the Scheme, including the creation, operation and concealment of the Excelsior / Flash structure and to any aspect of his  relationship or dealings with Individuals A and B, as defined in

Attachment A – Statement of Facts.  For avoidance of doubt, nothing herein shall be construed as a waiver of attorney-client privilege, work product protection, or other applicable privileges, if any, during the representation of Robert F. Smith by any of the counsel or law firms that have advised him in this criminal investigation;

(h) paying all federal income tax, penalties, and interest owed to the IRS, as determined by the IRS, pursuant to his participation in the Scheme, in the amount of $56,278,125 for calendar years 2000 through 2014, and waiving any objection to the imposition of the civil fraud penalty, under Title 26 U.S.C. § 6663, on the tax due as determined by the IRS. A partial payment to the United States totaling one-half of this amount owed to the IRS shall be made at or before the execution of this Agreement with equal quarterly payments made thereafter to the United States, and payment in full no later than eighteen (18) months after the execution of this Agreement. The amount of tax, penalty, and interest due pursuant to this sub-paragraph shall not be reduced by a carryback, deduction, loss, credit, or other tax benefit of any kind which is, or may become available.  A separate payment of tax associated with the 2015 calendar year will be made by Robert F. Smith to the IRS, together with an Amended Income Tax Return for the 2015 calendar year, reflecting previously unreported income from the Scheme.  Robert F. Smith shall also waive any objection to the imposition of the civil fraud penalty, under Title 26, U.S.C. § 6663, on the additional tax due and paid for the 2015 calendar year as reflected on the Amended Income Tax Return that Robert F. Smith will file.

(i) paying all penalties and interest computed by the IRS, pursuant to Title 31 U.S.C. §§5314 and 5322, in the amount of $82,930,165, related to Robert F. Smith's failure to timely file truthful and accurate Foreign Bank Account Reporting Forms TD F 90-22.1 ("FBARs"), reporting his financial interest in the foreign bank accounts referenced in the Statement of Facts for the calendar years 2012, 2013, and 2014. A partial payment to the United States totaling one-half of this amount of the FBAR penalties and interest shall be made at or before the execution of this Agreement with equal quarterly payments made thereafter to the United States, and payment in full no later than eighteen (18) months after the execution of this Agreement. The amount of tax, penalty, and interest due pursuant to this sub-paragraph shall not be reduced by a carryback, deduction, loss, credit, or other tax benefit of any kind which is, or may become available.

(j) beginning in 2019, fully and accurately reporting to the IRS and United States all of his offshore financial interests, transactions, and income, as required by United States statutes and regulations;

(k) abandoning his protective, or tentative, claims for refund totaling $182,138,000 filed with the IRS consisting of a (i) a protective refund claim submitted to the IRS on May 12, 2017 for amounts paid in connection with the submission pursuant to the Streamlined Domestic Offshore Procedures, and (ii) protective refund claims filed with the IRS for charitable contribution deductions on September 21, 2018, and October 11, 2019, in connection with the contributions to Fund II Foundation, and any other claims related to the disposition of unreported income that was part of the Scheme, and take no further direct or indirect tax benefit from such claims;

(l) cooperating with the IRS, including signing at the time of execution of this Agreement the attached closing agreements with the IRS relating to his tax liabilities and FBAR liabilities (Attachments D and E), and cooperating with the IRS in all audits of Robert F. Smith's federal income tax returns, to ensure Robert F. Smith is in full compliance with all applicable federal income tax statutes;

(m) bringing to the Department of Justice Tax Division's or the United States' attention

all other crimes, in addition to those committed as part of the Scheme, which Robert F. Smith has committed, and all other criminal proceedings, investigations, or prosecutions in which he has been or is a subject, target, party, or witness; and

(n) committing no crimes whatsoever.

4. **Violation of Agreement.**   It is understood that should the Department of Justice Tax Division or the United States Attorney's Office for the Northern District of California determine in its sole discretion that Robert F. Smith has knowingly given false, incomplete, or misleading testimony or information, or otherwise violated any provision of this Agreement, then:

(a) Robert F. Smith shall thereafter be subject to prosecution for any federal criminal violation of which the United States has knowledge, including crimes relating to the Scheme set forth in the Statement of Facts (Attachment A), perjury, and obstruction of justice; and any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement for Robert F. Smith to waive all defenses based on the statute of limitations and the Speedy Trial Act (18 U.S.C. § 3161) with respect to any prosecution that is not time-barred on the date that this Agreement is signed. Robert F. Smith further agrees to the tolling of any applicable statute of limitations from August 13, 2020 until all the terms of this Agreement are fulfilled.

