# EXHIBIT 1

## EXHIBIT A TO ROBERT F. SMITH NON-PROSECUTION AGREEMENT

### STATEMENT OF FACTS

1. Robert F. Smith ("Smith"), age 57, is a resident of Austin, Texas and a citizen of the United States. From 2000 through May 2015, Smith engaged in an illegal scheme to conceal income and evade taxes he owed by using an offshore trust structure with related foreign corporations and offshore bank accounts, and by willfully filing a series of false documents with the Internal Revenue Service ("IRS") and the Treasury Department.

2. Beginning in or about 1997, while working as an investment banker at a leading global investment bank and securities firm, Smith met and developed a business relationship with Individual A, the CEO of a corporation that produces and markets computer software ("Company A"), located in Houston, Texas. Smith, who received an MBA from Columbia University in 1994, worked extensively with Individual A in 1997 and 1998 regarding the potential sale of Company A. During that process, Smith learned that Company A was purportedly owned by a foreign holding company that, in turn, was purportedly owned by a foreign trust located in Bermuda. Individual A told Smith that the foreign trust was created by Individual A's father in the 1980s. Individual A, and others who worked for Individual A, told Smith that because Company A was owned by the offshore trust, no United States income tax would be owed on the profits gained from the sale of Company A's stock.

3. The contemplated sale of Company A did not occur. Instead, Individual A approached Smith about the prospect of creating a private equity fund ("Fund 1") in which Individual A would be the sole limited partner investor, through his foreign trust structure. Smith left his employment with the investment bank and in 2000, founded a private equity firm located in San Francisco, California. Smith has been the CEO of the private equity firm since that time. Individual A initially made a $300 million commitment to Fund 1, which was later increased to $1 billion. Although the Fund 1 partnership agreement listed Individual A's foreign trust entity as its sole limited partner, it became apparent to Smith that Individual A completely controlled this foreign trust structure and made all final and substantive decisions regarding its investments in Fund 1.

4. Individual A personally dictated the terms under which he would invest in Fund 1, including that Fund 1 had to be located in the Cayman Islands and that Smith hold half his carried interest in Fund 1 through a "perfected foreign trust" similar to the one used by Individual A. Specifically, Smith would personally receive an 8 percent general partnership interest in Fund 1, holding 4 percent through his LLC and the other 4 percent through an offshore trust that Smith controlled. All Fund 1 profits Smith earned were to be paid through these entities. Individual A told Smith that a portion of the general partner income and distributions from Fund 1 had to be held offshore because Individual A did not want to bring his foreign trust, and related foreign companies, into United States courts to litigate claims if Fund 1 failed to perform. Smith understood from Individual A, that Individual A did not want the United States Internal Revenue Service ("IRS") to know about his own foreign trust's participation in Fund 1. Individual A presented this unconventional business proposal as a "take-it-or-leave-it" offer, dictating the unique terms and unorthodox structure to the arrangement. Despite any misgivings, Smith

accepted Individual A's offer, viewing it as a unique business opportunity he eagerly wanted to pursue. It became apparent to Smith that despite paperwork that indicated to the contrary, Individual A completely controlled Individual A's foreign trust and related foreign companies, and made all substantive decisions regarding all of its transactions and investments.

5. For the purpose of forming a similar foreign trust, Individual A referred Smith to Individual B, a lawyer in private practice in Houston, Texas who specialized in foreign trusts and "asset protection" planning. Smith understood that Individual B previously assisted Individual A's father in creating Individual A's trust in the 1980s.

6. Individual B told Smith that he could form a foreign trust that could hold assets for Smith, and that Smith could use and benefit from these assets without paying United States income tax. In order to avoid United States income and estate tax, Smith was to have a foreign U.K. relative of his then-spouse ("nominee settlor") appear to fund the creation of the foreign trust with an initial "donation" of $7,500. Individual B told Smith that he and his family could be named beneficiaries of the foreign trust, and that the foreign trust must also include charitable beneficiaries in order to assure the tax-free nature of the trust. Despite representations and paperwork to the contrary, the charitable aspects of the trust were discretionary, not mandatory. Individual B also told Smith that the paperwork he and Smith prepared would make it appear as if the income and assets of the trust were not owned or taxable to Smith. Smith knew that the nominee settlor would not be involved in the creation of this foreign trust, and would neither contribute assets to the trust, nor pay any fees. Despite appearing too good to be true, Smith did not consult with other reputable tax attorneys or legal advisors he knew and trusted to verify the validity, or legal soundness, of what Individual B told him. In fact, Individual A told Smith that aside from Individual B, he should not to discuss his offshore structure with other attorneys.

