STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, CA 95113
Telephone:     (408) 535-5040
Facsimile:     (408) 535-5081
Email: michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
United States Department of Justice
Telephone:     (202) 514-5230
Email: corey.smith@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARLOS E. KEPKE,<br><br>Defendant. | Criminal No. 3:21-CR-00155-JD<br><br>UNITED STATES' SUPPLEMENTAL MOTION IN LIMINE TO ADMIT EVIDENCE OF UNDERCOVER CONTACTS<br><br>Pretrial Conf.:   November 21, 2022<br>Time:             1:30 p.m.<br>Place:            Courtroom 11, 19th Floor |

The United States of America ("United States") hereby respectfully moves the Court to admit limited evidence of an undercover operation targeting Defendant Carlos Kepke described in more detail below, and states as follows in support:

**BACKGROUND**

Beginning in 2017, the IRS initiated an undercover operation concerning Defendant's marketing of tax shelters. The undercover operation resulted in the collection of dozens of recordings of Defendant's contacts with undercover agents, all of which have been transcribed and produced to Defendant. On August 10, 2022, the United States filed a Motion seeking to submit evidence related to

the undercover operation at trial. *See* Doc. 66. After hearing argument on the Motion, the Court issued an Order on October 20, 222, directing the United States to provide Defendant with a specific statement of the undercover evidence that it expects to introduce at trial by October 28, 2022. *See* Doc. 104. The Court also indicated that it would likely allow evidence of the undercover operation which bore on Defendant's knowledge or intent that offshore structures and trusts were designed to evade federal income taxes. *See id*.

The United States provided Defendant specific excerpts of the undercover contacts between Defendant and the undercover agent as ordered, but has since further reduced the undercover evidence it seeks to admit at trial. The parties have reached no agreement about the admissibility of this evidence. Accordingly, the United States hereby respectfully moves the Court for an order admitting the recordings described below, as well as limited testimony form the undercover agent in order to orient the jury as the recordings are played.

### THE PROFFERED UNDERCOVER EVIDENCE

The undercover operation utilized multiple undercover agents. The first undercover agent posed as a prospective client seeking to protect his assets. The United States does not seek to introduce any recordings of Defendant's interactions with the first undercover agent. The second undercover agent ("Undercover Agent") presented himself to Defendant as a friend of the first undercover agent, and a small-business owner with money he wished to protect. The United States seeks to introduce the following evidence of Defendant's interactions with the Undercover Agent:

During Defendant's first telephone conversation with the Undercover Agent, which occurred on December 4, 2017, Defendant explained to the Undercover Agent that a foreign trust could be used to shelter assets from the IRS, but only if, among other things, the trust was created and funded by someone other than the Undercover Agent. *See* Designation 1, attached hereto (IRS-2018-0000364 – 24:7 to IRS-2018-0000368 – 28:10, approximate duration: 3:33) ("[T]he tax benefits … start when you have somebody other than yourself creating [the trust] . . . they have to fund it – a check or money has to come from them."). After establishing that he understood there could be no legitimate tax benefits if the Undercover Agent created and funded the offshore trust, Defendant went on to instruct the Undercover Agent to create and fund a trust using a nominee (the Undercover Agent's cousin) so that the IRS would

never know that the Undercover Agent was the true creator and funder.  Specifically, Defendant told the Undercover Agent that "what you don't want [is] … for the IRS or anybody to go and say, 'your cousin didn't really create this trust.  You created the trust cause you gave him the money.' . . . And that makes you the creator. … All the tax benefits are demolished, you've been making all these gains and not paying taxes and you should've paid taxes on it, and you're in big trouble because you didn't … because you are the creator and you didn't pay taxes on it.  So, you wanna be sure that you're not the creator."  Defendant then told the Undercover Agent how to funnel money to his nominee by pretending to buy an asset from him.  *See* Designation 2, attached hereto (IRS-2018-0000399 – 59:4 to IRS-2018-0000402 – 62:7, approximate duration: 2:49).  Thus, the December 4, 2017, call establishes that Defendant was aware that no legitimate tax savings could be achieved if the Undercover Agent created and funded the trust, and also that he knew the Undercover Agent should pay tax on income generated within any foreign trust he created and funded.  Nevertheless, Defendant advised the Undercover Agent to establish and fund the trust using a nominee in order to hide the arrangement from the IRS.  In effect, during the December 4th call Defendant acknowledged that he was aware that federal tax law imposes a duty on taxpayers to report income generated by offshore trusts they create and fund, and also counseled a prospective client to violate that duty by engaging in a transaction designed – not to comply with the law – but rather to conceal the offshore trust's true nature from the IRS.

In a meeting held on February 7, 2018, at Defendant's home office in Houston, Texas, Defendant further instructed the Undercover Agent on funneling money to his nominee by pretending to buy an asset from him, and made clear that the pretext was necessary – not to comply with the law – but rather to conceal the offshore trust's true nature from the IRS.  *See* Designation 3, attached hereto (IRS-Kepke-2018-0000727 – 32:5 to IRS-Kepke-2018-0000732 – 37:7, approximate duration: 2:55) ("[I]f the government ever audits you . . . I'm just gonna say 'he didn't give [the nominee] the money.'").

