

# In The Supreme Court of Bermuda

## CIVIL JURISDICTION

2020: No. 37

**IN THE MATTER OF A JUDICIAL REVIEW**

**BETWEEN:**

**(1) MEDLANDS (PTC) LIMITED**
(as Trustee of the A. Eugene Brockman Charitable Trust)
**(2) SPANISH STEPS HOLDINGS LIMITED**
**(3) POINT INVESTMENTS LIMITED**

**APPLICANTS**

-and-

**(1) COMMISSIONER OF THE BERMUDA POLICE SERVICE**

**DEFENDANT**

-and-

**EVATT TAMINE**
**ST. JOHN'S TRUST COMPANY (PVT) LIMITED**

**INTERESTED PARTIES**

---

| | |
|---|---|
| **Before:** | Hon. Chief Justice Narinder Hargun |
| **Appearances**: | Mr. Hodge Malek QC, Jeffrey Elkinson and Benjamin Adamson, Conyers Dill & Pearman Limited, for the Applicants |
| | Mr. Aidan Caisey QC and Shakira J. Dill-Francois, Deputy Solicitor General, Attorney-General's Chambers, for the Defendant |
| | Mr. David Brownbill QC, Jerome Lynch QC and Paul Harshaw, Canterbury Law Limited, for Evatt Tamine |

| | |
|---|---|
| **Dates of Hearing:** | **9 – 10 March 2020** |
| **Date of Judgment:** | **26 March 2020** |

1

# JUDGMENT

*Judicial review; whether protocol to preserve privilege should be set aside;
scope of legal professional privilege; right to a copy of the seized material
under section 21 (4) of PACE*

1. These proceedings arise out of a US Department of Justice ("**DOJ**") Mutual Legal Assistance request (the "**DOJ Request**") made on 27 April 2018 under the *Treaty between the Government of the* United *States and the Government of Bermuda relating to Mutual Legal Assistance in Criminal Matters* signed on 22 January, 2009 (the "**Treaty**"). The Treaty and the *Criminal Justice (International Co-operation) (Bermuda) Act 1994* provide for this assistance to be given.

2. The Treaty obliges the Government of Bermuda to provide assistance in response to a valid request and requires the Government of Bermuda to use its best efforts to keep requests and their contents confidential, if such confidentiality is requested, as was the case here, by the Requesting Party (Article 5 (5)).

3. Upon the instructions of the Attorney General's Chambers, the Bermuda Police Service (the "**BPS**" or the "**Defendant**") applied for and obtained search warrants pursuant to section 39 of *the Proceeds of Crime Act 1997* ("**POCA**") and evidence (the "**Materials**") was seized from the residence and storage unit of Evatt Tamine, a barrister. The BPS recognised that the material may contain legal professional privilege ("**LPP**") material and proposed a protocol to remove such material.

4. There was lengthy dialogue between the BPS, the Applicants and the Interested Parties as to the appropriate terms of a protocol. This resulted in lengthy correspondence between the parties. On 5 September 2019, the BPS proposed a third version of the protocol (the "**Protocol**") which was further modified by letter of 10 December 2019. In these proceedings the Applicants seek to challenge the lawfulness of the Protocol. It is now nearing two years since the DOJ Request was received by the Bermuda authorities.

5.  In paragraph 25 of the Originating Motion dated 20 January 2020, the Applicants contend that the Protocol is ultra vires the BPS's statutory powers under the Police and Criminal Evidence Act 2006 ("**PACE**") and/or POCA and/or irrational because the Protocol is plainly inappropriate, defeats the objective of a proper review of LPP material, fails to protect the Applicants' fundamental rights to LPP, and is contrary to the statutory protections in PACE and/or POCA in that:

    1.  It is not a workable Protocol, including for the reason that it does not set out an appropriate process for identifying material that falls outside the scope of the Warrant.

    2.  It permits Mr Tamine to have access to the Applicants' confidential and or LPP material and/or to take and retain copies of the same, which he has no right to read or take copies of.

    3.  The Applicants have legitimate concerns about Mr Tamine's bona fides in participating in the proposed review and/or it is likely that Mr Tamine will subvert the review by delaying the review process and/or wrongly identifying material.

    4.  The Protocol may result in the Applicants' LPP and/or confidential material being provided by Mr Tamine to third parties, contrary to the Applicants' fundamental rights to LPP and rights of confidentiality.

    5.  The involvement of Mr Tamine will likely cause huge and unreasonable delays, since the huge volume of material seized cannot likely be reviewed by one person in any reasonable time-frame.

6.  The Originating Motion also seeks information and documents requested in the Applicants' letters of 13 and 16 January 2020 and 18 February 2020. However, during the hearing of this matter Counsel for the Applicants advised the Court that he no longer pursued this application.

7.  Mr Tamine also seeks to review the decision of the Commissioner of Police not to provide to Mr Tamine a copy of all material seized as a result of the searches carried out by the BPS at Mr Tamine's premises. Mr Tamine contends that this decision by the Defendant is inconsistent with the rights granted to Mr Tamine (and the duties imposed on the Defendant) pursuant to section 21 of PACE. At the commencement of the hearing I gave leave to Mr Tamine to proceed with his application for judicial review.

**Background**

8.  Mr Tamine was (until September 2018) a director of St John's Trust Company (PVT) Limited ("**SJTC**") and of Spanish Steps Holdings Ltd (the Second Applicant or "**Spanish Steps**") and Point Investments Ltd (the Second Applicant or "**Point Investments**"). Spanish Steps and Point Investments are companies held as part of the A. Eugene Brockman Charitable Trust ("**the Brockman Trust**"), of which Mr Brockman is a beneficiary.