(b) All statements made by Robert F. Smith to the United States, or other designated law enforcement agents, and any testimony given by Robert F. Smith before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads from such statements or testimony shall be admissible in evidence in any criminal proceeding brought against Robert F. Smith.

(c) Robert F. Smith shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule or regulation that such statements or any leads derived therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

(d) Robert F. Smith agrees to be subject to the jurisdiction of, and venue in, the United States District Court for the Northern District of California for any perjury, obstruction of justice, or false statement prosecutions related to any testimony or oral or written statements given in accordance with this Agreement. Robert F. Smith appoints his attorney, Mark Filip, as his agent to accept service of legal process, including subpoenas and summonses, in any proceeding instituted by the United States or IRS, or to which the United States or IRS is a party with respect to the crimes described above.

5. **No Repudiation or Contradiction of Statement of Facts**. Robert F. Smith agrees that he shall not, himself or through any agent or representative, make any statement, in litigation or otherwise, repudiating or contradicting the Statement of Facts associated with this Agreement (Attachment A). Any contradictory statement by Robert F. Smith or his agent shall constitute a violation of this Agreement. If such a contradictory statement is determined to constitute a violation of this Agreement, then Robert F. Smith thereafter shall be subject to

prosecution for his participation in the Scheme, as described in the Statement of Facts (Attachment A), and waives his right to contest or object to these facts set forth therein. The decision as to whether any contradictory statement will be imputed to Robert F. Smith for the purpose of determining whether Robert F. Smith has committed a violation of this Agreement shall be at the sole discretion of the United States. Upon the United States reaching a determination that a contradictory statement has been made by Robert F. Smith, the United States shall promptly notify Robert F. Smith in writing, and Robert F. Smith may avoid a violation of this Agreement by repudiating the statement in question both to the recipient of the statement and to the United States within seven (7) days after Robert F. Smith's receipt of notice. Robert F. Smith consents to the public release by the United States, in its sole discretion, of any repudiation.

6.    **Public Record.** Robert F. Smith and the United States agree that upon execution of this Agreement, the Agreement and the associated Statement of Facts (Attachment A) and Closing Agreements with the IRS (Attachments D and E) shall be a matter of public record. Moreover, Robert F. Smith agrees to waive any and all statutory rights afforded to him under Title 26 U.S.C. § 6103 regarding the public disclosure of information contained in the Statement of Facts.

7.    **Agreement Not to Prosecute.** If the Department of Justice Tax Division and the United States Attorney's Office for the Northern District of California determine that Robert F. Smith has fully complied with the terms of this Agreement, then the Department of Justice Tax Division and the United States Attorney's Office for the Northern District of California agree not to criminally prosecute Robert F. Smith for any federal crimes arising from the Scheme, as generally described in the Statement of Facts (Attachment A) to include (i) any attempt to defraud the United States, evade or defeat tax, or any fraud or false statements on any documents subscribed to the Internal Revenue Service ("IRS") for the tax years 2000 through 2015; and (ii) Robert F. Smith's failure to timely file truthful and accurate Foreign Bank Account Reporting Forms TD F 90-22.1 ("FBARs"), reporting his financial interest in the foreign bank accounts for the calendar years 2012 through 2019. This Agreement does not provide any protection against prosecution for any future conduct by Robert F. Smith, or for any misconduct not disclosed by Robert F. Smith during this investigation.

8.    **Limits on this Agreement.**   Other than the Department of Justice Tax Division, the United States Attorney's Office for the Northern District of California, and IRS-CI, this Agreement does not bind any other component of the Department of Justice or any other federal, state, or local law enforcement or regulatory authority.

9.    **Totality of this Agreement.** This Agreement sets forth all of the terms of the Non-Prosecution Agreement between Robert F. Smith and the United States. It constitutes the complete and final agreement between the United States and Robert F. Smith in this matter. There are no other agreements, written or otherwise, modifying the terms, conditions, or obligations of this Agreement. No future modifications or additions of this Agreement, in whole or in part, shall be valid unless they are set forth in writing and signed by the United States, Robert F. Smith, and Robert F. Smith's counsel.