7. Smith paid nearly all the costs and fees associated with the trust. In 2000, Smith purported to have the nominee settlor settle his Belizean trust, called Excelsior Trust ("Excelsior"). Smith personally paid nearly half the $7,500 to settle the trust and paid the entire $30,000 in administrative fees required to form and create Excelsior. Smith's foreign relative, the nominee settlor of Excelsior, paid none of the administrative fees. Further, from 2000 through 2014, Smith paid annual fees of approximately $5,000 to maintain Excelsior in Belize. The nominee settlor was not involved in the payment of these fees. From 2000 through 2014, Smith also paid Individual B approximately $800,000 in fees for Individual B's assistance with the creation of a false paper trail, regarding the maintenance and operation of Excelsior and its related entities. Smith falsely told the Belizean nominee trustee that the initial donation of $7,500 came from the nominee settlor to create the false impression that Excelsior was an independent foreign trust being created and formed by someone other than Smith.

8. Individual B further told Smith that the foreign trust could own foreign corporations to hold various assets in foreign jurisdictions, similar to Individual A's foreign trust. Smith understood from Individual B that although assets would be held and titled under the foreign trust and foreign corporate names, Smith could continue to control the assets and use them for his personal benefit.

9. With the assistance of Individual B, Smith created a foreign limited liability company named Flash Holdings, LLC ("Flash"), in Nevis. At Individual B's direction, Smith

falsely represented to the Belizean nominee trustee for Excelsior that Flash was formed under the direction of the nominee settlor, using bearer shares, and that Flash was purportedly owned by Excelsior.[1] In reality, Smith paid the fees and costs to form Flash and made all substantive decisions regarding Flash's operations, transactions, income, investments, and assets.

10. Following the formation of Excelsior and Flash, Smith held a 4% general partnership interest in Fund 1 under his own name and a 4% general partnership interest in the name of Flash. Smith was at all times in control of and the beneficial owner of Flash's 4% general partnership interest in Fund 1. Smith understood from Individual B that he controlled both the investment decisions for Flash and its assets, but he felt obligated to honor any claims Individual A made against Flash's tax-free funds held in a foreign jurisdiction if Fund 1 was not successful. Smith understood that Individual A could assert claims over the assets of Fund 1 if the fund were to lose money. Individual A had the power to remove Smith and the general partners from Fund 1 by forcing a sale of general partner interests to Individual A at Individual A's valuation.

11. In 2000, when Smith formed Excelsior and Flash, Smith knew that Excelsior and Flash were intended, and would be used, to avoid the payment of United States income tax on income earned from investments in Fund 1 and other private equity funds. Smith knowingly and intentionally used Excelsior and Flash and their associated foreign bank accounts to conceal from the IRS, and the United States Treasury Department, income earned and/or distributed to Flash from Fund 1 and other private equity funds.

12. At all times from their formation, Smith knowingly and intentionally controlled Excelsior and Flash for his use, benefit, and enjoyment, subject only to a claim Individual A could assert to Fund 1. Although Excelsior had a nominee trustee in Belize, that trustee exercised no independent judgment and made no decisions regarding Excelsior other than those that Smith directed. Similarly, although Flash had a nominee corporate manager and resident agent in Nevis, these managers and agents exercised no independent judgment over Flash, and made no decisions regarding Flash other than those that Smith directed.

13. Individual B recommended that Smith work through him to create a paper record for purposes of creating a false impression that Excelsior's trustees and Flash's managers made independent decisions for these entities when in fact, Smith made all substantive decisions in their regard. Individual B advised Smith to communicate with the nominee trustees and nominee managers of Excelsior and Flash through Individual B for greater confidentiality, which Individual B knew was intended to, and did, conceal Smith's control and beneficial ownership of the income concealed in bank accounts under Flash's name.