Another key aspect of Defendant's proposal to the Undercover Agent was the use of a nominee trustee.  The United States expects the evidence at trial will establish conclusively that Defendant was well aware that the tax treatment of offshore trusts can depend on control: A trust that is genuinely controlled by an independent trustee may be treated differently than a trust which is under the control of, for instance, a beneficiary.  For this reason, Defendant advised the Undercover Agent to employ an

offshore trustee, but made clear that the trustee would be a nominee, and that the Undercover Agent would retain the ability to control assets held in the trust because the trustee would always follow the Undercover Agent's instructions. *See* Designation 4, attached hereto (IRS-Kepke-2018-0000302 – 38:1 to IRS-Kepke-2018-0000303 – 39:1, approximate duration: 0:54); & Designation 5, attached hereto (IRS-Kepke-0000304 – 40:9 to IRS-Kepke-2018-0000306 – 42:10, approximate duration: 1:36).  During the February 7th meeting, Defendant actually introduced the Undercover Agent to the proposed offshore trustee who he identified as "Emil" (in fact, Belizean attorney Emil Arguelles, whom the government expects to call as a witness at trial), and both Emil and Defendant assured the Undercover Agent that the trustee would not exercise any real control over the offshore trust, *see* Designation 6, attached hereto (IRS-Kepke-2018-0000743 – 48:13 to IRS-Kepke-2018-0000744 – 49:21, approximate duration: 0:44), and that the trust would be managed according to the Undercover Agent's instructions, which would be transmitted to the trustee through Defendant. *See* Designation 7, attached hereto (IRS-Kepke-2018-0000714 – 19:21 to IRS-Kepke-2018-0000716 – 21:18, approximate duration: 2:01); & Designation 8, attached hereto (IRS-Kepke-2018-0000799 – 104:21 to IRS-Kepke-2018-0000800 – 105:17, approximate duration: 0:55).  These admissions are significant because they make clear that Defendant proposed a trust that was designed to appear as if it was under the control of an independent trustee, but which would actually be controlled by the Undercover Agent.  The evidence will establish that Defendant was aware that there is no legitimate reason for installing a nominee trustee, and also that he sought to create the false appearance that his clients' trusts had independent management specifically to confuse the IRS and avoid tax.

Defendant's final conversation with the Undercover Agent occurred on August 17, 2018 – just two days after IRS agents executed a search warrant at Defendant's home office in Houston.  During that conversation, in an effort to avoid getting the Undercover Agent "in trouble," Defendant instructed the Undercover Agent (whom Defendant still believed to be a client) to entirely abandon the tax-avoidance component of his planned offshore trust.  *See* Designation 9, attached hereto (IRS-2018-0000524 – 2:9 to IRS-Kepke-2018-0000526 – 4:4, approximate duration: 1:41).  When the Undercover Agent questioned this sudden change in strategy, Defendant told the Undercover Agent: That he was not confident the subterfuge he had proposed with respect to the creation and funding of the trust was

adequate to hide the fact that the Undercover Agent was actually going to be the true creator and funder, *see* Designation 10, attached hereto (IRS-2018-0000527 – 5:12 to IRS-Kepke-2018-0000530 – 8:5, approximate duration: 2:36) ("[T]he IRS now, when they . . . get . . . a tax benefit trust like yours would be, they start looking back as to . . . how was it created  . . . and are we sure that the person that created, put his own money in it, and not that it was . . . given to him or anything like that and I think . . .  your situation . . . was as strong as we could do at the time, but . . . I just don't feel like it's strong enough now.'"); acknowledged that the structure he proposed to the Undercover Agent would not have created any legitimate tax savings, *see* Designation 11, attached hereto (IRS-2018-0000539 – 17:6 to IRS-Kepke-2018-0000539 – 17:19, approximate duration: 0:28) ("[T]he IRS is gonna come to you … if they do, six years from Now … and they're gonna … say no. … [W]e don't like the way that trust was created, we think it's … your money … you should've been payin' tax on that money from day one … and here you are, and here's a penalty."); and told the Undercover Agent that the IRS was smart enough to figure out the truth behind the planned facade, which would create serious problems.  *See* Designation 12, attached hereto (IRS-2018-0000549 – 27:22 to IRS-Kepke-2018-0000550 – 28:15, approximate duration: 0:34) ("I been doin' this a long time. Every now and then the government, the IRS says, 'you know, there's so damn much money being saved by taxpayers offshore' … Most-most of the time they don't look at the creation, how it was created.… But now their-their folks know … I think they're gettin' smarter, really is one of the problems.").  Defendant's statements during this conversation, especially when considered in light of the fact that it occurred two days after IRS Special Agents raided Defendant's home, are tantamount to admissions that Defendant knew all along that the structure he attempted to sell the Undercover Agent was improper, and immediately sought to abandon the project when he learned he was under IRS scrutiny.

## CONCLUSION

The United States has carefully culled twelve recordings, totaling slightly less than 21 minutes, from the more than twelve hours of recordings produced during the entire course of the undercover operation.  Each of the designated recordings is tightly focused on Defendant's knowledge and intent. When considered collectively and in context, they clearly indicate that Defendant was aware that federal tax law imposes a duty on taxpayers to report income generated by offshore trusts they create, fund, and

control, and also that he knowingly counseled a prospective client to violate that duty by surreptitiously creating, funding, and controlling an offshore trust using nominees specifically in order to conceal assets from the IRS.  As discussed in more detail in the United States' initial motion, Doc. 66, this evidence is direct evidence of Defendant's knowledge and intent with respect to the crimes charged in the Indictment, and also highly probative of multiple Federal Rule of Evidence 404(b) purposes (including Defendant's motive, intent, preparation, plan, knowledge, and absence of mistake or accident), and the evidence's probative value is not substantially outweighed by any risk of undue prejudice.

      For the reasons stated above, the government hereby respectfully moves for the admission of the designated recordings described above, as well as limited live testimony from the Undercover Agent to set the context for those recordings.

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

s/ Michael G. Pitman
COREY J. SMITH
Senior Litigation Counsel
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America