9.  Until 19 December 2019, SJTC acted as trustee of the Brockman Trust. SJTC is wholly owned by Cabarita (PTC) Limited, of which Mr Tamine is the sole member and director. On 19 December 2019 the First Applicant ("**Medlands**") was appointed, in confidential proceedings, by Order of Subair Williams J as the trustee of the Brockman Trust. Mr James Gilbert is the sole member of Medlands and was, until shortly before the hearing, its sole director.

10. The DOJ Request states that the United States Attorney for the Northern District of California and the Internal Revenue Service – Criminal Investigation ("**IRS**" or "**US authorities**") are investigating whether Robert Brockman, Evatt Tamine and others, violated United States criminal laws by engaging in a scheme to defraud the United States government and evade the assessment and payment of Federal income taxes. Those involved in the scheme, according to the Request, created a complex overseas financial structure of foreign trusts and corporations in an effort to keep US authorities from discovering the true ownership and control of assets associated with those entities. The Request states that as a result of Mr Tamine's and Mr Brockman's unlawful conduct, the

4

United States government was defrauded of tax revenue on approximately $1.5 billion of taxable income. The extent of Mr Brockman's control over the Brockman Trust is a key issue in the investigations.

11. The Request seeks banking and transactional records from Bermuda to confirm Mr Brockman's ownership and control over the funds on deposit in Bermuda, and his intent to conceal funds upon which taxes should have been paid. In addition, the US authorities seek to corroborate other evidence that indicates that Mr Brockman and Mr Tamine directed deposits of investment income into accounts in Bermuda for Mr Brockman's benefit, and failed to advise the US authorities of this income, as required under US law.

12. In September 2018, Mr Tamine agreed to become a co-operating witness in respect of the DOJ and IRS investigations.

13. As a result of searches carried out by the BPS at Mr Tamine's home at 2 Hidden Lane, Pembroke HM06 and also at Mr Tamine's storage facility at Island Self Storage, 3 Mills Creek Road, Pembroke HM06, in September and October 2018, a number of electronic devices and hardcopy documents were seized by the BPS (the "**Seized Material**"). According to the affidavit of Michael Padula, a US attorney acting for Mr Tamine, the Seized Material comprised the following:

> 1. Various items of computer equipment belonging to Mr Tamine and his family, used by them personally and containing music, videos, photographs and other personal and private files (including the client files of Ms. Sophie Tod, who is a barrister and married to Mr Tamine). These items cover at least 95% of the total data files in question.

> 2. Various items of computer equipment used by Mr Tamine in the course of his employment with Mr Brockman (including matters concerning SJTC and the Brockman Trust structure). All of this equipment, according to Mr Padula, belongs to Mr Tamine. Among these, the key items are those relating to what is referred to as the "encrypted server". This contains the data sought in the

investigations: the encrypted emails passing between Mr Brockman and Mr Tamine which apparently do not concern operational matters in regard to SJTC and the Brockman Trust structure.

14. The affidavit of Detective Superintendent Nicholas Pedro confirms that all of the Seized Material is currently in the possession of the BPS, but has not been reviewed pending the finalisation of the Protocol which has been under discussion between the Deputy Solicitor General, Counsel for Mr Tamine and Counsel for SJTC. The purpose of the Protocol was to provide an avenue in which all of the privileged material could be removed before forwarding the evidence to the US authorities. Additionally, it was decided that since this process was due to take place, any irrelevant material could be removed at this time.

15. The final version of the Protocol is contained in the letters from the Attorney General's Chambers dated 5 September 2019 and 10 December 2019 and it provides:

   1. For the purposes of ensuring that no LPP Material is disclosed to the investigating team, all copied material will be forwarded to an independent professional reviewer, retained by the BPS, to ensure that all LPP Material is removed.

   2. Given Mr Tamine's familiarity with the Seized Material he will, in the presence of the independent reviewer, remove all irrelevant, confidential and LPP Material. This is intended to be a sifting exercise and is not binding upon the reviewer in any way. Irrelevant material is defined as material that is personal to Mr Tamine and his wife Sophie Tod. Confidential material is considered to be any material which is not material associated with SJTC.

   3. The decision of the reviewer in relation to LPP is final and the Protocol does not contemplate the parties making any further submissions to the reviewer or an application to the court in relation to this issue.

**Position of the parties**

16. The Applicants contend that the Protocol is ultra vires the BPS's statutory powers under POCA and/or PACE and/or is Wednesbury irrational, because:

    1. The Protocol interferes with the Applicants' fundamental rights to LPP because it permits Mr Tamine to have access to the Brockman Trust's and/or the Applicants' LPP Material, to review it and/or to take and retain copies of the same, which he has no right to read or take copies of.

    2. The Protocol provides for no process for identifying material falling outside the scope of the two warrants issued by the Court.

    3. There is a risk that Mr Tamine may not participate in the review process in good faith.

    4. The involvement of Mr Tamine will likely cause unreasonably long delays, since it is not likely to be possible for one person to review the huge volume of Seized Material in any reasonable time-frame.

17. The BPS contends that the Protocol complies with the essential requirements of the process designed to ensure that the investigating body does not see any LPP Material. In particular:

    1. Mr Tamine's involvement in the process has to be seen in the context of highly unusual facts in that, over many years, he was the sole or the principal generator and custodian of the Brockman Trust related documents now to be found in the Seized Materials. In particular, so far as there are documents in those materials which attract LPP, it is likely that it would have been him who was relevantly writing to lawyers, and receiving advice and documents from the lawyers (in his capacity as an employee and/or officer of SJTC).

2. What is paramount in search and seizure cases involving the presence, or possible presence, of LPP material is that the police and/or the investigating authority should not have access to such material. In such cases however it is inevitable that someone other than the putative holder of the LPP must look at the material. The Applicants appear to accept the need for an independent reviewer. Mr Tamine's anticipated role in an initial sorting exercise is in the same category.