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 6 -*

RICHARD E. ZUCKERMAN
**Principal Deputy Assistant**
**Attorney General**
**Tax Division**

Date __10/10/2020__

DAVID L. ANDERSON
**United States Attorney**
**Northern District of**
**California**

Date __10/13/2020__

**AGREED AND CONSENTED TO:**

Robert F. Smith

OCT 9, 2020
Date

**APPROVED:**

Mark Filip
**Kirkland & Ellis LLP**
**Attorney for Robert F. Smith**

Date signed __OcT 9, 2020__

W. Neil Eggleston
**Kirkland & Ellis LLP**
**Attorney for Robert F. Smith**

Date signed __Oct 9, 2020__

Emily P. Hughes
**Kirkland & Ellis LLP**
**Attorney for Robert F. Smith**

Date signed __October 9, 2020__

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 7 -*

**Mark E. Matthews**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed ___Oct 9, 2020___

**Scott D. Michel**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed ___OCTOBER 9, 2020___

**EXHIBIT A TO ROBERT F. SMITH**
**NON-PROSECUTION AGREEMENT**

**STATEMENT OF FACTS**

1.    Robert F. Smith ("Smith"), age 57, is a resident of Austin, Texas and a citizen of the United States. From 2000 through May 2015, Smith engaged in an illegal scheme to conceal income and evade taxes he owed by using an offshore trust structure with related foreign corporations and offshore bank accounts, and by willfully filing a series of false documents with the Internal Revenue Service ("IRS") and the Treasury Department.

2.    Beginning in or about 1997, while working as an investment banker at a leading global investment bank and securities firm, Smith met and developed a business relationship with Individual A, the CEO of a corporation that produces and markets computer software ("Company A"), located in Houston, Texas. Smith, who received an MBA from Columbia University in 1994, worked extensively with Individual A in 1997 and 1998 regarding the potential sale of Company A. During that process, Smith learned that Company A was purportedly owned by a foreign holding company that, in turn, was purportedly owned by a foreign trust located in Bermuda. Individual A told Smith that the foreign trust was created by Individual A's father in the 1980s. Individual A, and others who worked for Individual A, told Smith that because Company A was owned by the offshore trust, no United States income tax would be owed on the profits gained from the sale of Company A's stock.

3.    The contemplated sale of Company A did not occur. Instead, Individual A approached Smith about the prospect of creating a private equity fund ("Fund 1") in which Individual A would be the sole limited partner investor, through his foreign trust structure. Smith left his employment with the investment bank and in 2000, founded a private equity firm located in San Francisco, California. Smith has been the CEO of the private equity firm since that time. Individual A initially made a $300 million commitment to Fund 1, which was later increased to $1 billion. Although the Fund 1 partnership agreement listed Individual A's foreign trust entity as its sole limited partner, it became apparent to Smith that Individual A completely controlled this foreign trust structure and made all final and substantive decisions regarding its investments in Fund 1.

4.    Individual A personally dictated the terms under which he would invest in Fund 1, including that Fund 1 had to be located in the Cayman Islands and that Smith hold half his carried interest in Fund 1 through a "perfected foreign trust" similar to the one used by Individual A. Specifically, Smith would personally receive an 8 percent general partnership interest in Fund 1, holding 4 percent through his LLC and the other 4 percent through an offshore trust that Smith controlled. All Fund 1 profits Smith earned were to be paid through these entities. Individual A told Smith that a portion of the general partner income and distributions from Fund 1 had to be held offshore because Individual A did not want to bring his foreign trust, and related foreign companies, into United States courts to litigate claims if Fund 1 failed to perform. Smith understood from Individual A, that Individual A did not want the United States Internal Revenue Service ("IRS") to know about his own foreign trust's participation in Fund 1. Individual A presented this unconventional business proposal as a "take-it-or-leave-it" offer, dictating the unique terms and unorthodox structure to the arrangement. Despite any misgivings, Smith

accepted Individual A's offer, viewing it as a unique business opportunity he eagerly wanted to pursue. It became apparent to Smith that despite paperwork that indicated to the contrary, Individual A completely controlled Individual A's foreign trust and related foreign companies, and made all substantive decisions regarding all of its transactions and investments.

5.     For the purpose of forming a similar foreign trust, Individual A referred Smith to Individual B, a lawyer in private practice in Houston, Texas who specialized in foreign trusts and "asset protection" planning. Smith understood that Individual B previously assisted Individual A's father in creating Individual A's trust in the 1980s.