14. Beginning in approximately 2005, Flash began to earn and receive general partnership carried interest income from Fund 1. Distributions of this income were initially made to Flash's bank account at bank in the British Virgin Islands ("BVI Account"). Although Smith was not a signatory on the BVI Account, Smith was its beneficial owner and controlled all transactions concerning the account through Flash's nominee manager. Smith did not report this

---

[1] A bearer instrument is a document that entitles the holder of the document rights of ownership or title to the underlying property.

income to the IRS.

15. In 2007, Smith caused an account in Flash's name to be opened at Banque Bonhôte in Switzerland into which additional carried interest income earned by Flash from Fund 1 and later from additional private equity funds were deposited (the "Bonhôte Account"). At all times, Smith was the sole signatory on the Bonhôte Account, fully controlled the Bonhôte Account, and was listed in Banque Bonhôte records as the beneficial owner of the Bonhôte Account. Smith was, in fact, the beneficial owner of the Bonhôte Account.

16. In 2005, Smith and his then-wife purchased a vacation home in Sonoma, California. Smith titled the property they selected in Flash's name. Smith directed that the purchase price of $2.5 million be paid with untaxed funds from the BVI Account. Smith and his then-wife renovated the Sonoma property and paid for the renovation costs with untaxed funds deposited in the BVI Account and the Bonhôte Account. Smith and his family used the Sonoma property and had unfettered access to it from 2005 to 2014. Smith knowingly and willfully neither timely reported to the IRS nor timely paid income tax on these funds.

17. In 2010, after Smith and his then-wife moved to Switzerland, they acquired two ski properties in Megève, France and later a Megève commercial property using untaxed funds to make the purchases, and with Individual B's advice, titled the properties in the names of foreign entities. Smith directed the payment of more than 13 million Euros from the Bonhôte Account to purchase and furnish the properties. Smith and his family had control of the Megève ski properties and had priority access to them from 2010 to 2014 unless rented to third parties. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

18. From 2005 to 2013, Smith withdrew untaxed funds from the BVI Account and the Bonhôte Account for his personal use and benefit. In 2011 and 2012, Smith transferred more than $13 million from the Bonhôte Account to a United States bank account for his benefit. Smith used these funds to build a home and make improvements to property that he owned in Colorado and to fund charitable activities on that property for inner city children and wounded veterans. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

19. From 2000 until 2014, Smith knowingly and intentionally did not advise his tax return preparer about Excelsior, Flash, and the BVI Account and the Bonhôte Account. Smith knowingly and intentionally did not tell his return preparer that he controlled these entities and bank accounts and that he had placed a portion of his general partnership income from Fund 1 and other private equity funds into those entities and accounts. Smith knowingly and intentionally did not tell his return preparer that he used untaxed income deposited into these foreign accounts for his own personal benefit.

20. From in or about 2006 through 2015, Smith willfully filed false United States Individual Income Tax Returns, Forms 1040, for the tax years 2005 through 2014 in which he failed to disclose his beneficial interest in, and control over the BVI Account and the Bonhôte Account. In addition, Smith willfully failed to report on these income tax returns the income he earned from Fund 1, and other private equity funds, a portion of which he directed to be deposited into the BVI Account and Bonhôte Account. Smith willfully understated his income on these tax

returns and willfully evaded more than $43,000,000 in U.S. federal income taxes for the tax years 2005 through 2014.

21. Smith knew that United States laws and regulations require United States citizens who have signatory authority over, or a financial interest in, a foreign bank account[s] to annually file a Foreign Bank Account Reporting Form TD F 90-22.1 ("FBAR"), with the United States government reporting either this signatory authority and/or financial interest. Prior to 2011, Smith knowingly and intentionally did not file an FBAR as required by law. In or around September 2011, Smith filed an FBAR for the 2010 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account Smith also willfully failed to file an FBAR for 2011 as required by law. In or around June 2013, Smith filed an FBAR for 2012 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account for purposes of concealing his ownership and control of these accounts.

22. In or around November 2013 and January 2014, Smith received letters from Banque Bonhôte regarding the bank's intended participation in the United States Department of Justice "Swiss Bank Program" which required participant banks to report all United States-related accounts to the United States government (the "Bank Program Letters"). Smith received these letters relating to the Bonhôte Account. The Bank Program Letters noted that the Bonhôte Account was held by a United States person, and requested Smith to waive Swiss bank secrecy related to it. It further recommended that Smith consider applying to the IRS's Offshore Voluntary Disclosure Program ("OVDP") to report his non-compliance. The Bank Program Letters also informed Smith that if he failed to take one of these actions that Banque Bonhôte would close the Bonhôte Account. In March 2014, Smith filed a preclearance request with the IRS seeking entry into OVDP. In April 2014, the IRS denied Smith's preclearance application into OVDP.