3. It is no part of the reviewer's function under the Protocol to assess which documents fall properly to be transmitted to the DOJ pursuant to the request. The reviewer's function is to identify and remove LPP Material, and other non-Brockman Trust related material, of Mr Tamine and his wife; and identify and remove personal family material of Mr Tamine.

4. It is no part of the Protocol that Mr Tamine is to take or retain copies of any LPP Material.

5. The alleged lack of good faith on part of Mr Tamine does not give rise to any public law right of complaint and in any event these concerns are groundless as the highly experienced reviewer can be trusted to categorise material correctly.

6. The complaint in relation to undue delay is not understood. If the need arises, the Protocol does not prohibit the engagement of additional counsel to review the Seized Material.

18. Mr Tamine contends that the Applicants are asking the Court in these proceedings to "micromanage" the BPS's decision making with respect to the Protocol. In particular Mr Tamine contends:

1. Medlands has no right whatsoever to be provided with copies of the Seized Material pursuant to section 21 (4) of PACE.

2. The Protocol is entirely workable and, aside from the complaint with regard to privilege issues, Medlands' criticisms relate to the minutiae of the operation of the Protocol which there is no need for the BPS to set out in the Protocol itself.

3. In relation to the issue of privilege, Medlands can assert no privilege against Mr Tamine.

4. There is no risk of LPP Material being provided by Mr Tamine to third parties.

5. Mr Tamine's involvement will not cause "huge and unreasonable delays".

**Discussion**

***The relevant legal test***

19. The Applicants' main contention in these proceedings is that the BPS's decision to propose the Protocol is "*Wednesbury irrational*". This is a reference to the test for irrationality established by the English Court of Appeal in *Associated Provincial Picture Houses v Wednesbury Corp* [1948] 1 KB 223, per Lord Greene MR at 230:

> "*once it is conceded, as it must be conceded in this case, that the particular subject-matter dealt with by this condition was one which it was competent for the authority to consider, there, in my opinion, is an end of the case. Once that is granted, Mr. Gallop is bound to say that the decision of the authority is wrong because it is unreasonable, and in saying that he is really saying that the ultimate arbiter of what is and is not reasonable is the court and not the local authority. It is just there, it seems to me, that the argument breaks down. It is clear that the local authority are entrusted by Parliament with the decision on a matter which the knowledge and experience of that authority can best be trusted to deal with. The subject-matter with which the condition deals is one relevant for its consideration. They have considered it and come to a decision upon it. It is true to say that, if a decision on*

9

*a competent matter is so unreasonable that no reasonable authority could ever have come to it, then the courts can interfere."*

20. The Applicants do not contend that the implementation of a protocol designed to remove privileged and irrelevant material by an independent reviewer is, *per se*, unlawful. Indeed, the Applicants have proposed their own version of the protocol which they say is "*workable*" and seek an order "*directing the BPS to adopt and follow a protocol in the form proposed by the Plaintiffs*".

21. In this jurisdiction Subair Williams J sanctioned the use of the protocol in *A Law Firm and Estate of the Deceased v Commissioner of Police* [2018] Bda LR 27. In that case, the BPS had retained various electronic devices which were originally seized from the residence of the Deceased. Two of the three electronic items which were seized, namely a cell phone and a laptop computer, belonged to the First Applicant, a law firm where the Deceased was employed as a practising attorney immediately prior to his death. The third item seized was another laptop computer which belonged to the Deceased personally. At paragraph 58 of the Judgment, Subair Williams J approved procedural terms for the review of the seized electronic devices by an independent counsel which required, *inter alia*, that "*independent Counsel shall identify and isolate all data and information subject to legal professional privilege as defined by section 10 of PACE.*"

22. It appears that the use of independent counsel is now routine in all the modern search and seizure cases. At paragraph 8 – 210 of *Privilege, Colin Passmore*, Fourth Edition, it is noted that: "*A practice has developed, apparently first devised by the Customs and Excise Commissioners, of applying to the Attorney General for him to nominate a member of the Bar to assist in resolving privilege disputes as they arise in the course of executing a search warrant. Counsel's role in such situations, as described by Smedley J in <u>R v Customs and Excise Commissioners, Ex p. Popely</u> [1999] S.T.C. 1016, includes sifting through the documents seized before a decision is made as to which of them should be retained.*"

23. In the circumstances the challenge by the Applicants is not to the concept of utilising an independent counsel to identify and separate out LPP material, but to the detailed application of the concept to the facts of this case.

**Scope of the Protocol and the Applicants' objections**

24. In considering the proper scope of the protocol, it is relevant to keep in mind the essential purpose of the exercise. In *R v Director of the SFO, ex p. McKenzie* [2016] EWHC 102 (Admin) Burnett LJ emphasised that the essential purpose of the exercise is to ensure that potential LPP material will not be read by members of the investigative team before it has been independently reviewed for LPP:

> *31. It is common ground between the parties that LPP is an important right jealously guarded by the common law. Lord Millett adverts to that proposition in the Bolkiah case and it is supported by a constant line of authority at the highest level. The SFO recognises the fundamental importance of safeguarding the LPP vested in those whose conduct it is investigating and from whom material has been seized or demanded. Both its policy and the 2013 Guidelines reflect that importance. The question remains what criterion should be applied at the sifting stage by an authority lawfully in possession of bulk electronic or hard copy documents which may contain LPP material, given the context in which it came into its possession.*

> *32. The essential aim of the SFO's policy is to ensure that LPP material relevant to an inquiry is not read by anyone involved in the investigation. That aim is uncontroversial, laudable and correct. But it would be imposing too onerous a legal obligation on an investigating authority, in the context of the exercise of statutory powers of seizure and production, to require it to demonstrate that there could be no real risk of that happening. It is inappropriate to equate a public body exercising statutory powers in connection with suspected crime with a solicitor who proposes to act against his former client. The material is lawfully in the possession of that public body acting in the public interest in investigating and prosecuting crime.*