6.     Individual B told Smith that he could form a foreign trust that could hold assets for Smith, and that Smith could use and benefit from these assets without paying United States income tax. In order to avoid United States income and estate tax, Smith was to have a foreign U.K. relative of his then-spouse ("nominee settlor") appear to fund the creation of the foreign trust with an initial "donation" of $7,500. Individual B told Smith that he and his family could be named beneficiaries of the foreign trust, and that the foreign trust must also include charitable beneficiaries in order to assure the tax-free nature of the trust. Despite representations and paperwork to the contrary, the charitable aspects of the trust were discretionary, not mandatory. Individual B also told Smith that the paperwork he and Smith prepared would make it appear as if the income and assets of the trust were not owned or taxable to Smith. Smith knew that the nominee settlor would not be involved in the creation of this foreign trust, and would neither contribute assets to the trust, nor pay any fees. Despite appearing too good to be true, Smith did not consult with other reputable tax attorneys or legal advisors he knew and trusted to verify the validity, or legal soundness, of what Individual B told him. In fact, Individual A told Smith that aside from Individual B, he should not to discuss his offshore structure with other attorneys.

7.     Smith paid nearly all the costs and fees associated with the trust. In 2000, Smith purported to have the nominee settlor settle his Belizean trust, called Excelsior Trust ("Excelsior"). Smith personally paid nearly half the $7,500 to settle the trust and paid the entire $30,000 in administrative fees required to form and create Excelsior. Smith's foreign relative, the nominee settlor of Excelsior, paid none of the administrative fees. Further, from 2000 through 2014, Smith paid annual fees of approximately $5,000 to maintain Excelsior in Belize. The nominee settlor was not involved in the payment of these fees. From 2000 through 2014, Smith also paid Individual B approximately $800,000 in fees for Individual B's assistance with the creation of a false paper trail, regarding the maintenance and operation of Excelsior and its related entities. Smith falsely told the Belizean nominee trustee that the initial donation of $7,500 came from the nominee settlor to create the false impression that Excelsior was an independent foreign trust being created and formed by someone other than Smith.

8.     Individual B further told Smith that the foreign trust could own foreign corporations to hold various assets in foreign jurisdictions, similar to Individual A's foreign trust. Smith understood from Individual B that although assets would be held and titled under the foreign trust and foreign corporate names, Smith could continue to control the assets and use them for his personal benefit.

9.     With the assistance of Individual B, Smith created a foreign limited liability company named Flash Holdings, LLC ("Flash"), in Nevis. At Individual B's direction, Smith

falsely represented to the Belizean nominee trustee for Excelsior that Flash was formed under the direction of the nominee settlor, using bearer shares, and that Flash was purportedly owned by Excelsior.[1] In reality, Smith paid the fees and costs to form Flash and made all substantive decisions regarding Flash's operations, transactions, income, investments, and assets.

10.     Following the formation of Excelsior and Flash, Smith held a 4% general partnership interest in Fund 1 under his own name and a 4% general partnership interest in the name of Flash. Smith was at all times in control of and the beneficial owner of Flash's 4% general partnership interest in Fund 1. Smith understood from Individual B that he controlled both the investment decisions for Flash and its assets, but he felt obligated to honor any claims Individual A made against Flash's tax-free funds held in a foreign jurisdiction if Fund 1 was not successful.  Smith understood that Individual A could assert claims over the assets of Fund 1 if the fund were to lose money.  Individual A had the power to remove Smith and the general partners from Fund 1 by forcing a sale of general partner interests to Individual A at Individual A's valuation.

11.     In 2000, when Smith formed Excelsior and Flash, Smith knew that Excelsior and Flash were intended, and would be used, to avoid the payment of United States income tax on income earned from investments in Fund 1 and other private equity funds. Smith knowingly and intentionally used Excelsior and Flash and their associated foreign bank accounts to conceal from the IRS, and the United States Treasury Department, income earned and/or distributed to Flash from Fund 1 and other private equity funds.

12.     At all times from their formation, Smith knowingly and intentionally controlled Excelsior and Flash for his use, benefit, and enjoyment, subject only to a claim Individual A could assert to Fund 1. Although Excelsior had a nominee trustee in Belize, that trustee exercised no independent judgment and made no decisions regarding Excelsior other than those that Smith directed. Similarly, although Flash had a nominee corporate manager and resident agent in Nevis, these managers and agents exercised no independent judgment over Flash, and made no decisions regarding Flash other than those that Smith directed.

13.     Individual B recommended that Smith work through him to create a paper record for purposes of creating a false impression that Excelsior's trustees and Flash's managers made independent decisions for these entities when in fact, Smith made all substantive decisions in their regard. Individual B advised Smith to communicate with the nominee trustees and nominee managers of Excelsior and Flash through Individual B for greater confidentiality, which Individual B knew was intended to, and did, conceal Smith's control and beneficial ownership of the income concealed in bank accounts under Flash's name.