23. In or around June 2014, after receiving the OVDP preclearance denial, Smith willfully filed a false 2013 FBAR. Smith listed both the BVI Account and the Bonhôte Account on the 2013 FBAR, but only reported signature authority over these accounts while willfully omitting both his financial and beneficial interest in the accounts as well. Smith willfully omitted these disclosures to further conceal his taxable income deposited into these accounts.

24. In or around October 15, 2014, Smith willfully filed a false United States Individual Income Tax Return, Form 1040, for the tax year 2013, with the IRS, which misrepresented and willfully failed to disclose his income from, beneficial interest in, and control over Excelsior and Flash. Smith's 2013 federal income tax return also willfully failed to disclose Smith's financial interest in the BVI Account and Bonhôte Account. In addition, Smith willfully filed a false Form 8275, attached to his income tax return, in which he represented that the Excelsior / Flash structure had corporate trustees and managers and willfully concealed his control over those entities. Smith attempted to conceal from the IRS that he controlled and beneficially owned the offshore entities Excelsior and Flash. Smith also willfully failed to disclose on the Form 8275 his beneficial ownership of the BVI Account and Bonhôte Account and falsely claimed that income distributed to Flash from Fund 1, and other private equity funds, was required to be donated to charity.

25. In December 2014, Smith directed Excelsior to contribute all of the shares of Flash, and all of its assets, to a U.S. 501(c)(3) charitable organization. Smith knowingly and intentionally falsely claimed that this charitable contribution was required as part of an agreement with Individual A, the limited partner investor in Fund 1.

26. In or around May 2015, Smith willfully filed false FBARs for the calendar years 2008 through 2013 ("Streamlined FBARs") and false amended United States Individual Income Tax Returns, Forms 1040X, for tax years 2010 through 2013 ("Streamlined Tax Returns") as part of the Streamlined Domestic Offshore Procedures. Smith's Streamlined FBARs continued to represent that Smith only had signatory authority over the BVI Account and Bonhôte Account, while willfully omitting Smith's true beneficial ownership of these accounts.

27. Smith's Streamlined Tax Returns continued to willfully include a false Form 8275 which concealed his true beneficial ownership and control of Excelsior and Flash. Smith's Streamlined Tax Returns falsely reported that only small portions of income distributed to him in the United States from Flash's foreign bank accounts, were taxable to him. Smith willfully failed to report on his Streamlined Tax Returns over $200 million of partnership income distributed to Flash from Fund I and other private equity funds, over which Smith had beneficial ownership during the calendar years 2005 through 2014. Smith knew that the earned income attributed to Flash was in fact taxable to him when he filed the Streamlined Tax Returns.

28. The acts taken by Smith, including acts described above, were done willfully and knowingly with the specific intent to violate United States law. Smith acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses stated herein and does not identify all of the persons with whom he may have engaged in unlawful conduct.

29. The foregoing is a summary of relevant facts and is not a complete recitation of every relevant fact known.

AGREED AND CONSENTED TO:

_____    Date signed  OCT 9, 2020
Robert F. Smith

_____    Date signed  OCT. 9, 2020
Mark Filip
Kirkland & Ellis LLP
Attorney for Robert F. Smith

_____    Date signed  Oct 9, 2020
W. Neil Eggleston
Kirkland & Ellis LLP
Attorney for Robert F. Smith

_[signature]_  
**Emily P. Hughes**  
Kirkland & Ellis LLP  
Attorney for Robert F. Smith

Date signed _October 9, 2020_

_[signature]_  
**Mark E. Matthews**  
Caplin & Drysdale, Chartered  
Attorney for Robert F. Smith

Date signed _Oct 9, 2020_

_[signature]_ Scott D. Michel  
**Scott D. Michel**  
Caplin & Drysdale, Chartered  
Attorney for Robert F. Smith

Date signed _October 9, 2020_

_[signature]_  
**Richard E. Zuckerman**,  
Principal Deputy Assistant Attorney General  
Department of Justice  
Tax Division

Date signed _10/10/2020_