*33. In the absence of a former solicitor and client relationship, but bearing in mind the great importance of legal professional privilege, the law must nevertheless require public authorities to have procedures in place which are intended to prevent investigators reading LPP material and which make it very unlikely that they will do so. The adoption of any test which has been developed in connection with the grant of injunctive relief in private law proceedings, particularly when the test is couched in terms that injunctive relief will issue unless a condition is satisfied, is likely be to inapt. The better approach is to identify the positive duty the law imposes upon a seizing authority to guard against the risk that an investigator will read a document protected by LPP.*

25. The essential purpose of the Protocol is to engage an independent reviewer who is professionally qualified to identify LPP Material, so that it is not seen by the BPS and is not included in the material provided to the DOJ pursuant to the Request. That essential purpose, it seems to me, is achieved by the Protocol. All parties appear to accept that the independent reviewer should be Rebecca Chalkley, a senior member of the English Bar, who is well qualified to undertake the responsibility. Indeed, Ms Chalkley acted as the independent reviewer in 2018 in the Bermuda case of *A Law Firm v The Estate of the Deceased* [2018] SC (Bda) 27 Civ. The Protocol provides that any material identified by Ms Chalkley as LPP Material will not be provided to the BPS and will not be forwarded to the DOJ pursuant to the Request. The Protocol complies with the essential requirements referred to by Burnett LJ in *McKenzie*.

26. The Applicants complain that the Protocol is unworkable because it does not provide for a process for identifying material falling outside the scope of the warrants. However, as *McKenzie* shows, it is no part of the reviewer's function to assess which documents fall properly within the scope of the warrant. The reviewer's function, under the present Protocol, is to identify and remove LPP Material of the Applicants; identify and remove LPP material, and other non-Brockman Trust related material, of Mr Tamine and his wife; and identify and remove personal family material of Mr Tamine. The remaining material will then be reviewed by the BPS in conjunction with the Central Authority, who will decide which documents and pieces of evidence fall within the scope of the Request, and

12

will forward the same to the DOJ. Accordingly, it seems to me, that this ground of challenge is not well founded.

27. The Applicants also complain that the Protocol does not provide any role for the Court in the process and in particular the Applicants contend that the issue of LPP can only finally be determined by the Court. Indeed, in the draft protocol proposed by the Applicants, it is provided that the reviewer's Report will be sent directly to the Court and the Court will consider whether the parties should see any part of the Report and whether to invite any further submissions. It further provides that if the Report categorises any material as coming within the fraud exception, the relevant party which would have been the holder of the LPP but for the fraud exception will have an opportunity to respond and have the issue determined by the Court. This will require the relevant party to see the material and the independent reviewer's reasons as to why the exception applies so that they can make effective submissions.

28. The judgment of Burnett LJ in *McKenzie* shows the obligation on the BPS is to devise and operate a system which can reasonably be expected to ensure that potential LPP material will not be read by members of the investigative team before it has been independently reviewed for LPP. Such a system does not require that the reviewer's decision in relation to LPP be subject to further reviews and/or appeals to the reviewer or the Court. Indeed, the Court should have no direct role to play in such a review carried out by an independent reviewer. A protocol, which provides for further reviews by the reviewer and appeals to the Court, is bound to cause undue delays and should be avoided.

29. There is no suggestion in *McKenzie* that the issue of LPP can only finally be determined by the Court. The Applicants rely on *R. (On the application of Van der Pijl) v Secretary of State for the Home Department* [2014] EWHC 281 (Admin) and *Akhmedova v Akhmedov* [2019] EWHC 3140 (Fam), but these two cases are not in point. These cases were not dealing with a standard review by an independent reviewer to identify and separate out LPP material. These were cases where the Court, for different reasons, necessarily had to decide whether the material in question was privileged. Thus, in *Van der Pijl*, having held that the warrant was unlawful, the Court had to decide whether the material could still be

13

used and in that context had to determine whether it was subject to LPP. These two cases do not support the proposition that in a standard review by an independent reviewer, as is envisaged in this case, the Court is bound to have a direct role to play in determining whether any material is subject to LPP.

30. In the circumstances all Reports of the reviewer should be sent directly to the BPS and the BPS should be able to act upon the findings of the review in relation to LPP.

31. The Applicants also complain about the role of Mr Tamine in the review process. As noted above this case presents unusual facts. Mr Tamine is not a complete stranger to the materials which have been seized by the BPS. It appears that over many years Mr Tamine was the sole or principal generator and custodian of the Trust related document which were kept at his residence together with substantial quantities of files and documents which were purely personal to him and his family.

32. Having regard to this background, it is reasonable that Mr Tamine should provide assistance to the reviewer in the initial sifting of the material. As explained by Counsel for the Defendant it is not anticipated that Mr Tamine will be reviewing individual documents but will be assisting in categorising the material into broad categories.

33. In the circumstances I am satisfied that the implementation of the Protocol will not result in a breach of the Applicants' LPP. In order to allay the Applicants' concerns I would recommend that, in the first instance, Mr Tamine should consider whether such assistance can be provided in writing and it should be left to the reviewer to decide whether a meeting with Mr Tamine is useful and desirable. In the event such a meeting takes place it would be appropriate for a lawyer, from the Applicants' London solicitors, to be present at that meeting.

34. The Applicants object to the Protocol on the additional ground that there is a risk that Mr Tamine does not participate in the review in good faith. I accept the Defendant's submission that these concerns do not give rise to any public law right or complaint. In any event, in the context of the proposed review, they are groundless as it is acknowledged by

14

all parties that Rebecca Chalkley, the reviewer, can be trusted to categorise material correctly. Accordingly, I consider that this ground is without any substance.