14.     Beginning in approximately 2005, Flash began to earn and receive general partnership carried interest income from Fund 1. Distributions of this income were initially made to Flash's bank account at bank in the British Virgin Islands ("BVI Account"). Although Smith was not a signatory on the BVI Account, Smith was its beneficial owner and controlled all transactions concerning the account through Flash's nominee manager. Smith did not report this

---

[1] A bearer instrument is a document that entitles the holder of the document rights of ownership or title to the underlying property.

income to the IRS.

15.     In 2007, Smith caused an account in Flash's name to be opened at Banque Bonhôte in Switzerland into which additional carried interest income earned by Flash from Fund 1 and later from additional private equity funds were deposited (the "Bonhôte Account"). At all times, Smith was the sole signatory on the Bonhôte Account, fully controlled the Bonhôte Account, and was listed in Banque Bonhôte records as the beneficial owner of the Bonhôte Account. Smith was, in fact, the beneficial owner of the Bonhôte Account.

16.     In 2005, Smith and his then-wife purchased a vacation home in Sonoma, California. Smith titled the property they selected in Flash's name. Smith directed that the purchase price of $2.5 million be paid with untaxed funds from the BVI Account. Smith and his then-wife renovated the Sonoma property and paid for the renovation costs with untaxed funds deposited in the BVI Account and the Bonhôte Account. Smith and his family used the Sonoma property and had unfettered access to it from 2005 to 2014. Smith knowingly and willfully neither timely reported to the IRS nor timely paid income tax on these funds.

17.     In 2010, after Smith and his then-wife moved to Switzerland, they acquired two ski properties in Megève, France and later a Megève commercial property using untaxed funds to make the purchases, and with Individual B's advice, titled the properties in the names of foreign entities. Smith directed the payment of more than 13 million Euros from the Bonhôte Account to purchase and furnish the properties. Smith and his family had control of the Megève ski properties and had priority access to them from 2010 to 2014 unless rented to third parties. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

18.     From 2005 to 2013, Smith withdrew untaxed funds from the BVI Account and the Bonhôte Account for his personal use and benefit. In 2011 and 2012, Smith transferred more than $13 million from the Bonhôte Account to a United States bank account for his benefit. Smith used these funds to build a home and make improvements to property that he owned in Colorado and to fund charitable activities on that property for inner city children and wounded veterans. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

19.     From 2000 until 2014, Smith knowingly and intentionally did not advise his tax return preparer about Excelsior, Flash, and the BVI Account and the Bonhôte Account. Smith knowingly and intentionally did not tell his return preparer that he controlled these entities and bank accounts and that he had placed a portion of his general partnership income from Fund 1 and other private equity funds into those entities and accounts. Smith knowingly and intentionally did not tell his return preparer that he used untaxed income deposited into these foreign accounts for his own personal benefit.

20.     From in or about 2006 through 2015, Smith willfully filed false United States Individual Income Tax Returns, Forms 1040, for the tax years 2005 through 2014 in which he failed to disclose his beneficial interest in, and control over the BVI Account and the Bonhôte Account. In addition, Smith willfully failed to report on these income tax returns the income he earned from Fund 1, and other private equity funds, a portion of which he directed to be deposited into the BVI Account and Bonhôte Account. Smith willfully understated his income on these tax

returns and willfully evaded more than $43,000,000 in U.S. federal income taxes for the tax years 2005 through 2014.

21.     Smith knew that United States laws and regulations require United States citizens who have signatory authority over, or a financial interest in, a foreign bank account[s] to annually file a Foreign Bank Account Reporting Form TD F 90-22.1 ("FBAR"), with the United States government reporting either this signatory authority and/or financial interest. Prior to 2011, Smith knowingly and intentionally did not file an FBAR as required by law. In or around September 2011, Smith filed an FBAR for the 2010 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account Smith also willfully failed to file an FBAR for 2011 as required by law. In or around June 2013, Smith filed an FBAR for 2012 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account for purposes of concealing his ownership and control of these accounts.