35. Finally, the Applicants believe that the involvement of Mr Tamine will likely cause unreasonably long delays. In argument, Counsel for the Applicants emphasised that the Defendant should be looking at engaging more junior barristers to provide the necessary capacity to conduct the review in a reasonable period of time. However, there is nothing in the Protocol which prevents either the Defendant or the reviewer from acquiring this additional capacity. Indeed, Counsel for the Defendant made it clear that the Defendant has an open mind in relation to this issue. Again, I conclude that this ground is without any substance.

36. In all the circumstances I have come to the view that the proposed Protocol provides a workable solution to identify and separate out the Applicants' LPP. Its operation does not breach the Applicants' LPP. I do not consider that the Protocol is irrational in the sense that no reasonable public body could ever agree to it and accordingly there is no proper basis for the Court to interfere with the Defendant's decision to implement it.

***Issue of Privilege***

37. The issue whether privilege asserted by the Applicants against Mr Tamine is relevant in two ways. First, if privilege can be asserted against him, the Applicants argue that to allow Mr Tamine to review the Seized Material interferes with the Applicants' fundamental rights to LPP (an issue dealt with at paragraphs 31 to 33 above). Second, it affects the scope of Mr Tamine's right to obtain a copy of the material under section 21 (4) of PACE.

38. Mr Tamine's involvement with Mr Brockman and the Brockman Trust dates back to 2004. It appears that, as noted above, he was the principal generator and/or custodian of the Brockman Trust related documents now to be found in the Seized Materials. In relation to those documents in the Seized Materials which attract LPP, it is likely that it would have been Mr Tamine who was relevantly writing to lawyers, and receiving advice and document from the lawyers (in his capacity as an employee and/or officer of SJTC). The

Applicants point out, however, that the Brockman Trust has been in existence for approximately 30 years and Mr Tamine only came into the picture in 2004 and therefore there is the potential of existence of LPP Material in respect of which Mr Tamine had no involvement.

39. Counsel for Mr Tamine argues that LPP is not an issue to be burdened upon the BPS, and the BPS must not be made arbiters of third-party rights. LPP, it is said, is a private, civil law claim which, if it has any substance at all, can and should be pursued only in civil proceedings against Mr Tamine.

40. Section 21 of PACE provides:

> *"Access and copying*
>
> *21 (1) A police officer who seizes anything in the exercise of a power conferred by any enactment, including an enactment contained in an Act passed after this Act shall, if so requested by a person showing himself—*
>> *(a) to be the occupier of premises on which it was seized; or*
>> *(b) to have had custody or control of it immediately before the seizure, provide that person with a record of what he seized.*
>
> *(4)   Subject to subsection (8), if a request for a photograph or copy of any such thing is made to the officer in charge of the investigation by a person who had custody or control of the thing immediately before it was so seized, or by someone acting on behalf of such a person, the officer shall—*
>> *(a) allow the person who made the request access to it under the supervision of a police officer for the purpose of photographing or copying it; or*
>> *(b) photograph or copy it, or cause it to be photographed or copied*
>
> *(8) There is no duty under this section to grant access to, or to supply a photograph or copy of, anything if the officer in charge of the investigation for the purposes of*

which it was seized has reasonable grounds for believing that to do so would
prejudice—

> (a) that investigation; the investigation of an offence other than the offence
> for the purposes of investigating which the thing was seized; or
> (b) any criminal proceedings which may be brought as a result of—
>> (i) the investigation of which he is in charge; or
>> (ii) any such investigation as is mentioned in paragraph (b)."

41. Counsel argues that the terms of section 21 (4) appear to be mandatory and are not qualified
by reference to the existence of LPP in respect of the Seized Material. The only requirement
that the BPS has to be satisfied with is whether the applicant is *"a person who had custody
or control of the thing immediately before it was so seized"*.

42. I was initially attracted to this submission. However, it seems to me that PACE is very
much concerned with the preservation of LPP. Section 8(1)(d) provides that on an
application made by a police officer, a magistrate should only issue a warrant authorising
a police officer to enter and search the premises if the magistrate is satisfied, *inter alia*, that
the material on the premises does not consist of or include items subject to legal privilege.
It is likely that the reason why section 21 (4) makes no reference to LPP is because the
draftsman has assumed that the warrant issued by the magistrate could not apply to LPP
material and therefore no LPP material has been seized by the Police.

43. In *R v Derby Magistrates' Court, ex p B* [1996] A.C. 487, Lord Taylor said: *"Legal
professional privilege is thus much more than an ordinary rule of evidence, limited in its
application to the facts of a particular case. It is a fundamental condition on which the
administration of justice as a whole rests."* I accept the submission made by the
Applicants' counsel that LPP is not capable of being abrogated by statute unless by express
words or necessary implication (See: paragraph 11.09 of *Matthews and Malek on
Disclosure* (5th edition) where the cases of *R v IRC ex p. Morgan Grenfell* [2003] A.C. 563
and *Shlosberg v Avonwick Holdings Ltd* [2016] EWHC 1001 (Ch), [65]-[67] are cited). In
my judgement the consideration of PACE as a whole and the particular provisions
contained in section 21 do not seek to abrogate LPP by necessary implication.

17

44. Second, Counsel for Mr Tamine relies upon the facts that Mr Tamine was previously a director of SJTC, Spanish Steps, and Point Investments and in so far as there are any materials included in the Seized Materials over which those entities can properly assert privilege, Mr Tamine will have previously seen all such documents when he was a director of those entities and would, most likely, have been the very person involved in generating much of this material. In such circumstances, it is argued, that SJTC, Spanish Steps, and Point Investments cannot assert privilege as against Mr Tamine even though he is no longer a director of those companies and reliance is placed upon *Derby v Weldon (No. 10)* [1991] 1 WLR 660.