22.     In or around November 2013 and January 2014, Smith received letters from Banque Bonhôte regarding the bank's intended participation in the United States Department of Justice "Swiss Bank Program" which required participant banks to report all United States-related accounts to the United States government (the "Bank Program Letters"). Smith received these letters relating to the Bonhôte Account. The Bank Program Letters noted that the Bonhôte Account was held by a United States person, and requested Smith to waive Swiss bank secrecy related to it. It further recommended that Smith consider applying to the IRS's Offshore Voluntary Disclosure Program ("OVDP") to report his non-compliance. The Bank Program Letters also informed Smith that if he failed to take one of these actions that Banque Bonhôte would close the Bonhôte Account. In March 2014, Smith filed a preclearance request with the IRS seeking entry into OVDP. In April 2014, the IRS denied Smith's preclearance application into OVDP.

23.     In or around June 2014, after receiving the OVDP preclearance denial, Smith willfully filed a false 2013 FBAR. Smith listed both the BVI Account and the Bonhôte Account on the 2013 FBAR, but only reported signature authority over these accounts while willfully omitting both his financial and beneficial interest in the accounts as well. Smith willfully omitted these disclosures to further conceal his taxable income deposited into these accounts.

24.     In or around October 15, 2014, Smith willfully filed a false United States Individual Income Tax Return, Form 1040, for the tax year 2013, with the IRS, which misrepresented and willfully failed to disclose his income from, beneficial interest in, and control over Excelsior and Flash. Smith's 2013 federal income tax return also willfully failed to disclose Smith's financial interest in the BVI Account and Bonhôte Account. In addition, Smith willfully filed a false Form 8275, attached to his income tax return, in which he represented that the Excelsior / Flash structure had corporate trustees and managers and willfully concealed his control over those entities. Smith attempted to conceal from the IRS that he controlled and beneficially owned the offshore entities Excelsior and Flash. Smith also willfully failed to disclose on the Form 8275 his beneficial ownership of the BVI Account and Bonhôte Account and falsely claimed that income distributed to Flash from Fund 1, and other private equity funds, was required to be donated to charity.

25.     In December 2014, Smith directed Excelsior to contribute all of the shares of Flash, and all of its assets, to a U.S. 501(c)(3) charitable organization. Smith knowingly and intentionally falsely claimed that this charitable contribution was required as part of an agreement with Individual A, the limited partner investor in Fund 1.

26.    In or around May 2015, Smith willfully filed false FBARs for the calendar years 2008 through 2013 ("Streamlined FBARs") and false amended United States Individual Income Tax Returns, Forms 1040X, for tax years 2010 through 2013 ("Streamlined Tax Returns") as part of the Streamlined Domestic Offshore Procedures. Smith's Streamlined FBARs continued to represent that Smith only had signatory authority over the BVI Account and Bonhôte Account, while willfully omitting Smith's true beneficial ownership of these accounts.

27.    Smith's Streamlined Tax Returns continued to willfully include a false Form 8275 which concealed his true beneficial ownership and control of Excelsior and Flash. Smith's Streamlined Tax Returns falsely reported that only small portions of income distributed to him in the United States from Flash's foreign bank accounts, were taxable to him. Smith willfully failed to report on his Streamlined Tax Returns over $200 million of partnership income distributed to Flash from Fund 1 and other private equity funds, over which Smith had beneficial ownership during the calendar years 2005 through 2014. Smith knew that the earned income attributed to Flash was in fact taxable to him when he filed the Streamlined Tax Returns.

28.    The acts taken by Smith, including acts described above, were done willfully and knowingly with the specific intent to violate United States law. Smith acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses stated herein and does not identify all of the persons with whom he may have engaged in unlawful conduct.

29.    The foregoing is a summary of relevant facts and is not a complete recitation of every relevant fact known.


AGREED AND CONSENTED TO:


_____          Date signed    OCT 9, 2020
Robert F. Smith


_____          Date signed    OCT. 9, 2020
Mark Filip
Kirkland & Ellis LLP
Attorney for Robert F. Smith


_____          Date signed    Oct 9, 2020
W. Neil Eggleston
Kirkland & Ellis LLP
Attorney for Robert F. Smith


Page 6 of 6

Date signed   _October 9, 2020_

Emily P. Hughes
Kirkland & Ellis LLP
Attorney for Robert F. Smith

Date signed   _Oct 9, 2020_

Mark E. Matthews
Caplin & Drysdale, Chartered
Attorney for Robert F. Smith

Date signed   _ocTober 9, 2020_

Scott D. Michel
Caplin & Drysdale, Chartered
Attorney for Robert F. Smith

Date signed   _10/10/2020_

Richard E. Zuckerman,
Principal Deputy Assistant Attorney General
Department of Justice
Tax Division