45. The common law position in relation to the issue of LPP is summarised in paragraph 5-05 of Matthews and Malek on Disclosure (5th edition):

> " *Slade J set out the principles for granting a director access to company records set out in* <u>Conway v</u> <u>Petronius Clothing</u> *[1977] 1 WLR 72 at 89-91: (i) the right of the director to inspect the accounting records of the company is a right conferred by the general law rather than by the provisions of the Companies Acts; (ii) the right is conferred by the general law in order to enable the director to carry out his duties as such; (iii) accordingly the right determines when the director ceases to hold office; (iv) under the general law the court is left with the residue of discretion whether or not to order inspection; (v) in particular, special considerations are likely to apply to the exercise of that discretion in a case where the director who seeks to assert the right is about to be removed from office."*

46. The common law position was also considered by the Supreme Court of South Australia in *State of South Australia v Barrett* [1995] 13 ACLC 1369, and the court confirmed that a director's ability to access corporate documents at common law continued only as long as the director continued in office. That access was only for limited due diligence purposes, and not for any private or personal reasons. Directors' due diligence powers ceased when they left office.

47. The Supreme Court also held that the directors' common law ability to access corporate documents did not negate the existence of the company's legal professional privilege qua the directors; it only qualified it to the extent of a bone fide exercise of their powers so far as it was necessary to enable them to discharge their legal obligations. Mullighan J stated at 1,377:

> "Assuming that the privilege did not apply against them when they were directors of the Bank, it does not follow that it could never apply against them. In my view once they ceased to be directors and no longer had the right of inspection, they were placed in the same position as any other person outside the Bank and the privilege applied against them. There is no reason in principle or logic to conclude that the situation which existed when the documents came into existence must remain forever. The appropriate time to consider whether the privilege extends to relevant persons is when it is claimed."

48. On the basis of the above authorities, Counsel for the Applicants argues that after Mr Tamine ceased to be a director of the relevant companies, he was placed in the same position as any other person outside the relevant company and the Applicants could enforce their LPP against Mr Tamine in the ordinary way.

49. Counsel for Mr Tamine relies upon *Derby v Weldon (No.10)* [1991] 1 WLR 660 in support of the proposition that if a director has seen the privileged document in his capacity as a director then LPP cannot be asserted against him, even after he has ceased to be a director. In that case a senior in-house counsel prepared three memoranda which contained advice as to the steps that needed to be taken by the company to comply with the relevant regulatory body in the United States, the Commodities, Futures and Tradings Commission ("C.F.T.C."). The documents were plainly privileged and the issue was whether that privilege could be asserted against a director who had seen and considered that the documents in his capacity as a director. In relation to that argument Vinelott J said at page 670 F-H:

*"Mr Purle submitted that privilege is not lost merely because a document is communicated by a company to an officer or employee. That is no doubt true where the question arises in litigation between the company and a third party. But it does not follow that the company can rely on the privilege attaching to, for instance, instructions and advice passing between the company and its solicitors, copies of which have been supplied to the director, if there is subsequently litigation between the company and the director and the advice or instructions are material to an issue raised in the litigation, for instance, if the question is whether the director acted in accordance with the directions of the company. The three documents in this category, as I see it, are material to the question whether Mr Weldon acted within guidelines laid down in negotiations with the C.F.T.C."*

50. It is to be noted that the formulation of the exception in *Derby v Weldon (No. 10)* does not replace the common law rule articulated in *Conway v Petronius Clothing*. The exception only operates when there is litigation between the company and the former director and the documents in question, which the director has previously seen, are *"material to the issue raised in the litigation"*.

51. In *Law of Privilege, Bankim Thanki QC, 3rd edition, Derby v Weldon (No. 10)* is analysed as an example of waiver of privilege. At paragraph 5.10 the general statement is made that *"The position between parties to litigation is more often analysed in terms of waiver of privilege than loss of confidentiality"* and at the end of that paragraph *Derby v Weldon (No. 10)* is cited as an example. That case is also cited as an example of waiver of privilege at paragraph 16.38 in *Matthew and Malek on Disclosure (5th edition)*.

52. On the basis of *Derby v Weldon (No. 10)* Mr Tamine would be able to take the position that privilege has been waived in relation to documents which he has seen whilst he was a director of the Applicant Companies and which are relevant to the issues in the pending proceedings between him and the Applicant Companies. However, it does not follow, in my judgment, that the entirety of the LPP material is the subject of waiver by the Applicant Companies. In this regard it has to be borne in mind that the Brockman Trust has been in existence for approximately 30 years and Mr Tamine has only been employed by Mr

20

Brockman since 2004. In the circumstances there must be a real possibility that there are privileged documents which are not subject to any waiver by the Applicants.

53. Third, Counsel for Mr Tamine argues that SJTC cannot assert privilege as against its member, Cabarita (PTC) Limited, of which Mr Tamine is the sole director and shareholder. The legal position relating to whether a company can assert privilege against a shareholder is summarised by Blackburne J in *Arrow Trading and Investment Est 1920 v Edwardian Group Ltd* [2005] 1 BCLC 696 at [24]:

> 24. The company, through Mr Collings, opposes the application and does so on two grounds: first relevance and second privilege. I can dispose immediately of the privilege point. It is well established by authority that a shareholder in the company is entitled to disclosure of all documents obtained by the company in the course of the company's administration, including advice by solicitors to the company about its affairs, but not where the advice relates to hostile proceedings between the company and its shareholders: see <u>Re Hydrosan Ltd</u> *[1991] BCLC 418 and <u>CAS (Nominees) Ltd & others v. Nottingham Forest Plc & others</u> [2001] 1 All ER 954*. The essential distinction is between advice to the company in connection with the administration of its affairs on behalf of all of its shareholders, and advice to the company in defence of an action, actual, threatened or in contemplation, by a shareholder against the company.

54. In paragraph 5-02 of *Matthews and Malek on Disclosure* (5th edition), the authors accept that this general rule is well established under English law although its basis is *"distinctly dubious"*. They say that the principle was established in the 19th century before cases such as *Salomon v Salomon* [1897] A.C. 22 drew a clear distinction between a company and its shareholders and held that the shareholders have no interest in the property of the company. Once the separation between the company and the shareholders had been established, the law should have changed but it did not. They point out that the Canadian courts have taken a different view and Australian authority, whilst not clear-cut, also suggests a contrary view.

55. Here, Mr Tamine is not a shareholder in SJTC or the Applicants. SJTC is wholly owned by Cabarita (PTC) Limited ("**Cabarita**") and Mr Tamine is the sole shareholder in Cabarita.

56. There is no authority which suggests that the rule should be extended to a shareholder of a shareholder in the company. The rule is partly based on the premise that shareholders are entitled to see the privileged documents in their capacity as shareholders (see the judgement of Simonds J in *W. Dennis and Sons, Limited v West Norfolk Farmers' Manure and* Chemical *Co-Operative Company, Limited* [1943] 1 Ch 220 at page 223). No such entitlement exists in a person in the position of Mr Tamine who is not a shareholder in the relevant company.

57. In the circumstances I conclude that the rule that a company cannot assert privilege as against a shareholder does not apply to Mr Tamine as he is not a shareholder in the relevant company. The rule does not, in my judgment, extend to a shareholder of a shareholder. The same analysis applies to the suggestion that the privilege does not exist because Mr Tamine is the sole director of Cabarita.

58. In conclusion, whilst *Derby v Weldon (No.10)* exception may apply to certain documents, it cannot be concluded with any degree of certainty that it applies to the entirety of the LPP material. Accordingly, there remains a real possibility that the Applicants may be able to assert privilege as against Mr Tamine in respect of some of the LPP material.

**Entitlement to a copy of the Seized Material pursuant to section 21 (4) of PACE**

*Claim to a copy of the Seized Material by Mr Tamine*

59. Counsel for Mr Tamine contends that Mr Tamine had custody or control of all of the Seized Materials immediately before they were seized within the meaning of section 21 (4) of PACE (set out at paragraph 40 above).

60. Counsel contends that leaving aside the issue of privilege, the only circumstance in which the provision of such copies could properly be refused is if the BPS had reasonable grounds for believing that to do so would prejudice a relevant investigation or criminal proceedings pursuant to section 21 (8) of PACE. It has not been suggested by the BPS in the present case that there is any basis for suggesting that any consideration under section 21 (8) of PACE could apply. Counsel for Mr Tamine submits that the BPS's decision not to provide copies to Mr Tamine was unlawful and/or irrational and it should be quashed.

61. In *B v B (Matrimonial Proceedings: Discovery)* [1978] Fam. 181, Dunn J considered the meaning of "custody" and "power" in the context of RSC Order 24 and stated at page 186:

> *""Custody" means" the actual, physical or corporeal holding of the document regardless of the right to its possession," for example, a holding of the document by party as servant or agent of the true owner. "Power" means "an enforceable right to inspect the document or to obtain possession or control of the document from the person who ordinarily has it in fact."*

62. Commenting on the above passage from the judgment of Dunn J in *B v B*, the authors of *Matthews and Malek on Disclosure (5th edition)* state at 5.63 that: *"Thus a company director who had the company's documents in his physical custody was obliged to give discovery of them if relevant, although such custody was only in his capacity as an officer of the company".*

63. It is common ground between the parties that as a result of the searches carried out by the BPS at Mr Tamine's home and at his personal storage facility in September and October 2018, a number of electronic devices and hardcopy documents were seized by the BPS. In the circumstances it must follow that immediately before the seizure of the Seized Materials, Mr Tamine had custody or control of all those materials. In principle, subject to the issue of LPP, Mr Tamine is entitled to a copy of the Seized Materials.

64. Counsel for the Applicants relies upon a passage at paragraph 15–148 in *Archbold: Criminal Pleading, Evidence and Practice*, 2020, stating that " *where company documents*

23

*are seized the person who may ask the police for access to them or for copies of them under s.21(3) and (4) as having had "custody or control" of the documents immediately before their seizure is the company itself, the directors or former directors of the company do not possess the right in their capacity as such: see Re D.P.R. Futures Ltd [1989] 1 W.L.R. 778, Ch D."*

65. Having regard to this passage in *Archbold* and the reliance placed on it by Counsel for the Applicants, it is necessary to consider closely the facts and reasoning in *D.P.R. Futures*. In that case the Securities and Investment Board (the "SIB") issued a notice of prohibition against the company on 11 July 1988. On the same date the SIB authorised an investigation into the company's affairs. On 15 July 1988 a winding up petition was presented to the court by the SIB and on the same day the official receiver was appointed provisional liquidator of the company. On 12 October 1988 a compulsory winding up order was made and on the same date many of the books and records of the company were removed from the company's premises by the Serious Fraud Office.

66. In the circumstances, it is to be noted that by the time the seizure of the company's documents took place on 12 October 1988 the directors of the company had already lost their powers on 15 July 1988 when the official receiver was appointed provisional liquidator. Accordingly, at the time of the seizure of the company's documents, they were not in the custody or control of the directors. Second, the documents were taken not from the premises of the directors but taken from the company's business premises. Third, this case did not involve an application under section 21 (4) of PACE or an application by the directors in their capacity as directors. This was in fact an application in their capacity as contributories of the company in the winding up process under section 155 of the Insolvency Act 1986. Under this section the court has a discretion whether to provide disclosure or not. The application under section 155 was refused on the grounds that contributories were not seeking documents for the purposes of the winding up but to defend their position against the SFO and further because the documents were plainly not in the possession of the company at the time of the application.

67. In my judgment this case is of no assistance in relation to an application for a copy of the documents under section 21 (4) of PACE and the facts of this case where documents are plainly in the custody of a director and are taken from the director's residence.

68. In the circumstances, I order that Mr Tamine be provided with a copy of the entire Seized Materials within a reasonable period of time other than documents and information in respect of which the Applicants are able to claim LPP. In this regard I record the undertaking given on behalf of Mr Tamine that all the material delivered to him will be preserved and a copy will be kept by his London solicitors, Mishcon de Reya.

### *Claim to a copy of the Seized Material by Medlands*

69. In the Originating Motion, the Applicants seek a direction that the Brockman Trust documents be provided to Medlands and/or the previous trustee pursuant to section 21 (4) of PACE with any disputes about ownership dealt with pursuant to Court directions. At paragraph 15 of the grounds set out in the Originating Motion, Medlands asserts that *"the BPS agreed to provide copies of the Materials to the Trust and/or Mr Tamine pursuant to the right of owners under section 21 (4) PACE to be provided with copies"*.

70. In fact, as Counsel for Mr Tamine correctly submitted, there is no right of owners to be provided with copies of the Seized Materials under section 21 (4) of PACE. The entitlement to a copy of the Seized Material under section 21 (4) is confined to *"a person who had custody or control of the thing immediately before it was seized"*. Ownership of the Seized Material does not qualify a person to obtain a copy of the seized material under section 21 (4). What has to be proved is that the applicant had *"custody or control"* of the Seized Materials immediately before they were seized.

71. I accept the submission that in this case, Medlands cannot have had custody or control of the Seized Materials immediately before they were seized because Medlands was only incorporated in July 2019 and therefore it did not exist at the time when the Seized Materials were seized in September and October 2018.

72. Counsel for the Applicants argued that the entitlement to receive a copy of the Seized Material under section 21 (4) was a chose in action which was capable of transmission as with any other right. Counsel argued that any right to obtain a copy of the Seized Materials which belonged to SJTC had been transmitted to Medlands when Medlands was appointed as successor trustee on 19 December 2019. I am unable to accept this submission. It seems to me that the right of a person to make a request for a copy of the Seized Materials under section 21 (4), is a public law right rather than a private law property right which is capable of being transmitted or assigned to a third party. The Court of Appeal decision in *Allen v Chief Cheshire Constable* of [1988] Lexis Citation 2350 makes clear that a claim to enforce rights under section 21 (4) *"is an application to enforce a public law right, whether or not it gives rise to a private right as well"*.

73. In the circumstances, I conclude that Medlands has no enforceable rights for a copy of the Seized Materials under section 21 (4) for the reason that Medlands did not have *"custody or control"* of the Seized Materials immediately before they were seized. Any rights possessed by SJTC to obtain a copy under section 21 (4) were public rights and not capable of transmission to Medlands on its appointment as the successor trustee on 19 December 2019.

### *Claim to a copy of the Seized Material by SJTC*

74. There is no formal application by SJTC for an order that it be provided with a copy of the Seized Materials. Whilst added as an Interested Party, SJTC was not represented at the hearing and did not make any written submissions.

75. It should be noted that the Protocol contemplates that a copy of certain documents would be provided to SJTC. The letter from the Attorney General's Chambers dated 5 September 2019 provides that *"once the irrelevant, confidential and LPP material has been removed, the remaining documents will be forwarded to SJTC."* Irrelevant material is defined as *"material that is personal to Evatt Tamine and his wife Sophie Tod. This material will be divided into 2 batches; (a) family items such as photos and movies; and (b) Evatt Tamine's financial information such as banking and investment data."* Confidential material is

defined as *"any material which Evatt Tamine knows, considers or ought upon reasonable enquiry or examination, believes is not material associated with SJTC"*.

76. Counsel for the Applicants points out that this part of the Protocol has not been challenged by any party and accordingly, stands to be implemented by the BPS. It is of course open to the BPS to comply with the representations made on its behalf in the letter from the Attorney General's Chambers dated 5 September 2019. Barring a change in circumstances, SJTC would have an expectation that the BPS would comply with the representations made in the final paragraph of the letter from the Attorney General's Chambers dated 5 September 2019 and in the ordinary course the BPS would be expected to honour such expectations.

77. It is possible that if an application was made by SJTC for a copy of the Seized Materials, it could establish that it had *"control"* over the documents or information belonging to the Brockman Trust on the basis that it had an immediate right of access to the documents and the information in question. It may also be able to establish *"control"* as a consequence of its alleged ownership of the servers, a factual issue which is in dispute. However, as the issue has not been argued by SJTC, the Court is not in a position to finally determine this issue.

**Conclusion**

78. In the circumstances I reject the Applicants' application that the Defendant's decision to implement the Protocol be quashed. I see no reason why the Protocol should not be implemented.

79. Going forward any representations made by any party to the reviewer should be made on an open basis and the correspondence should be copied to the other parties (other than correspondence in relation to the application of the fraud exception). This applies to any and all representations already made by the parties to the reviewer.

80. All the Reports of the reviewer should only be sent to the BPS and the BPS is entitled to rely upon those Reports in relation to the determinations made concerning the existence of LPP. This also applies to work already carried out by the reviewer and any Reports prepared or to be prepared in relation to that work. I direct the reviewer to provide the existing Report to the BPS without any further delay.

81. If the reviewer considers that the volume of the material to be reviewed justifies the engagement of additional junior barristers, the reviewer should make such a request to the BPS. Given that it is nearly two years since the DOJ Request was received by the Bermuda authorities the Court directs that any remaining steps required to comply with the Request be taken expeditiously.

82. I will hear the parties in relation to the issue of costs, if required.

Dated this 26 March 2020

NARINDER K HARGUN

CHIEF JUSTICE